RECEIVED
U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

RECEIVED
U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

2005 JUN 15  PM 3: 21

NANCY M.
MAYER-WHITTINGTON
CLERK

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA
333 Constitution Avenue, NW
Washington, DC 20001, Telephone: (202) 354-3050

**UTHAIWAN WONG-OPASI, Ph.D.**, Plaintiff, pro se ) Civil Action No. **1:05cv1083 PLF**
7033 Somerset Farms Drive, Nashville, TN 37221, U.S.A. )
Telephone: (615) 349-6825 )
v. )
**JAMES A. HEFNER, Ph.D.**, Defendant, sued )
individually and as TSU President at all relevant times )
708 Postal Ct., Brentwood, TN 37027-7647, U.S.A. ) Judge **Paul L. Friedman**
**AUGUSTUS BANKHEAD, Ed.D.**, Defendant, sued )
individually and as TSU VPAA at all relevant times )
177 Lelawood Cir., Nashville, TN 37209-4524, U.S.A. )
**JO HELEN, RAILSBACK, Ph.D.**, Defendant, sued )
individually and as Acting Dept. Head in '96-97 & )
Chair of Tenure and Promotion Committee in '97-98 )
408 Bowling Ave. Nashville, TN 37205-2522, U.S.A. ) **Jury Demand**
**GLORIA C. JOHNSON, Ph.D.**, Defendant, sued )
individually and as LLP Dept. Head at all relevant times )
1495 Bell Rd., Nashville, TN 37211-6636, U.S.A. )
**MARY D. MBOSOWO**, Defendant, sued )
individually and as French Coordinator at relevant times )
2616 Redvine Rd., Edmond, OK 73034, U.S.A. )
**MARCIA G. ELLISON**, Defendant, sued )
individually and as Spanish Instructor at relevant time )
1101 Downs Blvd.,Apt.E107, Franklin, TN 37064, U.S.A. )
**JOSEPH H. UDELSON, Ph.D.**, Defendant, sued )
individually & as '97-'98 A&S T&P Comm. Member )
72B Old Lyme Drive#2, Buffalo, NY 14221-2255, U.S.A. )

## AN <u>AMENDED</u> COMPLAINT FOR DECLARATORY JUDGMENT,

## RESTITUTION, AND TREBLE DAMAGES

Per provisions of Rule 15 of the Federal Rules of Civil Procedure which allow a

plaintiff to amend his or her complaint, <u>as of right</u>, <u>without</u> leave of Court for as long as no

answer to the original complaint has been filed by a defendant, the plaintiff, hereby,

respectfully files this Amended Complaint. The contents in this amended complaint incorporate,

amend, complete, and replace the contents of the original complaint, except for the filing date of

the original complaint which remains May 31, 2005.

The plaintiff alleges:

## I.    **PLAINTIFF**

1.    The plaintiff is a lawful permanent resident of the United States of America.

2.    She was employed as a "tenure-track" faculty member by Tennessee State

University (hereinafter, TSU) in Nashville, TN from the academic year of 1992 to 1999.

3.    Her employment contract with TSU was initially signed by Defendants Hefner

and Johnson who were TSU hiring agents (in spite of Johnson's intentional signature omission)

and said contract was governed by the Tenure and Promotion Policies of the Tennessee Board of

Regents (hereinafter, TBR).

4.    Thus, the TBR and TSU policies on Tenure, Tenure Appeals, Promotion, and

Promotion Appeals were "**contracts by extension**" or "**inseparable / indivisible contracts**" as

they formed integral and inseparable parts of TSU faculty's employment contracts for the

contracts' performance, change, termination, renewal, or extension, etc.

5.    All of the named defendants knew the existence of the plaintiff's said

employment contract with TSU as well as said TBR and TSU policies.

6.    Defendants Bankhead, Railsback, Johnson, and Udelson, in particular, had been

employed by TSU for over two decades and thus, at all relevant times, were very familiar with

faculty employment contracts and TBR and TSU policies.

7.    However, the named defendants in this legal action conspired to intentionally

induce or procure the breach of said contract by blatant, malicious misrepresentation in order to

deny her tenure and promotion in the academic years of 1996-97 and 1997-98.

8.     As a direct and proximate result, the plaintiff suffered not only a tremendous loss of employment due to contract non-renewal but also a loss of her good name and employment opportunities with other employers:--academic and non-academic alike due to defendants' knowing, intentional, and malicious misrepresentation of her character and professionalism.

## II.     DEFENDANTS

9.     Defendant Hefner is sued herein individually and as President of Tennessee State University (with its principal place of business located at 3500 John A. Merritt Blvd., Nashville, TN 37209) at all relevant times, for conspiring with all other named defendants herein to maliciously procure breach of plaintiff's employment contract, resulting in a non-renewal of her employment contract after its ending in May 1999.

10.     Defendant Bankhead is sued individually and as TSU Vice President for Academic Affairs who knowingly and intentionally made false misrepresentations on tenure and promotion policies as well as on plaintiff's tenure and promotion profiles during plaintiff's two tenure and promotion applications in two academic years, i.e. 1996-97 and 1997-98.

11.     Defendant Bankhead also knowingly, intentionally, and maliciously failed to act properly upon plaintiff's appeals of his negative tenure and promotion recommendations in 1997-98.

12.     Defendant Railsback is sued individually and in her "claimed" "official" capacity as the "Acting Head" of the Dept. of Languages, Literature, and Philosophy or as Defendant Johnson's agent solely for the purpose of acting maliciously on the plaintiff's tenure and promotion application in 1996-97 and for coercing the plaintiff to change the rank she applied for in 1997-98.

13.    Defendant Johnson is sued in her individual and official capacities as the "Head" of the Dept. of Languages, Literature, and Philosophy for her intentional and malicious absence from duty in the tenure and promotion application process in the academic year of 1996-97 and for conspiring with all of the named defendants in the denials of the plaintiff's tenure and promotion applications in 1997-98.

14.    Defendant Mbosowo is sued in dual capacities as she intentionally and maliciously conspired with Defendants Ellison, Johnson, and more to misrepresent herself as plaintiff's immediate supervisor in February 1997.

15.    Defendant Mbosowo's sole purpose was to unlawfully instigate an investigation on Defendant Ellison's complaint against the plaintiff in order to create a knowingly false and malicious misrepresentation of the plaintiff's character and professionalism in the plaintiff's employment records at TSU and in the Office of Special Counsel and U.S. Equal Employment Opportunity Commission records of plaintiff's complaints of employment discrimination against Defendants Hefner, Bankhead, Johnson, Lovett, and TSU.

16.    Defendant Ellison is sued individually and in her official capacity as a Spanish instructor under the plaintiff's supervision who knowingly, intentionally, and maliciously brought a false complaint against the plaintiff in February 1997.

17.    Defendant Udelson is sued individually and for his official role in writing a false, damaging report or evaluation of the plaintiff's tenure and promotion application in 1997-98, based solely upon false allegations of plaintiff's "lack of collegiality."

18.    Services of process upon Tennessee public officers are upon the State Attorney General pursuant to Rule 4 of the Tennessee Rules of Civil Procedure at 425 Fifth Avenue North, Cordell Hull Bldg., 2nd Floor, Nashville, TN 37243.

19.    However, the State Attorney General is prohibited by state law to represent public officers whose malfeasance, misfeasance, and/or nonfeasance is done for personal gain in the Court of Law.

### III.    JURISDICTION

20.    Jurisdiction of this Court is based upon the diversity of citizenship of the parties in this legal action. **28 U.S.C. 1332.**

### IV.    VENUE

21.    Venue in this Court is proper given that the defendants' procurement of contract breach occurred in both the states of Tennessee and District of Columbia as a result of two investigations of employment discrimination by federal agencies in the Washington, DC area.

### V.    CAUSE OF ACTION

22.    This lawsuit is brought for a declaratory judgment, restitution, and treble damages caused by defendants' **"Procurement of Breach of Contracts"** pursuant to **Tenn. Code Ann. 47-50-109.**

### VI.    ELEMENTS OF CAUSE OF ACTION

23.    The plaintiff avers that based on the facts which are more fully set out in Section VII below and in the Exhibits attached to this Complaint, the named defendants in this lawsuit, acting separately and in unison, falsely procured or induced breach of the plaintiff's employment contract with TSU.

24.    This legal action warrants the Court's declaration that unlawful procurement of breach of contract did occur based on the factual allegations herein and evidence in the Exhibits which show:

(1)    that there existed a legal contract between the parties, i.e. the plaintiff's employment contract with TSU;

(2)    that the defendants knew or should have known the existence of said contract;

(3)    that the defendants intended to induce its breach;

(4)    that the defendants acted maliciously;

(5)    that the contract was breached;

(6)    that the act complained of was the proximate cause of the breach of the contract; and

(7)    that damages resulted from the breach.

## VII.    FACTS

### a.    The Contract

25.    In the academic year of 1992-93, the plaintiff was hired on a seven-year tenure track faculty employment contract, shown in Exhibit 1, and incorporated herein by reference.

26.    The termination or renewal of said employment contract is governed by TBR policy and TSU policy on tenure, as stated in Clause 6 of the Employment Contract. To wit:

"This appointment is a **tenure-track appointment**, which is for faculty employed in a probationary period of employment. **A tenure-track appointment does not include any right to permanent or continuous employment or any interest in or expectancy of renewal of the appointment.** This appointment is on an annual basis only, **subject to renewal by this institution, and annual approval by the Tennessee Board of Regents**, for a maximum probationary period of **seven years**. The minimum requirements and conditions for the award of tenure by the Tennessee Board of Regents upon completion of the probationary period are set forth in **TBR Policy 5:00:03:00 on academic freedom, responsibility and tenure**, which policy is incorporated by reference as if fully set forth herein. Requirements and conditions for the recommendation of tenure by this Institution are set forth in **the policies of the Institution** and are incorporated by reference as if fully set forth herein. **Tenure may only be awarded by positive action by the Tennessee Board of Regents.**"

6

27.    Thus, the plaintiff's employment contract consisted of **eight inseparable and indivisible parts**, namely:

a) The <u>Employment Contract</u> signed by the parties (shown in Exhibit 1);

b) TBR policy on <u>Academic Freedom, Responsibility and Tenure</u> (Policy No. <u>5:02:03:00</u> as shown in Exhibit 2);

c) TSU policy on <u>Tenure</u>, as set forth on pages 51-60 of the <u>Faculty Handbook</u> (the version which was in force in 1996-97, 1997-98, and 1998-99 as shown in Exhibit 3);

d) TBR policy on <u>Appeals and Appearances Before the Board</u> (Policy No. <u>1:02:11:00</u> as shown in Exhibit 4);

e) TSU policy on <u>Tenure Appeals</u>, as set forth on pages 68-69 of the <u>Faculty Handbook</u> (the version which was in force in 1996-97, 1997-98, and 1998-99 as shown in Exhibit 3);

f) TBR policy on <u>Guidelines for Faculty Promotion Recommendations at Universities, Community Colleges, and Technical Institutes</u>, Policy No. <u>5:02:02:00</u> as shown in Exhibit 5);

g) TSU policy on <u>Promotion</u> as set forth on pages 69-76 of the <u>Faculty Handbook</u> (the version which was in force at all relevant times since 1989 as shown in Exhibit 3); and

h) TSU policy on <u>Promotion Appeals</u> as set forth on pages 76-77 of the <u>Faculty Handbook</u> (the version which was in force at all relevant times since 1989 as shown in Exhibit 3).

### b.    <u>Fifth and Sixth Year Tenure Eligibility</u>

28.    The language of the TBR policy on Tenure is clear: *Tenure may be applied for :--*

EITHER (a):   in the Fifth-Year of service;

7

OR (b):     in the Sixth-Year of Service;

OR (c):     early tenure by exceptions.

29.     Evidence of option 28(a) is found in Section E(1), p. 7 of TBR Policy No.:

5:02:03:00 (cf. Exhibit 2) and in Section E(1), p. 55 in TSU Faculty Handbook (cf. Exhibit 3)

both of which read:

"1.  ..... A recommendation for tenure of a faculty member following a
probationary period of **not less than five years** may be made by the president of an institution;"

30.     This condition was spelled out in Clause 2 of an Eligibility Checklist for Tenure

which was used for the 1996-97 Tenure and Promotion Review at TSU (cf. Exhibit 6) as follows:

"2.     **By the end of the current academic year,** the faculty member **will have
completed** not less than the minimum **five continuous years of probationary service at TSU**
(except in the case of an approved leave of absence which cannot count as any part of the
probationary period)."

31.     Evidence of Fifth-Year Tenure Eligibility is independently found in Section I(3),

p. 1 of TBR policy on Appeals and Appearances Before the Board, Policy No.: 1:02:11:00 (cf.

Exhibit 4) which reads:

"3.     Denial of tenure unaccompanied by notice of termination in the **fifth year** of
the probationary period;"

32.     Evidence of option 28(b) is found in Section F(2), p. 8 of TBR Policy No.:

5:02:03:00 (cf. Exhibit 2) and in Section F(2), p. 57 in TSU Faculty Handbook (cf. Exhibit 3)

both of which read:

"2.     When a faculty member on a tenure-track appointment completes the **sixth
year of the probationary period,** the faculty member will either be recommended for tenure by
the president or will be given notice of non-renewal of the appointment following the seventh
year of service....."

33.    Evidence of option 28(c) is found in Section E(1), p. 7 of TBR Policy No.:

5:02:03:00 (cf. Exhibit 2) and in Section E(1), p. 55 in <u>TSU Faculty Handbook</u> (cf. Exhibit 3)

both of which read:

>    "1.        ..... exceptions to the minimum probationary period may be made under special circumstances upon recommendation by the president and the Chancellor and approval by the Board."

### c.    Knowing, Intentional, and Malicious Misrepresentations

34.    At the time of contract signing, despite the plaintiff's request, Defendant Hefner,

through his agents, however, maliciously omitted giving the plaintiff a copy of said TBR and

TSU Policies on Tenure by giving a false promise of furnishing them to the plaintiff at a later

date.

35.    Moreover, the plaintiff's initial rank was maliciously and intentionally

misrepresented by the defendants as only "Assistant Professor" even though her qualifications

and experiences merited a "Professor" rank.

36.    Defendant Hefner, through his agents, also knowingly, intentionally, and

maliciously procured to breach an oral contract to give the plaintiff three years of credit for prior

experiences so that she could apply for early tenure and promotion or for promotion alone in her

first year of employment at TSU.

37.    Thereafter, Defendant Hefner, through his agents, knowingly, intentionally, and

maliciously withheld public information such as who received tenure and/or promotion and

public access to tenure/promotion records at TSU.

38.    As a direct and proximate result of defendants' misrepresentation and withholding

of tenure and/or promotion information, the plaintiff was not given an opportunity to apply for

tenure in her first year as promised nor could she apply for early tenure and/or promotion in her fourth year of employment.

39.    In the plaintiff's fifth year of employment in the academic year of 1996-97, she timely applied for both tenure and promotion by the October 4, 1996 deadline prescribed in the "TSU Timelines for Tenure and Promotion Review: 1996-97" (cf. Exhibit 7).

40.    The plaintiff **met the criteria for tenure and promotion application per the Eligibility Checklist (cf. Exhibit 6) used campus-wide in 1996-97.**

41.    Notwithstanding, Defendant Hefner, through a series of misrepresentations by his agents, knowingly, intentionally, and maliciously misrepresented TSU tenure policy by claiming that the appropriate year to apply for tenure was in the sixth year of employment even though the truth was that TBR policy allowed faculty two tries to apply for tenure:--i.e. once in the fifth year, if successful the first time around, and twice in the fifth and sixth years, if unsuccessful the first time—and in spite of TSU Faculty Senate's Resolution (cf. Exhibit 8 vis-a-vis Exhibit 9).

42.    The purpose of Defendant Bankhead's misrepresentation was to bar the plaintiff from applying for tenure even though by the time of Defendant Bankhead's university-wide announcement through a memorandum to the contrary, the plaintiff had already been approved for both tenure and promotion by her departmental committee on ranks and tenure (cf. Exhibit 10).

43.    Defendants Hefner and Bankhead went so far as to doing the most unconscionable acts such as replacing a prevailing eligibility checklist shown in Exhibit 6 above with an ex-post facto eligibility checklist shown in Exhibit 11b, promulgated in the Dean's letter, dated November 6, 1996, i.e. the very day that the plaintiff won recommendations for both tenure and promotion (cf. Exhibit 11a-c).

44.    Defendant Johnson conspired with Defendant Railsback in acting negatively on the plaintiff's tenure and promotion application in 1996-97 based on the false misrepresentation of the sixth-year tenure requirement.

45.    In effect, Defendant Railsback knowingly, intentionally, and maliciously replaced the plaintiff's eligibility checklist in Exhibit 6 with an ex-post facto checklist shown in Exhibit 12 which was filled out by Defendant Railsback herself without the plaintiff's consent or knowledge.

46.    Worse still, while misrepresenting herself as the "Acting Head" in place of Defendant Johnson, Defendant Railsback knowingly, intentionally, and maliciously failed to write a "Report on Teaching Effectiveness" on the plaintiff despite her duty as "Acting Head."

47.    Said omission was malicious because tenure by exceptions was permissible and if Defendant Railsback could not perform this duty, she knew or should have known that she had the moral obligation not to accept to act on behalf of Defendant Johnson.

48.    Moreover, even though the plaintiff might not have been eligible to apply for tenure as misrepresented by Defendant Hefner and his agents, she still was eligible to apply for promotion without tenure.

49.    Worst of all, Defendant Railsback knew that other faculty members in the department had been awarded tenure and/or promotion without full five years of service and without credit for prior service at TSU.

50.    Defendant Railsback misrepresented herself by writing to the Dean regarding the plaintiff's tenure and promotion approvals citing Defendant Johnson's conflict of interest and Johnson's eligibility to apply for promotion even though she knew the truth to be the contrary (cf. Exhibit 14).

11

51.    Exhibit 15 shows the ex-post facto change in the language of the eligibility

checklist from the language in the prevailing checklist as follows:

**Prevailing Checklist:**

"2.    **By the end of the <u>current</u> academic year, the faculty member <u>will have</u>
<u>completed</u> not less than the minimum <u>five</u> continuous years of probationary service at TSU**
(except in the case of an approved leave of absence which cannot count as any part of the
probationary period)."

**Ex-Post Facto Checklist:**

"2.    **At the end of the <u>last</u> academic year, the faculty member <u>completed</u> not
less than the minimum <u>five</u> continuous years of probationary service at TSU** (except in the
case of an approved leave of absence which cannot count as any part of the probationary
period)."

52.    **The foregoing change of eligibility criteria is evidence of a knowing,**

**intentional, and malicious breach of the plaintiff's employment contract.**

53.    **Because the plaintiff insisted on her contractual right to apply for tenure and**

**promotion according to the terms and conditions of her employment contract, Defendant**

**Hefner and his agents continued to cheat her by (a) making further knowing, intentional,**

**and malicious misrepresentations such as the false claim made by Defendant Bankhead in**

**Exhibit 16 that, "I do not think you will find any record of a person being recommended**

**for tenure until their sixth year." and (b) by removing her application from the Tenure and**

**Promotion Review Process (cf. Exhibit 17).**

54.    Another knowing, intentional, and malicious misrepresentation by Defendant

Hefner's agents was that promotion could not be applied for separately from tenure even though

TBR policies on tenure and promotion did not contain the simultaneous application requirement

as discussed in Exhibit 18.

55.    The plaintiff spear-headed a university-wide effort to oppose such bars by presenting records of actual lists of awards of tenure and promotion at TSU, obtained from TBR (cf. Exhibit 18).

56.    Exhibit 19 shows the two versions of representation with the plaintiff's representation based on previous TBR Lists of Tenure and Promotion Recommendations which contradict the defendants' misrepresentations heads-on.

57.    As a result, the TSU Chapter of the American Association of University Professors presented a university-wide petition for Defendant Hefner to comply with TBR policies (cf. Exhibit 20).

58.    However, Defendant Hefner knowingly, intentionally, and maliciously misrepresented to the TSU Faculty Senate who met with him on the AAUP Petition that "from now on, faculty in their fifth year of employment can apply for tenure."

59.    Said misrepresentation was false because Defendant Hefner did not restore the plaintiff's application which had been unlawfully removed from the tenure and promotion application process.

60.    As a direct and proximate result, the plaintiff was not awarded either tenure or promotion in 1996-97.

61.    The plaintiff had initiated a complaint of discrimination filing with the EEOC in Nashville and the Office of Special Counsel for Immigration-Related Unfair Employment Practices in Washington, DC since October 1996 before she formally filed the two complaints (cf. Exhibits 21a-c and 22).

62.    The plaintiff also filed an appeal for tenure and promotion with TBR (cf. Exhibit 23).

63.     As a result, Defendant Hefner conspired with or through Defendants Ellison, Mbosowo, Johnson, and Udelson, to procure contract breach by falsely charging the plaintiff with "lack of collegiality" through Defendant Ellison's complaint against the plaintiff's character as a person and as a libel to her teaching via unproven allegations of students' complaints of plaintiff's teaching.

64.     Defendant Mbosowo was never the plaintiff's immediate supervisor, only a colleague in different language programs, yet she conspired with Defendants Hefner, Ellison, and Johnson by falsely misrepresenting herself to be the plaintiff's immediate supervisor who had the authority to act on complaints against the plaintiff.

65.     Defendant Udelson knowingly, intentionally, and maliciously wrote a damaging evaluation on the plaintiff's tenure and promotion application in 1997-98 because his report was based upon a record from one side and never bothered to contact the plaintiff for her side of the story.

66.     All of these false misrepresentations were made in order to induce breach of contract by denying the plaintiff tenure in her sixth-year of employment which resulted in the termination of her employment contract in 1999.

67.     Defendant Bankhead also knowingly, intentionally, and maliciously made false allegations of the plaintiff's unauthorized use of her title of "Coordinator of Spanish" or "Coordinator of Foreign Languages" and of "lack of collegiality" in order to deny the plaintiff tenure and automatically omitted the issue of promotion **even though the two criteria of "Lack of Collegiality" and "Insubordination" were not included in TSU tenure or promotion policy (cf. Exhibit 24 vis-a-vis Exhibit 3, pp. 51-60 and 69-76).**

68.    All allegations made by Defendant Bankhead in his April 7, 1998 letter were false because Defendant Bankhead did not offer any proofs whether in the plaintiff's own handwriting or in a written statement made by his witnesses.

69.    In contrast, the plaintiff was able to secure a witness who would testify to the contrary of Defendant Bankhead's allegations (cf. Exhibit 25).

70.    Defendants Bankhead and Hefner knowingly, intentionally, and maliciously failed to act on the plaintiff's appeal against her tenure denial in 1997-1998 (cf. Exhibits 25-27).

71.    Instead, a notice of non-renewal of the plaintiff's employment contract was sent by Defendant Hefner in Exhibit 28.

72.    The plaintiff timely appealed her denial of tenure and promotion to TBR for the second year in a row.

73.    To date, the plaintiff has never received a recommendation for tenure, promotion, or both from the TBR.

74.    According to TBR and TSU policies, tenure is awarded only by a positive action taken solely by the TBR.

75.    Thus, failures to act on the plaintiff's appeal for tenure and/or promotion constituted "continuing violations."

76.    As a direct and proximate result, the plaintiff lost her seven years of employment and her cumulative experience and international acclaim.

77.    Said damages are restitutable via restoration to her original standing plus what she would have been able to do academically from 1999 to the present given her exceptional caliber.

## VIII.    STATUTE OF LIMITATIONS

78.    **Six** years, and not three years, after the cause of action accrued, is the applicable statute of limitations on an action based on contract, pursuant to contract law and **Tenn. Code Ann. 28-3-109(a)(3)** and for an action against public officers, for nonfeasance, misfeasance, and malfeasance in office pursuant to **Tenn. Code Ann. 28-3-109(a)(2).**

79.    Stated differently, this lawsuit, unlike plaintiff's prior lawsuits, is based on **contract law** under **Tenn. Code Ann. 47-50-109** and **not** tort law or employment discrimination laws.

80.    **Tenn. Code Ann. 47-50-109** provides for restitution of contract as well as a treble damage to restore the victim of false procurement or inducement of breach of contract to her original position had the breach not occurred.

81.    Moreover, all of the named defendants were public officers and the complaint hereinunder is evidence of their nonfeasance, misfeasance, and/or malfeasance in office.

82.    Hence, it is the cause of action, not the form of the suit, which determines the applicable statute of limitations, e.g. one year, three years, or six years. Callaway v. McMillian, 58 Tenn. 557 (1872).

83.    The applicable statute of limitations to a particular cause is determined according to the gravamen of the complaint. Headrick v. Union Carbide Corp., 825 S.W.2d 424 (Tenn. Ct. App. 1991).

84.    Accordingly, the applicable statute of limitations to this lawsuit is (a) **six years** after the cause of action accrued; (b) after the contract was terminated; or (c) **no applicable statute of limitations because of "continuing violations."** Greene v. THGC, Inc., 915 S.W.2d 809, 811; Walker v. Walker, 12 Tenn. App. 130.

## IX.    MOTION FOR DECLARATORY JUDGMENT /

## JUDGMENT ON THE PLEADING

85.    A motion for an oral hearing on declaratory judgment and further relief is contemporaneously-filed, herewith, pursuant to 28 U.S.C. Sections 2201 and 2202, Rule 57 of the Federal Rules of Civil Procedure, and Local Rules.

## X.    DAMAGES

86.    The damages accrued to date and will not toll until the plaintiff is restored to her employment at TSU.

87.    This is due to the fact that when a faculty member is not awarded tenure, it is a flag in her employment history and rarely would a comparable employment be found after vesting seven years of hard work at TSU.

88.    Worse still, is the fact that when employment discrimination is cried, through filings of EEOC and IRCA complaints as well as employment discrimination lawsuits, no other employers would hire the plaintiff in any job capacities.

89.    Damage is accrued for failures to place the plaintiff at the appropriate rank and/or to promote the plaintiff in rank thereafter, totaling approximately $10,000 - $20,000 a year in salary plus fringe benefits and retirement for seven years during her employment at TSU.

90.    Damage is also sought for approximately five years of unemployment.

## IX.    PRAYER FOR RELIEF

91.    The plaintiff prays that:--

    a.    the Court accept this Amended Complaint for filing as of right;

    b.    process be issued and served upon the defendants;

    c.    the Court enter a declaratory judgment against the defendants after an oral hearing as evidence is replete in this case;

d.    a jury be impaneled to hear damages;

e.    in the event the Court does not enter a declaratory judgment, a jury be impaneled to hear and decide the case;

f.    the plaintiff be awarded tenure and promotions had contract breach not occurred;

g.    treble damages be awarded to the plaintiff per provisions of Tenn. Code Ann. 47-50-109;

h.    Real and quasi attorney's fees;

i.    all malicious misrepresentations by the conspiring defendants be removed from the plaintiff's employment records; and

j.    other relief deemed proper by the Court.


I declare, under penalty of perjury, that the foregoing is true to the best of my knowledge, information, and belief.

Signed this **15th** day of **June, 2005**

Uthaiwan Wong-opasi, Ph.D., Plaintiff, pro se
7033 Somerset Farms Drive, Nashville, TN 37221
Telephone: (615) 349-6825

# LIST OF EXHIBITS
(Case No.: **1:05cv1083 PLF**)

Exhibit 1:      Plaintiff's Employment Contract
Exhibit 2:      TBR Policy on Tenure
Exhibit 3:      TSU Faculty Handbook, containing:
    TSU policy on Tenure (pp. 51-60);
    TSU policy on Tenure Appeals (pp. 68-69);
    TSU policy on Promotion (pp. 69-76); and
    TSU policy on Promotion Appeals (pp. 76-77)
Exhibit 4:      TBR Policy on Tenure Appeals
Exhibit 5:      TBR Policy on Promotion
Exhibit 6:      Prevailing Tenure and/or Promotion Eligibility Checklist in 1996-97
Exhibit 7:      1996-97 TSU Timelines for Tenure and Promotion Review
Exhibit 8:      TSU Faculty Senate's Resolution for Fifth-Year Tenure Applications
Exhibit 9:      Defendant Bankhead's Misrepresentation of Tenure Policy as Sixth-Year
Exhibit 10:     Approval of Plaintiff's Tenure and Promotion by departmental committee
Exhibit 11a-c:  Ex-Post Facto Replacement of Tenure/Promotion Eligibility Checklist
Exhibit 12:     Defendant Railsback's Use of Unlawful Ex-Post Facto T / P Checklist
Exhibit 13:     Defendant Railsback's "Report on (Plaintiff's) Teaching Effectiveness"
Exhibit 14:     Defendant Railsback's Misrepresentation as Acting Department Head
Exhibit 15:     Prevailing vs. Ex-Post Facto Checklist
Exhibit 16:     Defendant Bankhead's Misrepresentation of No Fifth-Year T/P Awards
Exhibit 17:     Removal of Plaintiff's Successful T & P Applications from Process
Exhibit 18:     Plaintiff's letter to Faculty Senate, dated 11/21/96
Exhibit 19:     Dispute regarding Fifth-Year vs. Sixth-Year Eligibility for T/P Review
Exhibit 20:     Evidence of Fifth-Year Tenure Awards in TSU-AAUP Petition
Exhibit 21a-c:  EEOC Complaint of Unlawful Discrimination Against Defendants
Exhibit 22:     IRCA Complaint of Unfair Employment Practices Against Defendants
Exhibit 23:     Plaintiff's 1996-97 Tenure and Promotion Appeal to TBR
Exhibit 24:     Defendant Bankhead's Misrepresentation of Plaintiff's Title and Character
Exhibit 25:     Evidence of Plaintiff's Good Character and Professionalism
Exhibit 26:     Defendant Bankhead's Misrepresentation of Plaintiff's 1997-98 T/P Appeal
Exhibit 27:     Plaintiff's T/P Appeal to Defendant Hefner
Exhibit 28:     Defendant Hefner's Letter of Non-Renewal of Employment Contract
Exhibit 29:     Plaintiff's 1997-98 Tenure and Promotion Appeal to TBR

The State University and Community College System of Tennessee

**TENNESSEE STATE UNIVERSITY**
**NOTICE OF TENURE-TRACK APPOINTMENT**
**AND AGREEMENT OF EMPLOYMENT**
**FOR FACULTY**

Exhibit 1

Wong-opasi                    Uthaiwan                                    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

| Last | First | Middle | Social Security No. |

Address: 1010 WEst Green Street, #170, Urbana, IL 61801    (217) 332-2429   Telephone Number

Appointment as **Assistant Professor**   EEO Code **2** in

Department of **Languages, Literature & Philosophy** effective **August 24, 1992**

Basis of Appointment **Academic**    Part-time ____ % Annual Salary $ **32,000**

Rate of $ _____ per _____ Date of Birth **8/28/57**   Sex **F**   Race **Other**

Education **Ph.D. Degree**   Experience _____

| Account Number | % of Salary | Position No. | Object No. |
|---|---|---|---|
| 210215 | 100 | 006540 | 1200 |
| | | | |
| | | | |
| | | | |

This is to confirm your appointment to the position and salary outlined above, subject to the terms and conditions hereinafter set forth and your acceptance thereof:

1. This appointment is made subject to the laws of the State of Tennessee, the requirements and policies of the Tennessee Board of Regents, and the requirements and policies of Tennessee State University. Any renewal of this appointment through a Notice of Renewal of Tenure-Track Appointment for Faculty or a Notice of Renewal of Tenure-Track Appointment and Amendment of Agreement of Employment for Faculty will be subject to all laws, requirements and policies in effect at the time of renewal. To be valid and binding, such renewal must be fully executed by all parties.

2. The above-stated salary is contingent upon your completion of service for the full term of this appointment. The salary for an academic year appointment will accrue at the rate of one-half for each academic semester, and will be payable at the rate of one-twelfth of the amount for each month from August/September through July/August. The salary for a fiscal year appointment will accrue and be payable at the rate of one-twelfth for each completed month of service. In the case of appointments for less than an academic or fiscal year, or in the event of failure to complete the specified term of the appointment, the salary will be prorated in accordance with the policies of Tennessee State University.

3. This appointment and the above stated salary are in consideration of your faithful performance to the best of your ability of the duties and responsibilities assigned to you as a full-time faculty member of this institution, and such additional duties as may be assigned to you from time to time, subject to the policies of the department or other area of assignment, and subject to the supervision and direction of appropriate representatives of this institution.

4. A specific condition of this contract is your agreement to participate in an annual evaluation of your assigned duties and responsibilities.

5. Academic year appointments include no obligation for or guarantee of summer session employment.

6. This appointment is a tenure-track appointment, which is for faculty employed in a probationary period of employment. A tenure-track appointment does not include any right to permanent or continuous employment or any interest in or expectancy of renewal of the appointment. This appointment is on an annual basis only, subject to renewal by this institution, and annual approval by the Tennessee Board of Regents, for a maximum probationary period of seven years. The minimum requirements and conditions for the award of tenure by the Tennessee Board of Regents upon completion of the probationary period are set forth in TBR Policy 5:00:03:00 on academic freedom, responsibility and tenure, which policy is incorporated by reference as if fully set forth herein. Requirements and conditions for the recommendation of tenure by this institution are set forth in the policies of the institution and are incorporated by reference as if fully set forth herein. Tenure may only be awarded by positive action by the Tennessee Board of Regents.

7. By acceptance of this appointment, I agree to abide by the terms of the Drug-Free Workplace Act of 1988 as defined in published institution statements and policy. I also agree to notify the Office of Personnel of any criminal drug conviction for a violation occurring in the workplace no later than five days after such conviction.

8. The following special conditions shall govern this appointment: **Tenure-Track. Must assist with grants/research, student activities, and public service projects.**

You must signify your acceptance of this appointment under the terms and conditions set forth by signing each copy of this notice and returning the original and six copies to the Office of the President within fifteen days after the date of this notice.

**AUTHORIZATION**

| Department Head | Date | Equal Employment Opportunity | Date |
| Dean | Date | Grants (if applicable) | Date |
| Vice President | Date | Budget | Date |
| Personnel | Date | President | Date |

I accept this appointment under the terms and conditions described above.

Appointee _____ Date **8/24/92**

Tennessee State University
An Equal Opportunity/Affirmative Action Employer M/F
Which Does Not Discriminate Against The Handicapped
TSU: F-191
PERSONNEL-white ACADEMIC AFFAIRS-green DEAN-canary DEPARTMENT-blue EMPLOYEE-goldenrod BUDGET DIRECTOR-canary SUSPENSE-pink

Exhibit 2

Policy No. 5:02:03:00
Page 1 of 20

## TENNESSEE BOARD OF REGENTS

SUBJECT:   Academic Freedom, Responsibility, and Tenure

### I.  Introduction

The following policy of the Tennessee Board of Regents on academic freedom,
responsibility, and tenure is applicable to all universities, community
colleges, and technical institutes within the System.  The statement in
Article II on academic freedom and responsibility may be adopted by each
institution, or an institution may adopt an alternative statement, provided
that the statement is consistent with the policies set forth herein.  The
provisions in Article III on academic tenure are minimum provisions for the
institutions in this System and should be implemented in a manner appropriate
to the individual missions, traditions, and needs of the institutions.

Institutional policies on academic freedom, responsibility, and tenure must
cite and specifically acknowledge compliance with TBR Policy on Academic
Freedom, Responsibility, and Tenure (5:02:03:00).  Likewise, institutional
policies must embody and communicate clearly as a minimum all provisions,
definitions, and stipulations of the Board policy.

### II.  Academic Freedom and Responsibility

The Board recognizes the principle of academic freedom, pursuant to which:

A.  The faculty member is entitled to freedom in the classroom in
discussing his or her subject, being careful not to introduce into
the teaching controversial matter which has no relation to the
subject;

B.  The faculty member is entitled to full freedom in research and in
the publication of the results, subject to the adequate
performance of his/her other academic duties; but research for
pecuniary gain must be based upon an understanding with the
authorities of the institution; and

C.  The faculty member is a citizen, a member of a learned profession,
and an officer of an educational institution.  When the faculty
member speaks or writes as a citizen, he/she should be free from
institutional censorship or discipline, but his/her special
position in the community imposes special obligations.  As a man
or woman of learning and an educational officer, he/she should
remember that the public may judge the profession and the
institution by the faculty member's utterances.  Hence, a faculty

member should at all times be accurate, should exercise
appropriate restraint, should show respect for the opinions of
others, and should make every effort to indicate that he/she does
not speak for the institution.

D.    The principles of academic freedom and responsibility here defined
are applicable both to faculty as defined in Section III.D of the
policy and to non-tenure track full-time, part-time, or adjunct
faculty.

Academic freedom is essential to fulfill the ultimate objectives of an
educational institution - the free search for and exposition of truth - and
applies to both teaching and research. Freedom in research is fundamental to
the advancement of truth, and academic freedom in teaching is fundamental for
the protection of the rights of the faculty member in teaching and of the
student to freedom in learning. Implicit in the principle of academic freedom
are the corollary responsibilities of the faculty who enjoy that freedom.
Incompetence, indolence, intellectual dishonesty, serious moral dereliction,
arbitrary and capricious disregard of standards of professional conduct -
these and other grounds as set forth in Section O may constitute adequate cause
for dismissal or other disciplinary sanctions against faculty members subject
to the provisions of Article III. The right to academic freedom imposes upon
the faculty an equal obligation to take appropriate professional action against
faculty members who are derelict in discharging their professional
responsibilities. The faculty member has an obligation to participate in
tenure and promotion review of colleagues as specified in institutional policy.
Thus, academic freedom and academic responsibility are interdependent, and
academic tenure is adopted as a means to protect the former while promoting the
latter. While academic tenure is essential for the protection of academic
freedom, all faculty members, tenured or non-tenured, have an equal right to
academic freedom and bear the same academic responsibilities implicit in that
freedom.

III.  Policy on Academic Tenure

A.    Definitions

The following are general definitions of words and terms used in this
policy which are not hereinafter specifically defined; however, the
words and terms are subject to further qualification and definition in
the subsequent sections of this policy.

1.    Academic Tenure - a personnel status in an academic
organizational unit (e.g., a department or division) or
program of a college, university, or institute pursuant to
which the academic year appointments of full-time faculty who
have been awarded tenure are continued at an institution until
the expiration or relinquishment of that status, subject to

termination for adequate cause, for financial exigency, or for curricular reasons.

2. <u>Adequate Cause</u> - a basis upon which a faculty member, either with academic tenure or a tenure-track or temporary appointment prior to the end of the specified term of the appointment may be dismissed or terminated. The specific grounds which constitute adequate cause are set forth in Section O.

3. <u>Financial Exigency</u> - the formal declaration by the Tennessee Board of Regents that one of its institutions faces an imminent financial crisis, that there is a current or projected absence of sufficient funds (appropriated or non-appropriated) for the campus as a whole to maintain current programs and activities at a level sufficient to fulfill its educational goals and priorities, and that the budget can only be balanced by extraordinary means which include the termination of existing and continuing academic and non-academic appointments.

4. <u>Faculty Member</u> - a full-time employee who holds academic rank as instructor, assistant professor, associate professor, or professor, and for purposes of this policy, who meets the minimum requirements for eligibility for tenure in Section C and whose responsibilities primarily include instruction, research, and public service.

5. <u>Probationary Employment</u> - period of full-time professional service by a faculty member for whom an appointment letter denotes a tenure-track appointment in which he/she does not have tenure and in which he/she is evaluated by the institution for the purpose of determining his/her satisfaction of the criteria for a recommendation for tenure. Probationary employment provides an opportunity for the individual to assess commitment to the institution and for the institution to determine whether the individual meets its perception of quality and/or projected need.

6. <u>Temporary Appointment, Tenure-Track Appointment, Tenure Appointment, Term Appointment, and Clinical-Track Appointment</u> - these five types of faculty appointments are defined in Section D of this policy.

B.  Academic Tenure

Tenure is a status pursuant to which faculty appointments for the academic year in an organizational unit (e.g., a department or division) or program of a college, university, or institute, are continued until retirement or physical or mental disability, subject

to dismissal for adequate cause or unavoidable termination on account
of financial exigency or curricular reasons. Tenure is awarded only
by positive action by the Board, pursuant to the requirements and
procedures of this policy, at a specific institution. The awarding of
tenure is a recognition of the merit of a faculty member and of the
assumption that he/she would meet the long-term staffing needs of the
UNIT or PROGRAM and the institution. The continued professional
growth and development of faculty is necessary for institutions of
higher education to continue to provide educational programs in
accordance with the institution's mission, goals, and changing needs
of the institution. Tenure is only awarded to those members of the
faculty who have exhibited professional excellence and outstanding
abilities sufficient to demonstrate that their future services and
performances justify the degree of permanence afforded by academic
tenure. The Tennessee Board of Regents does not award tenure in
non-faculty positions. Notwithstanding the above, this section shall
not be interpreted as diminishing the rights of non-faculty employees
previously awarded tenure in positions at the state technical
institutes or area vocational-technical schools by the Board of
Education, whose rights are governed by TBR Policy on Tenure in
Non-Faculty Positions (5:02:03:20).

C.   Minimum Eligibility Requirements for Consideration for Academic Tenure



Institutional policies must include specifically identifiable sections
which define minimum eligibility requirements for consideration for
academic tenure. Those sections must clearly distinguish between (1)
minimum eligibility requirements for consideration for academic tenure
and (2) criteria to be considered in tenure recommendations (see
Section H).

1.  Academic tenure may only be awarded to full-time faculty
    members who:  (a) hold academic rank as instructor, assistant
    professor, associate professor, or professor and meet the
    minimum rank criteria for the rank held under the Board
    Policy No. 5:02:02:00; (b) have been employed pursuant to
    tenure-track appointments and have completed not less than
    the minimum probationary period of service; and (c) have been
    determined by the institution to meet the criteria for
    recommendation for tenure and have been so recommended
    pursuant to this policy.

2.  Faculty holding temporary appointments or term appointments
    are not eligible for tenure.

3.  Faculty members supported in whole or in part by funds
    available to the institution on a short-term basis, such as
    grants, contracts, or foundation sponsored projects, shall
    not be eligible for tenure unless continuing support for such


24

members can be clearly identified in the regular budget of the institution upon the recommendation of tenure to the Board.

4.  No faculty member shall be eligible for tenure in a non-faculty position; provided that where a faculty member with tenure is appointed to an administrative position, he/she will retain tenure in a former faculty position only; and provided further that a faculty member otherwise eligible for tenure who also holds a non-faculty position may be awarded tenure in the faculty position only, subject to the requirements of this policy.

    Notwithstanding the above, an individual previously awarded administrative tenure by the Board of Education will retain such tenure if the individual has continuously been employed by the institution since award of such tenure.

5.  Each institution may establish additional reasonable requirements for the eligibility of faculty for consideration for tenure. These may include but are not limited to the completion of the doctorate or other specified degree in the faculty member's discipline, a minimum rank of assistant professor or above, and prescribed research and publication achievements.

D.  Types of Appointments

There are five types of faculty appointments: temporary appointments, tenure-track appointments, tenure appointments, term appointments, and clinical-track appointments (in Medical School).

1.  Temporary appointments are appointments for a specific purpose for a time appropriate to that purpose or for an unspecified period, which appointments may be terminated according to the terms of the appointments. Temporary appointments ordinarily should be used for lecturers, adjunct or part-time faculty, faculty employed to replace regular faculty on leave of absence, and faculty employed pursuant to grants or for projects funded in whole or in part by non-appropriated funds. In addition, temporary appointments may be used for faculty employed on the basis of state appropriated funds in departments, divisions, or other academic units where the permanent and continued need for the position has not been established, provided that such appointments normally should not be in excess of three academic years. Appointments of faculty members supported by more than 50% grant funding, or other soft money sources, may be approved by the institution presidents/directors for periods of greater than three years. Other extensions of

temporary appointments for periods of greater than three years will require approval of the Chancellor.

2. Tenure-track appointments are appointments for regular full-time faculty with academic rank, and may be for the academic or fiscal year. Tenure-track appointments are for faculty who are employed in a probationary period of employment preliminary to consideration for tenure. Tenure-track appointments shall not include any right to permanent or continuous employment, shall not create any manner of legal right, interest, or expectancy of renewal or any other type of appointment, and shall be subject to annual renewal by the institution.

3. Tenure appointments are appointments of full-time faculty who have been awarded tenure by the Board pursuant to the provisions of this policy. Tenure appointments include the assurance of continued employment for the academic year for an indefinite period, subject to expiration, relinquishment, or termination of tenure as hereinafter provided. Such appointments do not include assurance of continued employment at any specified salary or position or employment during summer sessions or inter-sessions.

4. Term appointments are provided only for faculty at community colleges and technical institutes. They are non-tenurable appointments in a traditional rank (e.g., instructor, assistant professor, etc.) for a fixed period of no more than one (1) year and may be renewed with no presumed maximum number of re-appointments.

   Faculty should be placed on term appointments only when one or more of the following conditions pertains to the employment: (a) as a means for addressing staffing needs in technical programs when the projected need is more than temporary but less than long term, (b) as a means for staffing programs projected to phase out in a fixed period, or (c) when the size of a staffing cohort is projected to extend beyond the normal period for a temporary appointment but is not of sufficient length to warrant a tenure-track or tenured appointment. Term appointments shall not be used as a means for continuing employment of tenure-track faculty appointments when a negative tenure decision has been made or is projected.

5. Clinical-track appointments in the Medical School (a) are full-time university faculty appointments, (b) are non-tenurable appointments for a fixed term, (c) are renewable, and (d) permit appointment and promotion of faculty who participate in the University's academic program

by providing patient care services, by exposing students to
their professional expertise, and by directing students'
educational experiences in clinical settings where the
faculty members practice. Clinical-track appointments are
supported by funding from grants or contracts, from clinical
practice or clinical facilities, or from other non-state
sources.

E.    Probationary Employment

1.  Probationary faculty may be employed on annual tenure-track
    appointments for a maximum probationary period which may not
    exceed seven years. A recommendation for tenure of a faculty
    member following a probationary period of not less than five
    years may be made by the president of an institution;
    provided that exceptions to the minimum probationary period
    may be made under special circumstances upon recommendation
    by the president and the Chancellor and approval by the
    Board.

2.  The minimum probationary period of five years may include
    credit for prior service when agreed to by the president, and
    subject to the maximum permissible credit for prior service,
    pursuant to Section G.

3.  Employment during summer terms, in part-time positions, or
    during periods of leaves of absence (except in the
    circumstance described in 4 below) shall not be credited
    toward satisfying the probationary period.

4.  Only full-time continuous service at an institution will be
    included in determining completion of the probationary
    period, except where a break in service was pursuant to an
    approved leave of absence. The period of approved leave of
    absence shall be excluded from the requisite period for
    completion of the probationary period unless the president of
    the institution specified in writing prior to the leave of
    absence that it shall be included in the probationary period.
    In no case may more than one year of approved absence be
    included in determining completion of the probationary
    period.

5.  Where a faculty member is appointed to an administrative
    position prior to being awarded tenure at the institution, if
    he/she maintains a significant involvement in academic
    pursuits such as teaching and scholarship, the time or
    prorated portion of the time spent in the administrative
    position may be credited toward completion of the
    probationary period, provided that the department or division
    in which the faculty member would otherwise be employed
    recommends the faculty member for tenure

6. Where a faculty member is serving a probationary period in an academic unit (e.g., a department or division) or program and is subsequently transferred to another academic unit or program, the faculty member may - with the approval of the president - elect to begin a new probationary period with the transfer. If he/she does not so elect (and confirm in writing to the president), time spent in the first appointment shall count toward establishing the minimum and maximum probationary period (see E[1] above).

F. **Non-renewal of Non-tenured Faculty**

1. When tenure-track appointments of faculty are not to be renewed for further service, the faculty member shall receive notice of his/her non-retention for the ensuing academic year as follows:

   a. Not later than April 1 of the first academic year of service, if the appointment expires at the end of that year; or, if the appointment terminates during an academic year, at least two months in advance of its termination;

   b. Not later than January 1 of the second year of service, if the appointment expires at the end of that year; or, if the appointment terminates during an academic year, at least five months in advance of its termination; or

   c. Not later than the close of the academic year preceding the third or subsequent year of service, if the appointment expires at the end of that year; or, if the appointment terminates during an academic year, at least twelve months in advance of its termination.

   The above stated dates are the latest dates for notice of non-renewal of faculty on tenure-track appointments, and each institution may adopt annual dates which provide for longer notice of non-renewal. Notice of non-renewal shall be effective upon personal delivery of the notice to the faculty member, or upon the date the notice is mailed, postage prepaid, to the faculty member at his/her current home address of record at the institution.

   Dates for notice of non-renewal are in no way affected by any credit for prior service which may be awarded pursuant to Section III.G of this policy.

2. When a faculty member on a tenure-track appointment completes the sixth year of the probationary period, the faculty member will either be recommended for tenure by the president or will

be given notice of non-renewal of the appointment following
the seventh year of service. Such notice of non-renewal
should be given not later than the final day of the sixth
academic year. The faculty member's right in an instance
where timely notice is not given is described in I(1).

3. Faculty members on tenure-track appointments shall not be
terminated during the annual specified term of the
appointment except for reasons which would be sufficient for
the termination of tenured faculty.

4. The non-renewal or non-reappointment of any faculty member on
a tenure-track appointment does not necessarily carry an
implication that his/her work or conduct has been
unsatisfactory.

5. A faculty member whose tenure-track appointment is not
renewed shall be given an oral statement of the reason or
reasons for the non-renewal and an opportunity for discussion
at that time by the president or his/her designated
representative(s).

6. Unless there is a violation of state or federal law under the
limitations described in the TBR Policy on Appeals
(1:02:11:00), decisions which are not appealable to the
Chancellor include (a) non-renewal of a tenure-track faculty
appointment during the first four years of the probationary
period and (b) denial of tenure unaccompanied by notice of
termination in the fifth year of the probationary period.

G.  Credit for Prior Service

*previous
tenure track
not required
for credit*

1. Credit toward completion of the probationary period may, in
the discretion of the president, be given for a maximum of
three years of previous full-time service at other colleges,
universities, or institutes, provided that the prior service
is relevant to the institution's own needs and criteria. Any
credit for prior service which is recognized and agreed to
must be confirmed in writing at the time of the initial
appointment.

2. Credit toward completion of the probationary period may, at
the discretion of the president, be given for a maximum of
three years of previous full-time service in a temporary
faculty appointment or term appointment at the same
institution (see Types of Appointments, Section D[1]) or in
an earlier tenure-track appointment at the same institution
which has been followed by a break in service. Any credit
for prior service in a temporary full-time faculty
appointment at the same institution or in an earlier

Case 1:05-cv-01083-PLF    Document 2    Filed 06/15/2005    Page 30 of 134

tenure-track appointment (at the same institution) which has
been followed by a break in service must be recognized and
confirmed in writing in the appointment letter to a
tenure-track position.

H.  **Criteria to be Considered in Tenure Recommendations**

The nature and relative importance of the criteria for the
recommendation for tenure depend upon the nature, mission, and goals
of the institution in which tenure may be awarded and of the
department or division in which a faculty member is employed.  The
following criteria are neither exhaustive of the relevant criteria nor
ranked in any order of importance but may be utilized as general
criteria to be considered in the recommendation of tenure:

1.  Teaching effectiveness;

2.  Evaluation of scholarship, research, and public service
    activities;

3.  Professional degrees, awards, and achievements;

4.  Staffing needs of the department or division and the
    institution;

5.  Service to the institution, the community, and the State;

6.  Professional activities and membership and leadership in
    professional organizations;

7.  Participation in organizations and activities of the
    institution;

8.  Demonstrated potential for continuous professional growth;

9.  Ability to achieve the objectives of the faculty member, the
    department or division, and the institution;

10. Demonstrated willingness and ability to work effectively with
    colleagues to support the mission of the institution and the
    common goals both of the institution and of the academic
    organizational unit.



Institutional policies must include specifically identifiable
sections which enumerate criteria to be considered in tenure
recommendations and seek to clarify in broad terms their relative
importance.  Those sections must clearly distinguish between (1)
criteria relevant to assessing the merit of the probationary
candidate and (2) criteria relevant to assessing the long-term
staffing needs of the department or division and the institution.

Institutional policies must also include a clear statement as to
the role of evaluation in measuring those criteria relevant to
assessing the merit of the probationary candidate.

I.   Tenure Appointments

1.  No faculty member shall acquire or be entitled to any interest
    in a tenure appointment at an institution without a
    recommendation for tenure by the president of the institution
    and an affirmative award of tenure by the Board of Regents.
    No other person shall have any authority to make any
    representation concerning tenure to any faculty member, and
    failure to give timely notice of non-renewal of a contract
    shall not result in the acquisition of a tenure appointment,
    but shall result in the right of the faculty member to another
    year of service at the institution.

2.  Recommendations for or against tenure should originate from
    the department or division in which the faculty member is
    assigned and should include appropriate participation in the
    recommendation by tenured faculty in the department or
    division.  Institutional procedures shall ensure that peer
    committees have qualified privilege of academic
    confidentiality against disclosure of individual tenure votes
    unless there is evidence that casts doubt upon the integrity
    of the peer committee.  This policy shall be interpreted in a
    manner consistent with the Tennessee Public Records Act, as
    recorded in T.C.A. Sections 10-7-101 et seq.  The
    recommendation for tenure must be made by the president to the
    Chancellor and by the Chancellor to the Board.  In the event
    that tenure is awarded by the Board, the president shall
    furnish to the faculty member written confirmation of the
    award.

3.  Each institutional policy must include a process section which
    defines levels of review, procedures associated with review by
    various levels, and a clear description of materials
    concerning the candidate that each level will possess as it
    carries out the review.  Each policy should also include a
    calendar or schedule of the review process.  Each
    institutional process section must address (a) types and
    frequency of student evaluation of instruction by probationary
    faculty members and (b) uses of student evaluations in the
    review process leading to tenure.  Finally, each policy should
    (c) describe provisions for ensuring a student advisory role
    in defining those uses of student evaluation.

Missing
in TSU
Handbook

J.  Expiration of Tenure

Tenure status shall expire upon retirement of the faculty member.
Tenure shall also expire upon the event of permanent physical or
mental inability of a faculty member, as established by an
appropriate medical authority, to continue to perform his/her
assigned duties.

K.  Relinquishment of Tenure

A faculty member shall relinquish or waive his/her right to
tenure upon resignation from the institution or upon failure to
report for service at the designated date of the beginning of any
academic term, which shall be deemed to be a resignation unless,
in the opinion of the president, the faculty member has shown
good cause for such failure to report.  Where a tenured faculty
member is transferred or reclassified to another department or
division by the institution, the transfer or reassignment shall
be with tenure.  Tenure shall not be relinquished during
administrative assignments at the institution.

L.  Termination of Tenure for Reasons of Financial Exigency

A tenured faculty member may be terminated as a result of
financial exigency at an institution subject to Board declaration
that such financial conditions exist.  Personnel decisions
(including those pertaining to tenured faculty) that result from
a declaration of financial exigency at a Board of Regents
institution will comply with the Board Policy on Financial
Exigency (5:02:06:00).

M.  Termination of Tenure for Curricular Reasons

The employment of a tenured faculty member may be terminated
because (1) a program is deleted from the curriculum or (2)
because of substantial and continued reduction of student
enrollment in a field.   Before declaring that curricular reasons
exist, the president will ensure meaningful participation by the
institution's representative faculty body in identifying the
specific curricular reasons, evaluating the long-term effect on
the institution's curriculum and its strategic planning goals,
and the advisability of initiating further action.  Prior to
initiating the process described below, the president will
present - either verbally or in writing - a description of
curricular reasons that may warrant the termination of tenured
faculty member(s).  Each institutional policy will describe
procedures whereby this presentation will be made to a
representative faculty body, and that body will have the
opportunity to respond in writing to the president before action
described below is initiated.  Each of these reasons for

termination of tenure for curricular reasons must denote shifts
in staffing needs that warrant greater reductions than those
which are accommodated annually in light of shifting positions
from one department to another or among colleges to handle
changing enrollment patterns (see Definitions, Section 6).

1.  Upon determining that termination of one or more tenured
    faculty members is required for one or more of the two
    reasons cited above, the president shall furnish each faculty
    member to be terminated a written statement of the reasons
    for the termination. Those reasons shall address fully the
    curricular circumstances that warranted the termination and
    shall indicate the manner and the information upon which the
    decision of which faculty members were to be terminated was
    reached. The president's written statement shall also
    indicate that the faculty member has the opportunity to
    respond in writing stating any objections to the decision.

2.  If the faculty member(s) to be terminated indicate(s)
    objections to the president's written statement(s) and
    request(s) a review, the president will appoint a faculty
    committee consisting of a minimum of five tenured faculty
    members from a slate of ten tenured faculty members proposed
    by the representative faculty body. The committee shall
    conduct a hearing on the proposed termination(s). The
    committee shall report its findings and recommendations to
    the president, who shall in a reasonable time inform the
    faculty member(s) proposed for termination in writing either
    that the decision for termination stands or that it has been
    altered.

3.  The president's decision to terminate a tenured faculty
    member for curricular reasons is subject to appeal to the
    Chancellor and the Board as provided in the policy on appeals
    to the Board (TBR Policy 1:02:11:00).

4.  When a tenured faculty member is terminated for curricular
    reasons, the position will not be filled by a new appointee
    with the same areas of specialization as the terminated
    faculty member within a period of three years unless the
    terminated faculty member has been offered, in writing,
    reappointment to the position at his/her previous rank and
    salary (with the addition of an appropriate increase which,
    in the opinion of the president, would constitute the raise
    that would have been awarded during the period that he/she
    was not employed).

5.  Upon determining that termination of one or more tenured
    faculty members is warranted for curricular reasons, the
    president shall base his/her decision about which faculty

33

member(s) should be terminated upon his/her assessment as to
what action would least seriously compromise the educational
programs in a department or division.  Termination for
curricular reasons presumes a staffing pattern in a
department or division which cannot be warranted either by
comparison with general load practices within the institution
or by comparison with faculty loads in comparable departments
or divisions at similar institutions.  In that light, the
president shall also, at his/her discretion, base his/her
decision on a careful assessment of the impact of the
curricular reason on staffing requirements in the division or
department as compared to overall patterns in the institution
and to comparable departments or divisons which, in his/her
judgement, are in institutions similar enough to warrant
<u>assessment</u>.

Unless the president demonstrates (preferably by means of past
performance evaluations) that an exception should be made to
<u>reduce</u> qualitative compromise of an educational program, the
following considerations should guide (but not be construed as
mandatory) the president in determining the order of faculty
reductions in a department or division where termination of
tenured faculty is proposed for curricular reasons:

a.  part-time faculty should not be renewed before tenured
    faculty are terminated,

b.  temporary faculty or tenure-track faculty in the
    probationary period should not be renewed before tenured
    faculty are terminated,

c.  among tenured faculty, those with higher rank should have
    priority over those with lower rank,

d.  among tenured faculty with comparable rank, those with
    appropriate higher academic degrees should have priority
    over those with lower degrees, and

e.  among tenured faculty with comparable rank and comparable
    degrees, those with greater seniority in rank should
    normally have priority over those with less seniority.

6.  Definitions:

    a.  "Program is deleted from the curriculum" means that the
        Board takes formal action to terminate a degree major,
        concentration, or other curricular component and that such
        termination eliminates or reduces need for faculty
        qualified in that discipline or area of specialization.

b.  "Substantive and continued reduction of student
enrollment in a field" means that over a period of at
least three (3) years student enrollment in a field has
decreased at a rate in considerable excess of that of the
institution as a whole and that such reduction has
resulted in faculty-student ratios that, in the opinion
of the president, cannot be warranted either by
comparison with equivalent faculty load practices within
the institution or by comparisons with faculty loads in
comparable departments or divisions at similar
institutions which the president would deem to be
appropriate for comparison.

7.  When a tenured faculty member is to be terminated for
curricular reasons, the president will make every possible
effort to relocate the tenured faculty member in another
existing vacant position for which he/she is qualified. In
instances where (in the opinion of the president) relocation
within the institution is a viable alternative, the
institution has an obligation to make significant effort to
relocate the faculty member, including the bearing of
reasonable retraining costs. The final decision on relocation
is within the discretion of the president.

N.  Transfer of Tenure

Where a faculty member is tenured in an academic unit (e.g., a
department or division) or program and is subsequently transferred to
another academic unit or program, the transfer is with tenure. In no
instance may the faculty member be compelled to relinquish tenure (see
Section K) as a condition for effecting the transfer.

O.  Termination for Adequate Cause

A faculty member with tenure or a faculty member on a tenure-track
appointment prior to the end of the term of appointment may be
terminated for adequate cause, which includes the following:

1.  Incompetence or dishonesty in teaching or research.

2.  Willful failure to perform the duties and responsibilities for
which the faculty member was employed or refusal or continued
failure to comply with the policies of the Board, the
institution or the department, or to carry out specific
assignments, when such policies or assignments are reasonable
and non-discriminatory.

3.  Conviction of a felony or a crime involving moral turpitude.

4.  Improper use of narcotics or intoxicants, which substantially
    impairs the faculty member's fulfillment of his/her
    departmental and institutional duties and responsibilities.

5.  Capricious disregard of accepted standards of professional
    conduct.

6.  Falsification of information on an employment application or
    other information concerning qualifications for a position.

7.  Failure to maintain the level of professional excellence and
    ability demonstrated by other members of the faculty in the
    department or division of the institution.

P.  <u>Procedures for Termination for Adequate Cause</u>

    Termination of a faculty member with a tenure appointment, or with a
    tenure-track or temporary appointment prior to the annual specified
    term of the appointment, shall be subject to the following procedures:

    1.  No termination shall be effective until steps 4 through 10
        below have been completed.

    2.  Suspensions pending termination shall be governed by the
        following procedure.

        a.  A faculty member may not be suspended pending completion of
            steps 4 through 10 unless it is determined by the
            institution that the faculty member's presence poses a
            danger to persons or property or a threat of destruction to
            the academic or operational processes of the institution.
            Reassignment of responsibilities is not considered
            suspension; however, the faculty member must be reassigned
            responsibilities for which he/she is qualified.

        b.  In any case of suspension, the faculty member shall be
            given an opportunity at the time of the decision or
            immediately thereafter to contest the suspension; and, if
            there are disputed issues of fact or cause and effect, the
            faculty member shall be provided the opportunity for a
            hearing on the suspension as soon as possible at which
            time the faculty member shall be provided the opportunity
            for a hearing on the suspension as soon as possible at
            which time the faculty member may cross-examine his/her
            accuser, present witnesses on his/her behalf, and be
            represented by an attorney. Thereafter, whether the
            suspension is upheld or revoked, the matter shall proceed
            pursuant to these procedures.

3.  Except for such simple announcements as may be required
    concerning the time of proceedings and similar matters,
    public statements and publicity about these proceedings by
    either the faculty member or administrative officers will be
    avoided so far as possible until the proceedings have been
    completed, including consideration by the Board.

4.  Upon a recommendation by the chief academic officer of the
    institution to the president or upon a decision by the
    president that these procedures should be undertaken in
    consideration of the termination of a tenured faculty member,
    one or more appropriate administrators shall meet privately
    with the faculty member for purposes of attempting to reach a
    mutually acceptable resolution of the problems giving rise to
    the proposed termination proceedings.

5.  If a mutual resolution is not reached under step 4, the
    president shall appoint a faculty committee consisting of
    tenured faculty members, whose appointments should be, but
    are not required to be, agreed to by the faculty member.  The
    faculty committee shall conduct an informal inquiry of the
    facts giving rise to the proposed termination and seek a
    mutually acceptable resolution.  Should no such resolution be
    reached, the committee shall recommend to the president
    whether in its opinion further proceedings should be taken in
    pursuit of the termination.  The recommendation shall be in
    writing and shall be accompanied by reasons for the
    recommendation.  The committee's recommendation shall not be
    binding on the president.

6.  If no mutually acceptable resolution is reached through step
    5 and/or if after consideration of the faculty committee's
    recommendation the president determines that further
    proceedings are warranted to consider termination, the
    following steps shall be taken.

    a.  The faculty member shall be provided with a written
        statement of the specific charges alleged by the
        institution which constitute grounds for termination and a
        notice of hearing specifying the time, date, and place of
        the hearing.  The statement and notice must be provided at
        least twenty (20) days prior to the hearing.  The faculty
        member shall respond to the charges in writing at least
        five (5) days prior to the hearing.  The faculty member
        may waive the hearing by execution of a written waiver.

    b.  A committee consisting of members of faculty or faculty
        and administration shall be appointed to hear the case and
        to determine if adequate cause for termination exists
        according to the procedure hereinafter described.  The 37

committee shall be appointed by the president and the officially recognized faculty senate, assembly or advisory committee, with each appointing the number of members designated by the policy of the institution.  The committee may not include any member of the faculty committee referred to in 5 above.  Members deeming themselves disqualified for bias or interest shall remove themselves from the case, either at the request of a party or on their own initiative.  Members of the committee shall not discuss the case outside committee deliberations and shall report any ex-parte communication pertaining to the hearing to the president who shall notify all parties of the communication.

7.  The hearing committee shall elect a chairperson who shall direct the proceedings and rule on procedural matters, including the granting of reasonable extensions of time at the request of any party and upon the showing of good cause for the extension.

8.  The chairperson of the hearing committee may in his/her discretion require a joint pre-hearing conference with the parties which may be held in person or by a conference telephone call.  The purpose of the pre-hearing conference should include but is not limited to one or more of the following:

    a.  Notification as to procedure for conduct of the hearing.

    b.  Exchange of witness lists, documentary evidence, and affidavits.

    c.  Define and clarify issues.

    d.  Effect stipulations of fact.

    A written memorandum of the pre-hearing conference should be prepared and provided to each party.

9.  A hearing shall be conducted by the hearing committee to determine whether adequate cause for termination of the faculty member exists.  The hearing shall be conducted according to the procedures below.

    a.  During the hearing, the faculty member will be permitted to have an academic advisor present and may be represented by legal counsel of his/her choice.

    b.  A verbatim record of the hearing will be taken and a typewritten copy will be made available to the faculty member, upon request, at the faculty member's expense. 38

c.  The burden of proof that adequate cause exists rests with
    the institution and shall be satisfied only by clear and
    convincing evidence in the record considered as a whole.

d.  The faculty member will be afforded an opportunity to
    obtain necessary witnesses and documentary or other
    evidence.  The administration will cooperate with the
    committee in securing witnesses and making available
    documentary and other evidence.

e.  The faculty member and the administration will have the
    right to confront and cross-examine all witnesses.
    Where the witnesses cannot or will not appear, but the
    committee determines that the interests of justice
    require admission of their statements, the committee
    will identify the witnesses, disclose their statements,
    and, if possible, provide for interrogatories.

    An affidavit may be submitted in lieu of the personal
    appearance of a witness if the party offering the
    affidavit has provided a copy to the opposing party at
    least ten (10) days prior to the hearing and the
    opposing party has not objected to the admission of the
    affidavit in writing within (7) days after delivery of
    the affidavit or if the committee chairperson
    determines that the admission of the affidavit is
    necessary to ensure a just and fair decision.

f.  In a hearing on charges of incompetence, the testimony
    shall include that of qualified faculty members from
    the institution or other institutions of higher
    education.

g.  The hearing committee will not be bound by strict rules
    of legal evidence and may admit any evidence which is
    of probative value in determining the issues involved.
    Every possible effort will be made to obtain the most
    reliable evidence available.

h.  The findings of fact and the report will be based
    solely on the hearing record.

i.  The president and the faculty member will be provided a copy
    of the written committee report.  The committee's written
    report shall specify findings of fact and shall state
    whether the committee has determined that adequate cause for
    termination exists and, if so, the specific grounds for
    termination found.  In addition, the committee may recommend
    action less than dismissal.  The report shall also specify
    any applicable policy the committee considered.  39

10. After consideration of the committee's report and the record,
    the president may in his/her discretion consult with the
    faculty member prior to reaching a final decision regarding
    termination.  Following his/her review, the president shall
    notify the faculty member of his/her decision, which, if
    contrary to the committee's recommendation shall be
    accompanied by a statement of the reasons.  If the faculty
    member is terminated or suspended as a result of the
    president's decision, the faculty member may appeal the
    president's action to the Chancellor pursuant to TBR Policy
    1:02:11:00.  Review of the appeal shall be based upon the
    record of hearing.  If upon review of the record, the
    Chancellor notes objections regarding the termination and/or
    its proceedings, the matter will be returned to the president
    for reconsideration, taking into account the stated
    objections, and, at the discretion of the president, the case
    may be returned to the hearing committee for further
    proceedings.

Source:  TBR Meetings, June 25, 1976; June 26, 1981; June 25, 1982;
         September 30, 1983; September 19, 1986; September 18, 1987;
         December 4, 1987; December 2, 1988; October 1, 1990; December 7,
         1990; March 15, 1991; March 19, 1993; June 25, 1993; December 10, 1993

NOTE:    This policy became effective on July 1, 1976, as to all faculty then
         or thereafter employed in the Tennessee Board of Regents' System.  The
         minimum qualifications and requirements for eligibility for an award
         of tenure applied to all faculty who had not previously been
         expressly awarded tenure by the Board, and the previous probationary
         period for such faculty was extended to a maximum of seven years.
         Faculty who had previously been awarded tenure retained their tenured
         status under this policy, subject to its terms and conditions.

         The definition of tenure (see p. 2 of 20) shall become effective
         January 1, 1984.  That definition shall only apply to faculty tenured
         subsequent to the effective date.  For faculty members tenured
         previous to January 1, 1984, the applicable definition of tenure
         shall be:  "a status pursuant to which the academic year appointments
         of full-time faculty who have been awarded tenure are continued at an
         institution until the expiration or relinquishment of that status,
         subject to termination for adequate cause for financial exigency or
         curricular reasons (see policy adopted June 25, 1976)."

Exhibit 3

# FACULTY HANDBOOK



## Tennessee State University
## Nashville, Tennessee

# TABLE OF CONTENTS

FOREWARD......................................................................... 7
HISTORY, MISSION, AND UNIVERSITY GOALS .................................. 8
History........................................................................... 9
Mission Statement ............................................................. 10
University Institutional Goals ................................................ 11

UNIVERSITY ORGANIZATION AND GOVERNANCE - ADMINISTRATION.... 14
   The Tennessee Higher Education Commission.......................... 15
   The Tennessee Board of Regents....................................... 15
   Tennessee State University............................................. 16
      The President............................................................ 16
      Vice President for Academic Affairs................................... 16
         Associate Vice President for Academic Affairs for Extended Education..... 16
         Associate Vice President for Academic Affairs for Personnel
         Management and Strategic Planning ..................................... 17
      The Deans of Schools and Colleges.................................... 17
         Dean of the Graduate School ........................................... 17
         Dean of Admission and Records......................................... 17
         Director of Libraries and Media Services ............................... 18
      Vice President for Business and Finance ............................... 18
      Vice President for Student Affairs ...................................... 18
      Equal Opportunity and Affirmative Action............................. 18
      Vice President for Administration....................................... 18

ORGANIZATIONAL CHARTS............................................... 19
   President................................................................... 20
   Vice President for Academic Affairs ................................... 21
   Vice President for Administration ....................................... 22
   Vice President for Business and Financial Affairs ..................... 23
   Vice President for Student Affairs....................................... 24

UNIVERSITY ORGANIZATION AND GOVERNANCE - ACADEMIC UNITS.... 25
   Academic Affairs Units.................................................. 26
      Academic Deans......................................................... 26
   The Department Heads, Curriculum Coordinators and Program Directors ..... 27
   The Faculty ............................................................... 27
   Responsibilities of Academic Deans..................................... 28
   Responsibilities of Department Heads and/or Coordinators ............. 33
   Responsibilities of Faculty.............................................. 38

Organization of the Faculty............................................................ 40
   Purpose ............................................................................. 40
   Responsibilities ................................................................... 40
   Membership and Officers ....................................................... 41
   Voting Privilege................................................................... 41
   Meetings of the University Faculty ............................................ 41
   University-Wide Committees.................................................... 42

ACADEMIC REGULATIONS OF INTEREST TO FACULTY ........................ 43
Classrolls ................................................................................. 44
Grade Reporting ....................................................................... 44
Grade Book.............................................................................. 44
Grading System ........................................................................ 45
Withdrawing from a Course........................................................... 47
Academic and Classroom Conduct ................................................... 47
Posting Grades........................................................................... 47
Policy on Excessive Absences ........................................................ 48
Course Syllabi........................................................................... 48
Textbook Policies....................................................................... 49

FACULTY RIGHTS, ACADEMIC FREEDOM AND RESPONSIBILITY ............. 50
Statement of Affirmative Action..................................................... 51
Policies and Procedures for Tenure and Promotion ............................... 51
   Academic Freedom and Responsibilities ..................................... 51
   Policy on Tenure ................................................................. 52
      Definitions....................................................................... 52
      Academic Tenure .............................................................. 54
      Minimum Eligibility Requirements for Academic Tenure.................. 54
      Types of Appointment ........................................................ 55
      Probationary Employment.................................................... 55
      Non-renewal of Non-tenured Faculty........................................ 56
      Credit for Prior Service ....................................................... 57
      Criteria to be Considered in Tenure Recommendation ..................... 58
      Tenure Appointments ......................................................... 60
      Expiration of Tenure .......................................................... 60
      Relinquishment of Tenure .................................................... 60
      Termination of Tenure for Reasons of Financial Exigency................. 60
      Termination of Tenure for Curricular Reasons.............................. 61
      Termination Process........................................................... 61
      Transfer of Tenure............................................................ 63
      Termination for Adequate Cause............................................. 63
      Procedures for Termination for Adequate Cause ........................... 63
      Tenure Procedures............................................................ 67
      Tenure Appeals Procedure................................................... 68
   Policy on Promotion.............................................................. 69
      Minimum Criteria for Academic Rank ...................................... 70
      Criteria for Evaluation........................................................ 72
      Promotion Recommendations................................................. 74
      Promotion Procedures ........................................................ 74
      Promotion Appeals Procedure ............................................... 76

FACULTY PERSONNEL POLICIES AND PROCEDURES ........................... 78
Recruitment and Appointment of Faculty ..................................... 79
Faculty Proficiency in Oral English ........................................ 82
Communication through Channels ........................................ 84
Personnel Files ..................................................................... 84
Work Load ........................................................................ 84
Office Hours ..................................................................... 85
Absence from Work ............................................................ 85
Operation Under Adverse Weather Conditions .......................... 85
Faculty Evaluation .............................................................. 85
Faculty Professional Growth ................................................. 86
Research and Publication ..................................................... 86
Extra Curricular Duties ....................................................... 86
Patent and Copyright Policy .................................................. 86
Copyright and the Classroom Teacher ..................................... 86
Part-time Faculty ............................................................... 87
Compensation for Part-time Faculty ....................................... 87
Outside Employment/Consulting ........................................... 88
Faculty Renumeration and Securing Pay Checks ........................ 91
Extra Compensation ........................................................... 91
Summer School .................................................................. 91
Compensation for Summer School .......................................... 91
Grant Proposals ................................................................. 92
The Committee for the Protection of Rights and Welfare of Human Subjects
    Involved in Research ....................................................... 92
Research .......................................................................... 92
Faculty Release Time for Research ......................................... 92
General Travel Policies and Procedures ................................... 93
Faculty Grievance Procedure ................................................ 98


FACULTY BENEFITS .......................................................... 101
Summary of Faculty Benefits ................................................ 102
Health Insurance ............................................................... 102
Life Insurance ................................................................... 102
Disability Insurance ........................................................... 102
Dental Insurance ............................................................... 102
COBRA ........................................................................... 103
Retirement ....................................................................... 103
Annual Leave .................................................................... 103
Sick Leave ....................................................................... 103
Educational Benefits ........................................................... 104
Grant-In-Aid .................................................................... 104
Leave of Absence .............................................................. 104
Holidays .......................................................................... 105
Payroll Deductions ............................................................. 105


ACADEMIC AND ASSOCIATED SERVICES AND FACILITIES ......... 106
University Library .............................................................. 107
Child Care Services Center for Evening Students ....................... 109
Counseling Center .............................................................. 109
Testing Center ................................................................... 110

6

University Bookstores ............................................................................ 110
University  Post  Office............................................................................ 110
Fundraising............................................................................................ 110
Political Meetings on Campus................................................................. 110
Publicity for Faculty Activities............................................................... 111
Physical and Mental Health Programs for State Employees .................... 111
Recreational Facilities Available to Faculty ............................................. 111

## APPENDICES

A.    Faculty Senate Constitution

B.    Academic Deans and Department Heads

C.    The Instructional Faculty

# Faculty Rights, Academic Freedom, and Responsibility

51

# STATEMENT OF AFFIRMATIVE ACTION

It is the policy of Tennessee State University to provide and maintain a program of equal employment opportunity and fairness in all recruitment or recruitment advertising, hiring, employment upgrading or promotion, development, demotion or transfer, layoff or termination, rates of pay, leaves of absence, and other forms of compensation and training. It is the intent of this policy to safeguard against unsound and illegal personnel practices. The University, therefore, shall engage in no practices which will discriminate against any group or individual for reasons of race, color, religion, national origin, handicap, sex, age (except where sex or age is a bonafide occupational qualification as determined by statutory or Tennessee Board of Regents requirement), or status as a qualified disabled veteran or Veteran of the Vietnam Era. In the implementation of this policy, the University will aggressively seek to recruit and employ persons from classes that are under-represented in its work force. Reasonable accommodations have been and will continue to be made for qualified disabled veterans and other handicapped persons.

The University's policy statement requires units to undertake affirmative action in working toward the achievement of goals set forth and the attainment of an acceptable level of participation in its work force, programs and activities for students, and contracted services. Success achieved in meeting affirmative action goals will be a performance indicator used in the evaluation of all management personnel of the University. Likewise, the degree to which employment opportunity is assured in the functional units of managers/supervisors will be evaluated.

The University has adopted the policy that criteria for employment and promotion be job validated, such that only the skills or preparation actually necessary to the performance of a job are considered in making employment or promotion decisions.

# POLICIES AND PROCEDURES FOR TENURE AND PROMOTION

The following policy of Tennessee State University on academic freedom, responsibility, and tenure complies with Academic Freedom and Responsibility (Article II, 5:02:03:00, 1986) and the Policy on Academic Tenure (Article III, 5:02:03:00, 1986) of the Tennessee Board of Regents.

I.    Academic Freedom and Responsibility

Tennessee State University recognizes the principle of academic freedom and responsibility, pursuant to which

A.    The faculty member is entitled to freedom in the classroom in discussing his or her subject, being careful not to introduce into the teaching controversial matter which has no relation to the subject;

B.    The faculty member is entitled to full freedom in research and in the publication of the results, subject to the adequate performance of his or her other academic duties; but research for pecuniary gain must be based upon written consent from the Academic Vice President and the President of the University; and

52

C.    The faculty member is a citizen, a member of a learned profession, and an officer of the University. When the faculty member speaks or writes as a citizen, he or she should be free from University censorship or discipline, but his or her special position in the community imposes special obligations. As a man or woman of learning and an educational officer, he or she should remember that the public may judge the profession and the University by the faculty member's utterances. Hence, a faculty member should at all times be accurate, should exercise appropriate restraint, should show respect for the opinions of others, and should make every effort to indicate that he or she does not speak for the University.

Academic freedom, responsibility, and tenure are decisively important factors in the viability of Tennessee State University. Academic freedom -- the free search for and exposition of truth -- is essential to fulfill the ultimate objectives of this University and applies to teaching and research. Freedom in research is fundamental to the advancement of truth, and academic freedom in teaching is fundamental for the protection of the rights of the faculty member in teaching and of the student to freedom in learning. Implicit in the principle of academic freedom are the corollary responsibilities of the faculty who enjoy that freedom. Incompetence, indolence, intellectual dishonesty, serious moral dereliction, arbitrary and capricious disregard of standards of professional conduct - these and other grounds may constitute adequate cause for dismissal or other disciplinary sanctions against faculty members subject to the provisions of the Policy on Academic Tenure. The right to academic freedom imposes upon the faculty an equal obligation to take appropriate professional action against faculty members who are derelict in discharging their professional responsibilities. Thus, academic freedom and academic responsibility are interdependent, and academic tenure is adopted as a means to protect the former while promoting the latter. While academic tenure is essential for the protection of academic freedom, all faculty members (tenured or non-tenured) have an equal right to academic freedom and bear the same academic responsibilities implicit in that freedom.

II.    **Policy on Tenure**

A.    Definitions

The following are general definitions of terms used in this policy. The terms are subject to further qualification and definition in the subsequent sections of this policy.

1.    Academic Appointment:  a personnel designation (not an assignment of responsibilities) that this University grants to its faculty members in exchange for professional services in the areas of instruction, research, scholarship, and public service.

2.    Academic Department: an organizational unit within this University, generally devoted to the pursuit of a specific field of study.

3.    Academic Rank:  a position of faculty status in an academic organizational unit, limited to persons who meet this University's

criteria for faculty promotion and consisting of the levels of instructor, assistant professor, associate professor, and professor.

4.  Academic Tenure: a personnel status in an academic organizational unit pursuant to which the academic year appointments of full-time faculty who have been awarded tenure are continued at the University until the expiration or relinquishment of that status, subject to termination for adequate cause, for financial exigency, or for curricular reasons.

5.  Adequate Cause: a basis upon which a faculty member, either with academic tenure or with a tenure-track or temporary appointment prior to the end of the specified term of the appointment, may be dismissed or terminated.

6.  Tennessee Board of Regents: the unit which establishes, governs, manages, and controls the State University and Community College System of Tennessee.

7.  Faculty Member: a full-time employee who holds academic rank as instructor, assistant professor, associate professor, or professor and who for purposes of this policy meets the criteria for tenure, and whose primary responsibilities include instruction, research, scholarship, and public service. (See II.C below.)

8.  Financial Exigency: the formal declaration by the Tennessee Board of Regents that the University faces an imminent financial crisis, that there is a current or projected absence of sufficient funds (appropriated or non-appropriated) for the campus as a whole to maintain current programs and activities at a level sufficient to fulfill its educational goals and priorities, and that the budget can be balanced only by extraordinary means which include the termination of existing and continuing academic and non-academic appointments.

9.  President: the President of Tennessee State University.

10.  Probationary Employment: a period of full-time professional service by a faculty member for whom an appointment letter denotes a tenure-track appointment in which he or she does not have tenure and in which he or she is evaluated by the University for the purpose of determining his or her satisfaction of the criteria for a recommendation for tenure.

11.  "Program is deleted from the curriculum": the Board takes formal action to terminate a degree, major, concentration, or other curricular component and such termination eliminates or reduces need for faculty qualified in that discipline or area of specialization.

12.  "Substantive and continued reduction of student enrollment in a field": over a period of at least three (3) years, student enrollment in a field has decreased at a rate in considerable excess of that of the University as a whole and such reduction has resulted in faculty-student ratios that, in the opinion of the President, cannot be

warranted either by comparison with equivalent faculty load practices within the University or by comparisons with faculty loads in comparable departments at similar institutions which the President would deem to be appropriate for comparison.

13.    University:  Tennessee State University.

B.    Academic Tenure

Tenure is a status pursuant to which faculty appointments for the academic year in an academic organizational unit are continued until retirement or physical or mental disability, subject to dismissal for adequate cause or unavoidable termination on account of financial exigency or curricular reasons.  Tenure is awarded only by positive action by the Board, pursuant to the requirements and procedures of this policy at Tennessee State University.  The awarding of tenure is a recognition of the merit of a faculty member and of the assumption that he or she would meet the long-term staffing needs of the academic organizational unit and the University. It is awarded only to those members of the faculty who have exhibited professional excellence and outstanding abilities sufficient to demonstrate that their future services and performances justify the degree of permanence afforded by academic tenure.

C.    Minimum Eligibility Requirements for Consideration for Academic Tenure

1.    Academic tenure is awarded only to full-time faculty members who: (a) hold academic rank as instructor, assistant professor, associate professor, or professor and meet the minimum rank criteria for the rank;  (b) have been employed pursuant to tenure-track appointments and have completed not less than the minimum probationary period of service; and (c) have been determined by the University to meet the criteria for recommendation for tenure and have been so recommended pursuant to this policy.

*(Faculty holding temporary appointments are not eligible for tenure.)*

2.    Faculty members supported in whole or in part by funds available to the University on a short-term basis, such as grants, contracts, or foundation-sponsored projects, shall not be eligible for tenure unless continuing support for such members can be clearly identified in the regular budget of the University prior to initiating the tenure process.

3.    No faculty member is eligible for tenure in an administrative position; provided that where a faculty member with tenure is appointed to an administrative position, he or she will retain tenure in a former faculty position only and provided further that a faculty member otherwise is eligible for tenure who also holds an administrative position and may be awarded tenure in the faculty position only, subject to the requirements of this policy.

D.    Types of Appointment

There are three types of faculty appointments:

1.    <u>Temporary appointments</u> are for a specific purpose and for a time appropriate to that purpose or for an unspecified period, which appointments may be terminated according to the terms of the appointments. Temporary appointments are ordinarily used for lecturers, adjunct or part-time faculty, faculty to replace regular faculty on leave of absence, and faculty employed pursuant to grants or for projects funded in whole or in part by non-appropriated funds. In addition, temporary appointments are used for faculty employed on the basis of state-appropriated funds in academic organizational units where the permanent and continued need for the position has not been established; such appointments normally are not in excess of three academic years. Any request for an extension beyond three years requires the approval of the Chancellor.

2.    <u>Tenure-track appointments</u> are for regular full-time faculty with academic rank, and may be for the academic or fiscal year. Tenure-track appointments are for faculty who are employed in a probationary period of employment preliminary to consideration for tenure. Tenure-track appointments do not include any right to permanent or continuous employment, do not create any manner of legal right, interest or expectancy of renewal or any other type of appointment, and are subject to annual renewal by the University.

3.    <u>Tenure appointments</u> are for full-time faculty who have been awarded tenure by the Board pursuant to the provisions of this policy. Tenure appointments include the assurance of continued employment for the academic year for an indefinite period, subject to expiration, relinquishment or termination of tenure as hereinafter provided. Such appointments do not include assurance of continued employment at any specified salary or position during summer sessions or inter-sessions.

E.    Probationary Employment

1.    Probationary faculty may be employed on annual tenure-track appointments for a maximum probationary period which may not exceed seven years. A recommendation for tenure of a faculty member following a probationary period of not less than five years may be made by the President of the University, provided exceptions to the minimum probationary period may be made under special circumstances upon recommendation by the President and the Chancellor and approval by the Board.

2.    The minimum probationary period of five years may include credit for prior service when agreed to by the President, and subject to the maximum permissible credit for prior service. (See II.G.1.)

3.    Employment during summer terms, in part-time positions, or during periods of leaves of absence (except in the circumstance described in

"4" below) shall not be credited toward satisfying the probationary period.

4.    Only full-time continuous service at an institution will be included in determining completion of the probationary period, except where a break in service was pursuant to an approved leave of absence. The period of approved leave of absence shall be excluded from the requisite period for completion of the probationary period unless the President of the University specifies in writing prior to the leave of absence that it shall be included in the probationary period. In no case may more than one year of approved absence be included in determining completion of the probationary period.

5.    Where a faculty member is appointed to an administrative position prior to being awarded tenure at the University, if he or she maintains a significant involvement in academic pursuits such as teaching and scholarship, the time or a prorated portion of the time spent in the administrative position may be credited toward completion of the probationary period, provided that the academic organizational unit in which the faculty member would otherwise be employed recommends the faculty member for tenure.

6.    Where a faculty member is serving a probationary period in an academic organizational unit and is subsequently transferred to another academic unit, the faculty member may with the approval of the President elect to begin a new probationary period with the transfer. If he or she does not so elect (and confirm in writing to the President), time spent in the first appointment shall count toward establishing the minimum and maximum probationary period (see E.1 above).

F.    Non-renewal of Non-tenured Faculty

1.    When tenure-track appointments of faculty are not renewed for further service, the faculty member shall receive notice of his or her non-retention for the ensuing academic year as follows:

a.    not later than April 1 of the first academic year of service, if the appointment expires at the end of that year; or, if the appointment terminates during an academic year, at least two months in advance of its termination:

b.    not later than January 1 of the second year of service, if the appointment expires at the end of that year; or, if the appointment terminates during an academic year, at least five months in advance of its termination; or

c.    not later than the close of the academic year preceding the third or subsequent years of service, if the appointment expires at the end of that year or, if the appointment terminates during an academic year, at least twelve months in advance of its termination. Notice of non-renewal shall be effective upon personal delivery of the notice to the faculty

57

member or upon the date the notice is mailed, postage prepaid, to the faculty member at his or her current home address of record at the University.

Dates for notice of non-renewal are in no way affected by any credit for prior service which may be awarded persuant to section II.G.

2.    When a faculty member on a tenure-track appointment completes the sixth year of the probationary period, the faculty member will either be recommended for tenure by the President or be given notice of non-renewal of the appointment following the seventh year of service. Such notice of non-renewal should be given not later than the final day of the sixth academic year. The faculty member's right in an instance where timely notice is not given is described in the introductory paragraph of "I" below.

3.    Faculty members on tenure-track appointments shall not be terminated during the annual specified term of the appointment except for reasons which would be sufficient for the termination of tenured faculty.

4.    The non-renewal or non-reappointment of any faculty member on a tenure-track appointment does not necessarily carry an implication that his or her work or conduct has been unsatisfactory. A faculty member whose tenure-track appointment is not renewed shall be given an oral statement of the reason or reasons for the non-renewal by the President or his or her designated representative(s).

5.    The University provides the opportunity for the non-renewal faculty member to discuss his or her case in an appropriate manner with the dean.

G.    Credit for Prior Service

1.    Credit toward completion of the probationary period may, at the discretion of the President, be given for a maximum of three years of previous full-time service at other colleges, universities or institutes, provided that the prior service is relevant to the University's own needs and criteria. Any credit for prior service which is recognized and agreed to must be confirmed in writing at the time of the initial appointment.

2.    Credit toward completion of the probationary period may, at the discretion of the President, be given for a maximum of three years of previous full-time service in a temporary faculty appointment at the University (see Types of Appointments, Section D.1) or in an earlier tenure-track appointment at the University which has been followed by a break in service. Any credit for prior service in a temporary full-time faculty appointment at the University or in an earlier tenure-track appointment (at the University) which has been followed by a break in service must be recognized and confirmed in writing in the appointment letter to a tenure-track position.

*No degree requirement*

H.    Criteria to be Considered in Tenure Recommendation

The University does not award tenure automatically upon completion of the required years in rank. Rather, it is awarded by the University through the positive action of the Tennessee Board of Regents, in recognition of merit, achievement, potential, and the long-term staffing needs of the academic organizational unit or the University. It is awarded only to those members of the faculty who have exhibited professional excellence and outstanding abilities in teaching and either research or service, sufficient to demonstrate that their future services and performances will justify the degree of permanence afforded by academic tenure. Eligibility for tenure application is based on the faculty member's standing as instructor, assistant professor, associate professor, or professor and upon completion of five years in a tenure-track position.

The role of evaluation in measuring those criteria recognized above (i.e. merit, achievement, potential, and long-term staffing needs) is an important and comprehensive one, assuring that tenure is granted on the basis of quality of performance by involving (1) department head, (2) appropriate deans, (3) professional colleagues, and (4) students. The nature and relative importance of the criteria for recommendations for tenure are based on the fact that Tennessee State University is a comprehensive 1890 land-grant and major urban institution, mandated to provide instruction, research, and public service for the Metropolitan Nashville area, the State of Tennessee, and national and international constituents. Therefore, although all of the general criteria listed below may be considered to some degree in recommendations for tenure, emphasis will be placed on instruction, research, and public service. Exceptional performance should be indicated in the area of instruction and at least one other major area. Listed below are general criteria which may be considered in the evaluation process.

1.    Instruction

*Did all tenure promo & excs.^...^^ all of these?*

Since the University's mission is embedded in a philosophy of academic excellence, excellence in teaching is a major basis for consideration for academic tenure. Evaluation of instruction should be based on the examination and evaluation of the following.

- Curriculum and/or program development;
- Published works in the area of teaching;
- Honors and recognition for contributions to teaching;
- Individual's performance in the advisement of students;
- Development of well-structured course outlines;
- Development of new teaching materials and approaches;
- Demonstration of effective classroom instruction and management;
- Continued intellectual development within the person's field of specialization;
- Efficiency in meeting the expectations of the University pertaining to record keeping and reporting, attendance at faculty meetings, and other such duties and responsibilities related to his or her role as a member of the University professional community.

2.     Research (and Creative Activities)

Research, both basic and applied, is conducted to support and enhance the academic programs and other specialized areas related to the University's land-grant and urban roles. Faculty are encouraged to pursue scholarly research, to advance general and applied theory, and to improve human conditions.

The evaluation of research is based on documentation of the candidate's published research and other evidence of scholarly investigation, such as research papers presented at meetings of professional associations. In the area of fine arts, original and/or creative works may meet this criterion. Evaluation should stress the quality of the written material or the performance.

3.     Public Service and Professional Activities

Public service is the third major component of the University's land-grant mission. Evaluation of the public service component should be based on performance in three areas: public service to the community as defined by the role and mission of Tennessee State University; service to the University; and service to the applicant's academic discipline and budgeted assignment. Evaluation should be based on all three areas although it is realized that differences in emphasis may exist.

These criteria should include community service programs, public service consultation, committee responsibility, and active contributions to professional associations and should take into consideration the candidate's (a) performance in relation to assigned and budgeted duties; (b) performance for clientele as judged by impact on the individuals, groups, or organizations served; and (c) appraisal of the candidate's local, regional, and national professional involvement.

4.     Potential for Professional Growth

This includes formal academic study, participation in workshops, seminars and professional meetings, and other activities which indicate interest in continued improvement of one's teaching, research, and service.

5.     Staffing Needs

Recommendations for tenure must be made subject to the long-term staffing needs of the academic organizational unit and the University.

6.     Other Factors

Factors which may also be considered in tenure review are professional degrees, awards, licensure (certification, professional

designation) and achievements, and the ability to achieve the goals of the academic organizational unit and the institution.

I.    Tenure Appointments

No faculty member shall be entitled to or acquire any interest in a tenure appointment at the University without a recommendation for tenure by the President of the University and an affirmative award of tenure by the Tennessee Board of Regents. No other person shall have any authority to make any representation concerning tenure to any faculty member, and failure to give timely notice of non-renewal of a contract shall not result in the acquisition of a tenure appointment, but shall result in the right of the faculty member to another year of service at the University.

Recommendations for or against tenure of eligible faculty should originate from the academic organizational unit in which the faculty member is assigned and should include appropriate participation in the recommendation by tenured faculty in the unit. Peer committees shall have privilege of academic confidentiality against disclosure of individual tenure votes unless there is evidence that casts doubt upon the integrity of the peer committee. The recommendation for tenure must be made by the President to the Chancellor and by the Chancellor to the Board. In the event that tenure is awarded by the Board, the President shall furnish to the faculty member written confirmation of the award.

→ See TBR policy #5:02:03:00 II § 20 § 3 .

J.    Expiration of Tenure

Tenure status shall expire upon retirement of the faculty member, or at the end of the academic year during which a faculty member reaches age seventy (70). Tenure shall also expire upon the event of permanent physical or mental inability of a faculty member, as established by an appropriate medical authority, to continue to perform his or her assigned duties.

K.    Relinquishment of Tenure

A faculty member shall relinquish or waive his or her right to tenure upon resignation from the University, or upon failure to report for service at the designated date of the beginning of any academic semester, which shall be deemed to be a resignation unless, in the opinion of the President, the faculty member has shown good cause for such failure to report. Where a tenured faculty member is transferred or reclassified to another academic organizational unit by the University, the transfer or reassignment is with tenure. Tenure is not relinquished during administrative positions at the University.

L.    Termination of Tenure for Reasons of Financial Exigency

A tenured faculty member may be terminated as a result of financial exigency at the University subject to Board declaration that such financial conditions exist. Personnel decisions (including those pertaining to tenured faculty) that result from a declaration of financial exigency shall comply with the Board Policy on Financial Exigency.

**M.**     Termination of Tenure for Curricular Reasons

The employment of a tenured faculty member may be terminated (1) because a program is deleted from the curriculum, OR (2) because of substantial and continued reduction of student enrollment in a field. Before declaring that curricular reasons exist, the President will ensure meaningful participation by the University's Faculty Senate in identifying the specific curricular reasons, evaluating the long-term effect on the University's curriculum and its strategic planning goals, and the advisability of initiating further action. Prior to initiating the termination process described below, the President will present in writing to the Faculty Senate a description of curricular reasons that may warrant the termination of tenured faculty member(s). Before any action is taken, the Faculty Senate will have an opportunity to respond in writing to the President's curricular reasons for proposing to terminate tenured faculty.

See pp. 17-18 of 20; TRR policy # 5/02:03:00.

**N.**     Termination Process

1.     Upon determining that termination of one or more tenured faculty members is required for one or more of the two reasons cited above, the President shall furnish each faculty member to be terminated a written statement of the reasons for the termination. Those reasons shall address fully the curricular circumstances that warranted the termination and shall indicate the manner and the information upon which the decision of which faculty members were to be terminated was reached. The President's written statement shall also indicate that the faculty member has the opportunity to respond in writing, stating any objections to the decision.

2.     If the faculty member(s) to be terminated indicate(s) objections to the President's written statement(s) and request(s) a review, the President will appoint a faculty committee consisting of a minimum of five tenured faculty members from a slate of ten tenured faculty members proposed by the Faculty Senate; that committee shall conduct a hearing on the proposed termination or terminations. The Committee shall report its findings and recommendations to the President, who shall in a reasonable time inform, in writing, the faculty member(s) proposed for termination either that the decision for termination stands or that it has been altered.

3.     The President's decision to terminate a tenured faculty member for curricular reasons is subject to appeal to the Chancellor and the Board as provided in the policy on appeals to the Board.

4.     When a tenured faculty member is terminated for curricular reasons, the position will not be filled by a new appointee with the same areas of specialization as the terminated faculty member within a period of three years unless the terminated faculty member has been offered, in writing, re-appointment to the position at his or her previous rank and salary (with the addition of an appropriate increase which, in the opinion of the President, would constitute the raise that would have been awarded during the period that he or she was not employed).

5.  Upon determining that termination of one or more tenured faculty members is warranted for curricular reasons, the President shall base his or her decision about which faculty members(s) should be terminated upon his or her assessment of what action would least seriously compromise the educational programs in a department or a division. Termination for curricular reasons presumes a staffing pattern in an academic organizational unit which cannot be warranted either by comparison with general load practices within the University or by comparison with faculty loads in comparable units at similar institutions. In that light, the President shall also, at his or her discretion, base his or her decision on a careful assessment of the impact of the curricular reason on staffing requirements in the academic organizational unit as compared to overall patterns in the University and to comparable units which, in his or her judgement, are in institutions similar enough to warrant comparison.

    Unless the President demonstrates (preferably by means of past performance evaluations) that an exception should be made to avoid qualitative compromise of an educational program, the following considerations should guide - but not be construed as mandatory - the President in determining the order of faculty reductions in an academic organizational unit where termination of tenured faculty is proposed for curricular reasons:

    a.  part-time faculty should not be renewed before tenured faculty are terminated,

    b.  temporary faculty or tenure-track faculty in the probationary period should not be renewed before tenured faculty are terminated,

    c.  among tenured faculty, those with higher rank should have priority over those with lower rank,

    d.  among tenured faculty with comparable rank, those with appropriate higher academic degree(s) should have priority, and

    e.  among tenured faculty with comparable rank and comparable degrees, those with greater seniority in rank should normally have priority over those with less seniority.

6.  When a tenured faculty member is to be terminated for curricular reasons, the President will make every possible effort to relocate the tenured faculty member in another existing vacant position for which he or she is qualified. In instances where (in the opinion of the President) relocation within the University is a viable alternative, the University has an obligation to make significant effort to relocate the faculty member, including the bearing of reasonable retraining costs. The final decision on relocation is within the discretion of the President.

63

O.    Transfer of Tenure

    Where a faculty member is tenured in an academic organizational unit and is subsequently transferred to another unit, the transfer is with tenure. In no instance may the faculty member be compelled to relinquish tenure as a condition for effecting the transfer.

P.    Termination for Adequate Cause

    A faculty member with tenure or a faculty member on a tenure-track appointment prior to the end of the term appointment may be terminated for adequate cause, which includes the following:

1.    Incompetence or dishonesty in teaching or research.
2.    Willful failure to perform the duties and responsibilities for which the faculty member was employed, or refusal or continued failure to comply with the policies of the Board, the University, or the academic organizational unit, or refusal or continued failure to carry out specific assignments, when such policies or assignments are reasonable and non-discriminatory.
3.    Conviction of a felony or a crime involving moral turpitude.
4.    Improper use of narcotics or intoxicants which substantially impairs the faculty member's fulfillment of his or her departmental and University duties and responsibilities.
5.    Capricious disregard of accepted standards of professional conduct.
6.    Falsification of information on an employment application or other information concerning qualifications for a position.
7.    Failure to maintain the level of professional excellence and ability demonstrated by other members of the faculty in the academic organizational unit of the University.

Q.    Procedures for Termination for Adequate Cause

    Termination of a faculty member with a tenure appointment, or with a tenure-track or temporary appointment prior to the annual specified term of the appointment, shall be subject to the following procedures:

1.    No termination shall be effective until steps 4 through 10 below have been completed.

2.    Suspensions pending termination shall be governed by the following procedure.

    a.    A faculty member may not be suspended pending completion of steps 4 through 10 unless it is determined by the University that the faculty member's presence poses a danger to persons or property or a threat of destruction to the academic or operational processes of the University. Reassignment of responsibilities is not considered suspension; however, the faculty member must be reassigned responsibilities for which he or she is qualified.

b.     In any case of suspension, the faculty member shall be given an opportunity at the time of the decision or immediately thereafter to contest the suspension; and, if there are disputed issues of fact or cause and effect, the faculty member shall be provided the opportunity for a hearing on the suspension as soon as possible, at which time the faculty member may cross-examine his or her accuser, present witnesses on his or her behalf, and be represented by an attorney. Thereafter, whether the suspension is upheld or revoked, the matter shall proceed pursuant to these procedures.

3.     Except for such simple announcements as may be required concerning the time of proceedings and similar matters, public statements and publicity about these proceedings by either the faculty member or administrative officers will be avoided so far as possible until the proceedings have been completed, including consideration by the Board.

4.     Upon a recommendation by the Vice President for Academic Affairs to the President or upon a decision by the President that these procedures should be undertaken in consideration of the termination of a tenured faculty member, one or more appropriate administrators shall meet privately with the faculty member for purposes of attempting to reach a mutually acceptable resolution of the problems giving rise to the proposed termination proceedings.

5.     If a mutual resolution is not reached under step 4, the President shall appoint a faculty committee consisting of tenured faculty members, whose appointments should be, but are not required to be, agreed to by the faculty member. The faculty committee shall conduct an informal inquiry of the facts giving rise to the proposed termination and seek a mutually acceptable resolution. Should no such resolution be reached, the committee shall recommend to the President whether in its opinion further proceedings should be taken in pursuit of the termination. The recommendation shall be in writing and shall be accompanied by reasons for the recommendation. The committee's recommendation shall not be binding on the President.

6.     If no mutually acceptable resolution is reached through step 5 and/or if after consideration of the faculty committee's recommendation the President determines that further proceedings are warranted to consider termination, the following steps shall be taken.

a.     The faculty member shall be provided with a written statement of the specific charges alleged by the University which constitute grounds for termination and a notice of hearing specifying the time, date, and place of the hearing. The statement and notice must be provided at least twenty (20) days prior to the date of the hearing. The faculty member shall respond to the charges in writing at least five (5) days prior to the hearing. The faculty member may waive the hearing by execution of a written waiver.

b.     A committee consisting of a <u>minimum of five members</u> of the faculty or faculty and administration shall be appointed to hear the case and to determine if adequate cause for termination exists according to the procedure hereinafter described. The committee shall be appointed

by the President and the Faculty Senate. The committee may not include any member of the faculty committee referred to in 5 above. Members deeming themselves disqualified for bias or interest shall remove themselves from the case, either at the request of a party or on their own initiative. Members of the committee shall not discuss the case outside committee deliberations and shall report any ex-parte communication pertaining to the hearing to the President, who shall notify all parties of the communication.

7. The hearing committee shall elect a chairperson who shall direct the proceedings and rule on procedural matters, including the granting of reasonable extensions of time at the request of any party and upon the showing of good cause for the extension.

8. The chairperson of the hearing committee may in his or her discretion require a joint pre-hearing conference with the parties which may be held in person or by a conference telephone call. The purpose of the pre-hearing conference should include but is not limited to one or more of the following:

    a. Notification as to procedure for conduct of the hearing.

    b. Exchange of witness lists, documentary evidence, and affidavits.

    c. Define and clarify issues.

    d. Effect stipulations of fact.

A written memorandum of the pre-hearing conference should be prepared and provided to each party.

9 A hearing shall be conducted by the hearing committee to determine whether adequate cause for termination of the faculty member exists. The hearing shall be conducted according to the procedures below.

    a. During the hearing, the faculty member will be permitted to have an academic advisor present and may be represented by legal counsel of his or her choice.

    b. A verbatim record of the hearing will be taken and a typewritten copy will be made available to the faculty member, upon request, at the faculty member's expense.

    c. The burden of proof that adequate cause exists rests with the University and shall be satisfied only by clear and convincing evidence in the record considered as a whole.

    d. The faculty member will be afforded an opportunity to obtain necessary witnesses and documentary or other evidence. The administration will cooperate with the committee in securing witnesses and making available documentary and other evidence.

e.  The faculty member and the administration will have the right to confront and cross-examine all witnesses. Where the witnesses cannot or will not appear, but the committee determines that the interests of justice require admission of their statements, the committee will identify the witnesses, disclose their statements, and if possible, provide for interrogatories.

An affidavit may be submitted in lieu of the personal appearance of a witness if the party offering the affidavit has provided a copy to the opposing party at least ten (10) days prior to the hearing and the opposing party has not objected to the admission of the affidavit in writing within (7) days after delivery of the affidavit or if the committee chairperson determines that the admission of the affidavit is necessary to insure a just and fair decision.

f.  In a hearing on charges of incompetence, the testimony shall include that of qualified faculty members from the institution or other institutions of higher education.

g.  The hearing committee will not be bound by strict rules of legal evidence and may admit any evidence which is of probative value in determining the issues involved. Every possible effort will be made to obtain the most reliable evidence available.

h.  The findings of fact and the report will be based solely on the hearing record.

i.  The President and the faculty member will be provided a copy of the written committee report. The committee's written report shall specify findings of fact and shall state whether the committee has determined that adequate cause for termination exists and, if so, the specific grounds for termination found. In addition, the committee may recommend action less than dismissal. The report shall also specify any applicable policy the committee considered.

10.  After consideration of the committee's report and the record, the President may in his or her discretion consult with the faculty member prior to reaching a final decision regarding termination. Following his or her review, the President shall notify the faculty member of his or her decision, which, if contrary to the committee's recommendation shall be accompanied by a statement of the reasons.

If the faculty member is terminated or suspended as a result of the President's decision, the faculty member may appeal the President's action to the Chancellor pursuant to TBR Policy No. 1:02:11:00. Review of the appeal shall be based upon the record of hearing. If upon review of the record, the Chancellor notes objections regarding the termination and/or its proceedings, the matter will be returned to the President for reconsideration, taking into account the stated objections, and, in the discretion of the President, the case may be returned to the hearing committee for further proceedings.

R.  Tenure Procedures

The Vice President for Academic Affairs will publish the schedule for the tenure process. The faculty member applying for tenure will prepare a dossier which demonstrates his or her achievements in the areas of instruction, research, and service and which clearly illustrates the extent to which he or she meets or exceeds the eligibility requirements and criteria for tenure. The Vice President for Academic Affairs may, but is not required to, issue guidelines for preparation of the dossier.

The appeal process begins only after the Vice President for Academic Affairs has made his or her recommendation; however, the candidate may withdraw from the tenure process at any stage without prejudice.

1.  The Department Head will:

   a.  Receive from all candidates for tenure an application file containing items to be used in review at each committee level.

   b.  Add to the file a report on teaching effectiveness.

   c.  Convene the Departmental Promotion and Tenure Committee and explain the review process.

   d.  Forward (without comment) the application files to the Departmental Promotion and Tenure Committee.

2.  The Departmental Promotion and Tenure Committee will:

   a.  Review the application files of candidates in their Department for tenure.

   b.  Obtain a minimum of two letters of evaluation.

   c.  Complete and submit to the Department Head the Committee's recommendation on each candidate's application.

3.  The Department Head will:

   a.  Review the report of the Departmental Committee and all applicant files.

   b.  Prepare and submit to the Dean a written recommendation on each candidate.

4.  The Dean will receive all recommendations for tenure from department heads and will forward these (without comment) to the School Promotion and Tenure Committee.

5.  The School Promotion and Tenure Committee will:

   a.  Review the applicant file for each candidate, the departmental committee report, and the recommendations of Department Heads.

    b.    Prepare and submit to the Dean a written recommendation on each candidate.

6.    The Dean will:

    a.    Review all applicant files, including recommendations of the Departmental Committee and the School Committee.

    b.    Prepare and submit to the Vice President for Academic Affairs a written recommendation on each candidate

7.    The Vice President for Academic Affairs will forward all recommendations (without comment) to the Faculty Personnel Committee.

8.    The Faculty Personnel Committee will:

    a.    Review all applicant files for tenure, the reports of the committees, and the recommendations of the Department Heads and Deans.

    b.    Forward a recommendation on each candidate to the Vice President for Academic Affairs.

9.    The Vice President for Academic Affairs will:

    a.    Review all applicant files, including the report of the committees and the recommendations of previous administrators.

    b.    Forward a recommendation regarding each candidate to the President and inform each candidate of the Vice President's recommendation. If the Vice President for Academic Affairs' recommendation is negative, the candidate may appeal. (See Section S, Tenure Appeals Procedures).

10.    The President will:

    a.    Review all applicant files for tenure including the findings of appeals, the reports of the committees, and the recommendations of all previous administrators.

    b.    Forward all recommendations regarding tenure to the Chancellor of the Tennessee Board of Regents, along with decisions regarding any cases that were appealed.

S.    Tenure Appeals Procedure

    In the case of a negative recommendation for tenure, the following procedure shall be used:

1.    Upon written notification of a negative recommendation, a candidate may request a meeting to be held with the Vice President for Academic Affairs. At this meeting, the reasons for the negative recommendation shall be discussed. The candidate may then decide either to appeal or to accept the recommendation.

2. The candidate's appeal of a negative recommendation shall be in writing to the Vice President for Academic Affairs and shall respond to the issues raised in the meeting with the Vice President for Academic Affairs. Specifically,

   a. If there is a question of the substance or quality of the candidate's teaching, research or service, the candidate may provide additional information and documents to support reconsideration of his or her case and for inclusion and consideration in all subsequent reviews.

   b. If there is a procedural question, the candidate may provide a written description of the aspect of the review process that he or she believes to have been omitted or inadequate. This aspect will be included in the review process.

3. The Vice President for Academic Affairs may, upon review of the appeals materials, reverse his or her recommendation. In such a case, the Vice President will forward to the President a statement indicating that the recommendation has been reversed and will likewise notify the candidate.

4. If the Vice President does not reverse his or her recommendation after reviewing the appeals materials, the appeals materials and the applicant's file, including the recommendations of all previous committees and administrators, will be forwarded to the Tenure and Promotion Appeals Committee. This Committee will be appointed by the Vice President for Academic Affairs and the Chairperson of the Faculty Senate, who jointly will ensure that each academic school is represented.

5. The Tenure and Promotion Appeals Committee shall consider the candidate's appeals materials as well as the candidate's file, including the recommendations of all previous committees and administrators. This consideration shall result in a finding of "no change in recommendation" or "change to positive recommendation." This finding will be transmitted, in writing, to the Vice President for Academic Affairs.

6. The Vice President for Academic Affairs will notify the candidate of the Appeals Committee's recommendation and will inform the candidate of whether or not the Vice President's recommendation has changed.

7. The recommendation of the Tenure and Promotion Appeals Committee will be forwarded to the President along with the recommendation of the Vice President for Academic Affairs.

III. Policy on Promotion

The following policy of Tennessee State University on promotion complies with Tennessee Board of Regents policy. That is, it is consistent with Board policy regarding formal education and experience, teaching effectiveness, professional development, research and service to the University.

Promotion in rank is a recognition of one's past achievement and a recognition of one's future potential. In addition, it is a sign of confidence that the individual is capable of greater accomplishments and of assuming greater responsibilities. The policy of the University is to ensure that promotions are made strictly on merit, tempered by programmatic and fiscal considerations. In maintaining this policy, promotions are made objectively, equitably, impartially, and as recognition of merit in line with the following policies. The policies which follow provide a plan for documenting the evaluation process at the University.

A.    Minimum Criteria for Academic Rank

The University does not automatically promote faculty members upon completion of the required years in rank. Rather, promotion is awarded by the University through the positive action of the Tennessee Board of Regents in recognition of merit, achievement, and potential. A tenured or tenure-track faculty member becomes eligible to apply for promotion when he or she meets the defined qualifications for the various faculty ranks. These minimum criteria follow.

1.    Instructor

   a.    Potential ability in instruction and/or public service, and/or research.

   b.    Evidence of good character, mature attitude, and stable personality.

   c.    Master's degree in the instructional discipline or related area.

2.    Assistant Professor

   a.    Potential ability in instruction, public service and research.

   b.    Evidence of good character, mature attitude, and stable personality.

   c.    Earned doctorate from an accredited institution in the instructional discipline or related area

or

   d.    Master's degree in the instructional discipline when that Master's degree is the recognized terminal degree in that instructional discipline

or

   e.    Master's degree in the instructional discipline or related area

plus

30 semester hours (45 quarter hours) beyond the Master's in

that instructional discipline or related area earned in the formal pursuit of the doctorate

plus

appropriate professional experience credit in the instructional discipline or related area.

3.    Associate Professor

a.    Evidence of good character,  mature attitude, and stable personality.

b.    Documented (as outlined in institutional policy) ability (as opposed to mere potential) in instruction, public service, and research.  Achievement in all three areas is expected.  In special situations, given the nature of faculty members' duties and responsibilities, consideration may be given to using two criteria.

c.    Earned doctorate from an accredited institution in the instructional discipline or related area

plus

five (5) years' appropriate professional experience at the rank of Assistant  Professor in the instructional discipline or related area.

4.    Professor

a.    Evidence of good character, mature attitude, and stable personality and high degree of academic maturity and responsibility.

b.    Documented (as outlined in institutional policy) ability (as opposed to mere potential) in instruction, public service, and research.  Substantial achievement in each of the three areas is expected.  In special situations. given the nature of faculty members' duties and responsibilities, consideration may be given to using two criteria.

c.    Documented evidence (as outlined in institutional policy) of substantial quality professional productivity, and regional recognition in the academic discipline.

d.    Earned doctorate from an accredited institution in the instructional discipline or related area

plus

ten (10) years' appropriate professional experience, including a minimum of five (5) at the rank of Associate Professor, in the instructional discipline or related area.

5.    Exceptions to these minimum rank qualifications can be made by recommendation of the President.

B.    Criteria for Evaluation

The role of evaluation in assessing the merit of the candidate is an important and comprehensive one, ensuring that promotion is granted on the basis of quality of performance by involving department head, appropriate deans, professional colleagues, and students. The nature and relative importance of the criteria for recommendations for promotion are based on the fact that Tennessee State University is a comprehensive 1890 land-grant and major urban institution, mandated to providing instruction, research, and public service for the Metropolitan Nashville area, the State of Tennessee, and national and international constituents. Therefore, although all of the general criteria listed below may be considered to some degree in recommendations for promotion, emphasis will be placed on instruction, research, and public service. Listed below are general criteria which may be considered in the evaluation process.

1.    Instruction

Since the University's mission is embedded in a philosophy of academic excellence, excellence in teaching is a major basis for consideration for promotion. Evaluation of instruction should be based on the examination and evaluation of the following:

- Curriculum and/or program development;
- Published works in the area of teaching;
- Honors and recognition for contributions to teaching;
- Individual's performance in the advisement of students;
- Development of well-structured course outlines;
- Development of new teaching materials and approaches;
- Demonstration of effective classroom instruction and management;
- Continued intellectual development within the person's field of specialization;
- Efficiency in meeting the expectations of the University pertaining to record keeping and reporting, attendance at faculty meetings, and other such duties and responsibilities related to his or her role as a member of the University professional community.

2.    Research (and Creative Activities)

Research, both basic and applied, is conducted to support and enhance the academic programs and other specialized areas

related to the University's land-grant and urban roles. Faculty are encouraged to pursue scholarly research, to advance general and applied theory, and to improve human conditions.

The evaluation of research is based on documentation of the candidate's published research, and other evidence of scholarly investigation, such as research papers presented at meetings of professional associations. In the area of fine arts, original and/or creative works may meet this criterion. Evaluation should stress the quality of the written material or the performance.

3.    Public Service and Professional Activities

Public service is the third major component of the University's land-grant mission. Evaluation of the public service component should be based on performance in three areas: public service to the community as defined by the role and mission of Tennessee State University; service to the University; and service in the applicant's academic discipline and budgeted assignment. Evaluation should be based on all three areas although it is realized that differences in emphasis may exist.

These criteria should include community service programs, public service consultation, committee responsibility, and active contributions to professional associations and should take into consideration the candidate's (a) performance in relation to assigned and budgeted duties; (b) performance for clientele as judged by impact on the individuals, groups, or organizations served; and (c) appraisal of the candidate's local, regional, and national professional involvement.

4.    Potential for Professional Growth

This includes formal academic study, participation in workshops, seminars and professional meetings, and other activities which indicate interest in continued improvement of one's teaching, research, and service.

5.    Staffing needs

Recommendations for promotion must take into consideration (a) the fiscal impact of each promotion recommended, i.e. resources allocated to the University and distributed throughout the University for current operations, and (b) the rank distribution in each academic organizational unit to ensure it is commensurate with the mission outlines for the unit, e.g. level of courses being taught as well as student demand for offerings.

6.  Other Factors

    Factors which may also be considered in promotion review are professional degrees, awards, licensure (certification, professional designation) and achievements, and the ability to achieve the goals of the academic organizational unit and the institution.

C.  Promotion Recommendations

    Recommendations for or against promotion of eligible faculty should originate from the academic organizational unit in which the faculty member is assigned and should include appropriate participation in the recommendation by tenured faculty in the unit. Peer committees shall have privilege of academic confidentiality against disclosure of individual promotion votes unless there is evidence that casts doubt upon the integrity of the peer committee. The recommendation for promotion must be made by the President to the Chancellor and by the Chancellor to the Board. In the event that promotion is awarded by the Board, the President shall furnish to the faculty member written confirmation of the promotion.

D.  Promotion Procedures

    The Vice President for Academic Affairs will publish the schedule for the promotion process. The faculty member applying for promotion will prepare a dossier which demonstrates his or her achievements in the areas of instruction, research, and service and which clearly illustrates the extent to which he or she meets or exceeds the criteria for the promotion requested. The Vice President for Academic Affairs may, but is not required to, issue guidelines for preparation of the dossier.

    The formal appeal process begins only after the Vice President for Academic Affairs has made his or her recommendation; however, the candidate may withdraw from the promotion review process at any stage without prejudice.

1.  The Department Head will:

    a.  Receive from all candidates for promotion an application file containing items to be used in review at each committee level.

    b.  Add to the file a report on teaching effectiveness.

    c.  Convene the Departmental Promotion and Tenure Committee and explain the review process.

    d.  Forward (without comment) the application files to the Departmental Promotion and Tenure Committee.

2.   The Departmental Promotion and Tenure Committee will:

    a.   Review the application files of candidates in their Department for promotion.

    b.   Obtain a minimum of two letters of evaluation.

    c.   Complete and submit to the Department Head the Committee's recommendation on each candidate's application.

3.   The Department Head will:

    a.   Review the report of the Departmental Committee and all applicant files.

    b.   Prepare and submit to the Dean a written recommendation on each candidate.

4.   The Dean will receive all recommendations for promotion from department heads and will forward these (without comment) to the School Promotion and Tenure Committee.

5.   The School Promotion and Tenure Committee will:

    a.   Review the applicant file for each candidate, the departmental committee report, and the recommendations of Department Heads.

    b.   Prepare and submit to the Dean a written recommendation on each candidate.

6.   The Dean will:

    a.   Review all applicant files, including recommendations of the Departmental Committee and the School Committee.

    b.   Prepare and submit to the Vice President for Academic Affairs a written recommendation on each candidate

7.   The Vice President for Academic Affairs will forward all recommendations (without comment) to the Faculty Personnel Committee.

8.   The Faculty Personnel Committee will:

    a.   Review all applicant files for promotion, the reports of the committees, and the recommendations of the Department Heads and Deans.

b.   Forward a recommendation on each candidate to the Vice President for Academic Affairs.

9.   The Vice President for Academic Affairs will:

a.   Review all applicant files, including the report of the committees and the recommendations of previous administrators.

b.   Forward a recommendation regarding each candidate to the President and inform each candidate of the Vice President's recommendation. If the Vice President for Academic Affairs' recommendation is negative, the candidate may appeal. (See Section E, Promotion Appeals Procedures).

10.   The President will:

a.   Review all applicant files for promotion including the findings of appeals, the reports of the committees, and the recommendations of all previous administrators.

b.   Forward all recommendations regarding tenure to the Chancellor of the Tennessee Board of Regents, along with decisions regarding any cases that were appealed.

E.   Promotion Appeals Procedure

In the case of a negative recommendation for promotion, the following procedure shall be used:

1.   Upon written notification of a negative recommendation, a candidate may request a meeting to be held with the Vice President for Academic Affairs. At this meeting, the reasons for the negative recommendation shall be discussed. The candidate may then decide either to appeal or to accept the recommendation.

2.   The candidate's appeal of a negative recommendation shall be in writing to the Vice President for Academic Affairs and shall respond to the issues raised in the meeting with the Vice President for Academic Affairs. Specifically,

a.   If there is a question of the substance or quality of the candidate's teaching, research or service, the candidate may provide additional information and documents to support reconsideration of his or her case and for inclusion and consideration in all subsequent reviews.

b.   If there is a procedural question, the candidate may provide a written description of the aspect of the review process that he or she believes to have been omitted or inadequate. This aspect will be included in the review process.

3.    The Vice President for Academic Affairs may, upon review of the appeals materials, reverse his or her recommendation. In such a case, the Vice President will forward to the President a statement indicating that the recommendation has been reversed and will likewise notify the candidate.

4.    If the Vice President does not reverse his or her recommendation after reviewing the appeals materials, the appeals materials and the applicant's file, including the recommendations of all previous committees and administrators, will be forwarded to the Tenure and Promotion Appeals Committee. This Committee will be appointed by the Vice President for Academic Affairs and the Chairperson of the Faculty Senate, who jointly will ensure that each academic school is represented.

5.    The Tenure and Promotion Appeals Committee shall consider the candidate's appeals materials as well as the candidate's file, including the recommendations of all previous committees and administrators. This consideration shall result in a finding of "no change in recommendation" or "change to positive recommendation." This finding will be transmitted, in writing, to the Vice President for Academic Affairs.

6.    The Vice President for Academic Affairs will notify the candidate of the Appeals Committee's recommendation and will inform the candidate of whether or not the Vice President's recommendation has changed.

7.    The recommendation of the Tenure and Promotion Appeals Committee will be forwarded to the President along with the recommendation of the Vice President for Academic Affairs.

Exhibit 4

Policy No. 1:02:11:00
Page 1 of 4

## TENNESSEE BOARD OF REGENTS

SUBJECT:    <u>Appeals and Appearances Before the Board</u>

I.    Appeals to the Chancellor

A student or employee of an institution or school in the Board of Regents system may appeal a final decision of the president of an institution or a director of an area vocational-technical school to the Chancellor. TUAPA hearings as outlined in Policy No. 1:06:00:05 are not appealable to the Chancellor. Appeals to the Chancellor shall be limited to alleged violations of state or federal law or institutional/board policy where the complainant has not filed a federal/state administrative appeal or a lawsuit in state or federal court. If, at any time during the pendency of the appeal, a complainant files a lawsuit or administrative action based on the same subject matter as the appeal, the appeal will be dismissed without further action. Unless there is a violation of state or federal law under the limitations described above, decisions which are not appealable to the Chancellor shall include, but will not be limited to;

1.    Termination of executive, administrative, professional, clerical and support employees during or at the end of the initial probationary period or pursuant to the terms of the contract of employment;

2.    Non-renewal of a tenure-track faculty appointment during the first four years of the probationary period;

3.    Denial of tenure unaccompanied by notice of termination in the <u>fifth</u> year of the probationary period;

4.    Non-renewal of a temporary faculty appointment;

5.    Salary determinations;

6.    Student academic matters, e.g., grade appeals, failure to meet retention policies, etc.;

7.    Performance evaluations of faculty or staff; and

8.    Residency classification of students for tuition and fee purposes.

Appeals and supporting documents must be submitted in writing to the Chancellor within 20 calendar days following the date of a written decision by the president or director. The appeal must state the decision being appealed, the law and/or policy which is alleged to have been violated and the redress desired. The Chancellor shall review the decision on the basis of the record developed at the institution or school, with any new evidence which for good cause shown was not previously considered. The Chancellor may request a student or employee to appear and present arguments in support of an appeal.

II.    Appeals to the Board

A student or employee who is dissatisfied with the decision of the Chancellor on his or her appeal may petition the Board of Regents for permission to appeal the decision of the Chancellor to the Board. The petition must be submitted in writing to the Secretary of the Board within 20 calendar days following the date of the Chancellor's written decision.

The petition for appeal must present:

1.    A brief statement of the issues to be reviewed including a statement of the redress desired;

2.    A brief statement of the facts relevant to the issues to be reviewed, with appropriate reference to where such can be found in the record;

3.    A statement of applicable law/policy;

4.    A brief argument; and

5.    Citations of any applicable authorities, (such as policies, statutes, and cases).

The petition for appeal must be limited to ten (10) pages, typed, doubled spaced, and on 8 1/2 X 11" paper.

The appropriate standing committee of the Board shall review the decision of the Chancellor on the basis of the record submitted to the Chancellor, with any new evidence which for good cause shown was not previously considered, and determine whether the petition to appeal will be granted.

The Board committee, in determining whether to grant an appeal, may consider the following:

A.    Whether Board policy or procedures have been followed;

B.    Whether or not there is material evidence to substantiate the decision appealed from; and/or

C.    Whether or not there has been a material error in the application of the law, which *prima facie* results in substantial injustice.

The listing in A - C above is not exhaustive and, in the discretion of the Board committee, other considerations may be taken into account.

If the petition to appeal is granted, the committee shall hear the appeal at a subsequent regularly scheduled meeting of the committee and may request the person appealing to appear and present arguments on his or her behalf. The committee shall recommend action on the appeal to the Board of Regents. The decision of the Board shall be final and binding for all purposes.

III.    Record

The record on an appeal to the Chancellor or Board shall consist of all relevant documents, statements, and other materials submitted by the person appealing and by the president or director of the institution or school involved. In the event that the person appealing does not submit sufficient information to allow review of the decision being appealed, the Chancellor or the Board may require the person appealing to furnish any additional information which may be necessary.

IV.    Standard of Review

The following provisions shall govern the review by the Chancellor and Board of an appeal under this policy:

1.    A decision may be remanded for further consideration upon a finding that it was not made in accordance with applicable state or federal law or Board, institutional, or school procedures; provided, however, that the decision should not be remanded if the procedural error was not material to the decision and therefore constituted harmless error;

2.    A decision may be modified or reversed only upon a finding that the decision constituted an abuse of discretion or was made in violation of applicable state or federal law or Board, institutional, or school policies; provided, however, that the decision should not be modified or reversed if the violation of policy was not material to the decision and therefore constituted harmless error;

3.    A decision should be affirmed in the absence of a finding of abuse of discretion or material violation of applicable state or federal law or Board, institutional, or school policies or procedures.

Notwithstanding any provision herein to the contrary, any decision may be remanded by the Chancellor or Board for a resolution of the matter which is mutually acceptable to the parties or which is, in the best judgment of the Chancellor or Board, a fair and equitable resolution.

V.    Appearances Before the Board on Non-Appealable Issues

Individuals may be allowed to address a committee of the Board of Regents concerning issues which are not appealable but which are of broad concern to an institutional community. Such appearances must be approved by the Chancellor or the Chairman of the appropriate Board committee prior to being placed on a committee agenda. Notwithstanding, the Chairman or Vice Chairman of the Board may authorize appearances before the Board on any matter deemed appropriate for Board consideration. Requests for approval to appear before the Board shall be submitted to the Chancellor 20 calendar days prior to the date that the committee is next scheduled to meet.

Source:    Board of Regents Bylaws, as amended; SBR Meeting September 30, 1983; SBR Meeting December 12, 1986; SBR Meeting March 17, 1989 TBR Meeting March 25, 1994

Note:    Revised policy approved on September 30, 1983, to be effective on December 16, 1983.

## STATE BOARD OF REGENTS

SUBJECT:  Guidelines for Faculty Promotion Recommendations at
          Universities, Community Colleges, and Technical Institutes


Section I (a)   Guidelines for Faculty Promotion Recommendations at
                Universities.

### INTRODUCTION

Promotion in rank is a recognition of past achievement of the
individual being considered for promotion.  In addition, the
advancement in rank is usually a recognition of future potential and a
sign of confidence that the individual is capable of greater
accomplishments and of assuming greater responsibilities.  The policy
of the State Board of Regents is to make promotions strictly on
consideration of merit tempered by institutional and fiscal
considerations.*  In maintaining this policy, promotions are made
objectively, equitably, impartially, and as a recognition of merit in
line with the following policy guidelines.

The guidelines which follow provide a _general plan_ for documenting the
evaluation process at each institution.  However, _each institution must
develop specific promotion criteria which all units of that institution
will follow.  The institution's policy must be within the parameters
established by these general System guidelines._  The institution's
criteria shall contain a process section outlining the flow of
recommendation documents at the institution.  In addition, each
institution will incorporate in its promotion policy a system whereby
faculty may appeal the promotional decisions which have been made at
the institution.

Once the institution has developed its criteria complete with process
and appellate procedures, these must be forwarded to the State Board of
Regents for review and approval.  The institutional promotion policy
statements will be submitted via the Chancellor to the Committee on
Personnel of the Board for review and recommended action.  From the
Committee, the individual policy statements will be referred to the
Board for appropriate action.  Upon Board approval, the institutional
criteria become a part of Board of Regents Policy.


    *    The president of each institution is responsible for the master
        staffing plan of the institution.  In developing such a plan, the
        president will consider:  (1) the fiscal impact of each promotion
        recommended to the Board; i.e., resources allocated to the
        institution and distributed throughout the institution for current
        operations; and (2) the rank distribution in each department to
        ensure it is commensurate with the mission outlined for the
        department; i.e., level of courses being taught as well as student
        demand for offerings.

## MINIMUM RANK CRITERIA FOR PROFESSIONAL PERSONNEL IN
### INSTRUCTION, PUBLIC SERVICE, AND RESEARCH

Each institution shall establish criteria for personnel
recommendations. The following are a general set of criteria that
distinguish between academic ranks. The minimum rank qualifications
must be met in every recommendation regarding appointment to academic
rank and for promotion in academic rank or exceptions requested as
outlined in Item V.

It is the responsibility of each institution to develop (for Board
approval) specific criteria which fall within the parameters of these
general criteria. The institutional criteria may be more rigid than
the following criteria and may be written to distinguish between
functional areas of instruction, public service, and research, if so
desired.

Institutions will make all judgments regarding the appropriateness of
the degree and equivalent work experience credit. The equivalent work
experience credit may include relevant teaching experience or other
experiences such as experience gained as an administrator, counselor,
librarian, journeyman, or the like. When evaluating college level
instruction and service, the institution may make its own determination
whether or not the teaching or service experience from another
institution is to be accepted in total or discounted in some manner.

On initial appointments the institution may elect to make an exception
to these criteria as outlines in Item V.

I. Instructor

    A. Potential ability in instruction and/or public service, and/or research.

    B. Evidence of good character, mature attitude, and stable personality.

    C. Master's degree in the instructional discipline or related area.

II. Assistant Professor

    A. Potential ability in instruction, and/or public service, and/or research.

    B. Evidence of good character, mature attitude, and stable personality.

    C. Earned doctorate from an accredited institution in the instructional discipline or related area.

or

    D. Master's degree in the instructional discipline when that Master's degree is the <u>recognized terminal degree</u> in that instructional discipline

or

    E. Master's degree in the instructional discipline or related area

plus

    30 semester hours (45 quarter hours) beyond the Master's in that instructional discipline or related area

plus

    appropriate professional experience credit in the instructional discipline or related area.

Policy No. 5:02:02:00
Page 4 of 16

III. Associate Professor

    A.   Evidence of good character, mature attitude, and stable
        personality.

    B.   Documented (as outlined in institutional policy) ability (as
        opposed to merely potential) in instruction, and/or public
        service, and/or research.

    C.   Earned doctorate from an accredited institution in the
        instructional discipline or related area.

                          plus

        Five (5) years appropriate professional experience in the
        instructional discipline or related area.

IV. Professor

    A.   Evidence of good character, mature attitude, and stable
        personality and high degree of academic maturity and
        responsibility.

    B.   Documented (as outlined in institutional policy) ability (as
        opposed to merely potential) in instruction, and/or public
        service, and/or research.

    C.   Documented evidence (as outlined in institutional policy) of
        substantial quality professional productivity, and regional
        recognition in the academic discipline.

    D.   Earned doctorate from an accredited institution in the
        instructional discipline or related area

                          plus

        Ten (10) years appropriate professional experience in the
        instructional discipline or related area.

V.  Exceptions to these minimum rank qualifications can be made by
    recommendation of the president as an exception and approval by
    the State Board of Regents.

## PROMOTION CRITERIA

All universities are to develop and use specific criteria for evaluating the faculty in teaching, public service, and research using the following general criteria as <u>minimum</u> requirements.

[If the faculty member recommended for promotion is assigned in the institution budget to the public service area (continuing education and extended service) or research area rather than the instructional area, the evaluation should be based on the job assignment of the individual.]

1.  Instruction

Evaluation of instruction shall be based on the following criteria with the institution assigning varying degrees of weight to each criterion. Deficiencies in some criteria ought to be counterbalanced by superiority in others.

A.  Evaluation by department/division chairperson, and appropriate dean.

B.  Evaluation of curriculum and/or program development; development of instructional techniques, etc.

C.  Evaluation of the individual's performance in the advisement of students.

D.  Evaluation of published works in the teaching area; documentation of teaching methodology that may be shared with colleagues.

E.  Honors and recognition for contributions to teaching.

F.  A record of continued intellectual development within the individual's field of specialization.

G.  Evaluation by peers; especially those in the same academic area (as appropriate for the individual institution.)

H.  Student Evaluation of the teaching performance.

## 2. Research (and creative activities)

Although exceptions may exist, the evaluation of research is based on published documentation of the candidates research, such as published articles, monographs, proprietary research, and other evidence of scholarly investigation. In area of fine arts, original and/or creative works may substitute for the traditional research documents. Evaluation should stress the quality of the written material.

## 3. Public Service and Professional Activities

Evaluation of the public service component should be based on performance in three areas: public service to the community as defined by the institution's role and mission; service to the institution; and service within the bounds of the applicant's academic discipline and budgeted assignment. Evaluation should be based on all three areas although it is realized that differences in emphases may exist. The institution shall have the responsibility for determining the emphasis as well as the responsibility for determining specific criteria based on the individual's aspect of work. These criteria should include: community service programs, public service consultation, committee and administrative responsibilities, and active contributions to professional associations. In each case, documentation of the evaluation process and criteria shall be as complete as possible. Specific evaluative criteria might be developed using the following as guidelines:

A.   A description of the nominee's position that permits evaluation of performance in relation to assigned and budgeted duties. This should include a statement of the mission or purpose of the position, and of the objective(s) of the nominee's service unit, as well as the specific assigned tasks and responsibilities of the nominee.

B.   An evaluation of the nominee's performance. In addition to an appraisal of the nominee's ability, resourcefulness and creativity, this evaluation should include an assessment of the results of his or her work, in terms of measures of benefits or savings to his or her clientele, and ratings of work output, success, and tasks completed. The origination of new public service programs that have been seen through to successful completion is an indication of creativity.

C.   An evaluation of the nominee's effectiveness, as judged by his or her impact on individuals, groups, or organizations served. This should include indices of the success of his or her service, in terms of improvement of communities, programs, operating agencies, production processes, or management practices. It should also include indications of client satisfaction with the service provided by the nominee, and of the magnitude and complexity of his or her work (as opposed to perfunctory activity that does not lead to useful results).

D.  An appraisal of the nominee's local, regional and national
    stature.  Although the achievement of national stature is
    sometimes difficult for public service faculty whose
    activities are primarily directed to groups within the State,
    the public service professional should take advantage of
    every opportunity to project his or her accomplishments among
    peers on a local, regional, and national basis.  Public
    service work is sometimes not publishable.  The results may
    be in the form of direct consultations, planning reports, or
    instructional time directed largely to the recipients of
    university service programs.  But certain aspects of applied
    research and the results of other public service work are
    suitable for publication in professional journals.  For
    example, unique techniques developed to motivate clients, or
    new approaches to the transfer and application of knowledge,
    would be of interest to peers in other public service
    programs across the nation.

## GENERAL PROCESS GUIDELINES AT INSTITUTION LEVEL

So that the decision process can be as objective as possible, each
recommendation (forwarded from the department to a higher
administrative level in the institution) should be accompanied by
complete and careful documentation of the candidates teaching
performance, and/or public service contributions, and/or research.
Although the areas of instruction, public service and research are all
considered important, certain exceptions may exist where evaluation may
occur in one or the other area exclusively.  In these cases, as well as
in the general case, appropriate supervisory personnel shall clearly
and adequately document the facts which justify the individual's
promotion.  The initiating unit may, if it deems it desirable, include
information relative to the candidate's research activities,
publication record, exceptional administrative performance or other
types of contributions.  Additional procedures may be used by each
institution with approval of the State Board of Regents.  For example,
the institution may wish to establish an institution level promotion
review committee that is interdisciplinary to review the individual
unit recommendations.

## GENERAL PROCESS GUIDELINES AT BOARD LEVEL

A letter of recommendation from the president of the institution with
the "Institutional Promotion Report" as an attachment will be forwarded
to the Chancellor for his or her review.  The Chancellor's
recommendation will be forwarded to the Committee on Personnel and
their recommendation forwarded to the Board.

Policy No. 5:02:02:00
Page 8 of 16

Section I (b)  Guidelines for Faculty Promotion Recommendations at
Community Colleges and Technical Institutes

## INTRODUCTION

Promotion in rank is a recognition of past achievement of the
individual being considered for promotion. In addition, the
advancement in rank is usually a recognition of future potential and a
sign of confidence that the individual is capable of greater
accomplishments and of assuming greater responsibilities. The policy
of the State Board of Regents is to make promotions strictly on
consideration of merit tempered by institutional and fiscal
considerations.* In maintaining this policy, promotions are made
objectively, equitably, impartially, and as a recognition of merit in
line with the following policy guidelines.

The guidelines which follow provide a general plan for documenting the
evaluation process at each institution. However, each institution must
develop specific promotion criteria which all units of that institution
will follow. The institution's policy must be within the parameters
established by these general System guidelines. The institution's
criteria shall contain a process section outlining the flow of
recommendation documents at the institution. In addition, each
institution will incorporate in its promotion policy a system whereby
faculty may appeal the promotional decisions which have been made at
the institution.

Once the institution has developed its criteria complete with process
and appellate procedures, these must be forwarded to the State Board of
Regents for review and approval. The institutional promotion policy
statements will be submitted via the Chancellor to the Committee on
Personnel of the Board for review and recommended action. From the
Committee, the individual policy statements will be referred to the
Board for appropriate action. Upon Board approval, the institutional
criteria become a part of Board of Regents Policy.

---

*    The president of each institution is responsible for the master
     staffing plan of the institution. In developing such a plan, the
     president will consider: (1) the fiscal impact of each promotion
     recommended to the Board; i.e., resources allocated to the
     institution and distributed throughout the institution for current
     operations; and (2) the rank distribution in each department to
     ensure it is commensurate with the mission outlined for the
     department; i.e., level of courses being taught as well as student
     demand for offerings.

MINIMUM RANK CRITERIA FOR PROFESSIONAL PERSONNEL IN
INSTRUCTION, PUBLIC SERVICE, AND RESEARCH

Each institution shall establish criteria for personnel
recommendations. The following are a general set of criteria that
distinguish between academic ranks. The minimum rank qualifications
must be met in every recommendation regarding <u>appointment to</u> academic
rank and for <u>promotion in</u> academic rank or <u>exceptions requested</u> as
outlined in <u>Item V.</u>

It is the responsibility of each institution to develop (for Board
approval) specific criteria which fall within the parameters of these
general criteria. The institutional criteria may be more rigid than
the following criteria and may be written to distinguish between
functional areas of instruction, public service, and research, if so
desired.

Institutions will make all judgments regarding the appropriateness of
the degree and equivalent work experience credit. The equivalent work
experience credit may include relevant teaching experience or other
experiences such as experience gained as an administrator, counselor,
librarian, journeyman, or the like. When evaluating college level
instruction and service, the institution may make its own determination
whether or not the teaching or service experience from another
institution is to be accepted in total or discounted in some manner.

On initial appointments the institution may elect to make an exception
to these criteria as outlined in Item V.

I.  Instructor

   A.  Potential ability in instruction and/or public service.

   B.  Evidence of good character, mature attitude, and stable
       personality.

   C.  Sound educational background as outlined following for the
       applicable function:

       1.  Instruction

           a.  Academic Subject Areas

               Master's degree in the instructional discipline or
               related area.

           b.  Career Education Subject Areas

               Bachelor's degree in the instructional discipline
               or related area (evidence of professional
               competency, such as certification, is acceptable in
               lieu of the degree).

       2.  Public Service (Including Applied Research)

           Master's degree

II.  Assistant Professor

   A.  Potential ability in instruction and/or public service.

   B.  Evidence of good character, mature attitude, and stable
       personality.

   C.  Plus the following specific qualifications for the applicable
       function:

1.   Instruction

   a.   Academic Subject Areas

      1)   Earned doctorate from an accredited
           institution in the instructional discipline or
           related area

                   or

      2)   Master's degree in the instructional
           discipline or related area plus 30 semester
           hours (45 quarter hours) beyond the Master's
           in the instructional discipline or related
           area plus two years equivalent work experience
           credit,

                   or

      3)   Master's degree in the instructional
           discipline or related area plus four years
           equivalent work experience credit.

   b.   Career Education Subject Areas

        Bachelor's degree and certification, where
        applicable, plus five years equivalent work
        experience credit.

2.   Public Service (Including Applied Research)

     Master's degree

                   and

     Five years experience at the instructor level or five
     years experience in industry, government or other work
     experience area

III. Associate Professor

   A.   Evidence of good character, mature attitude, and stable
        personality.

   B.   Documented ability (as opposed to merely potential) in
        instruction, and/or public service.

   C.   Plus the specific qualifications as outlined following for
        the applicable function:

1.  Instruction

    a.  Academic Subject Areas

        1)  Earned doctorate from an accredited
            institution in the instructional descipline or
            related area

                        and

            Five years college level instruction

                        or

        2)  Master's degree in the instructional
            discipline or related area plus 30 semester
            hours (45 quarter hours) beyond the Master's
            in the instructional discipline or related
            area plus two years equivalent work experience
            credit

                        and

            Five (5) years college level instruction

                        or

        3)  Master's degree in the instructional
            discipline or related area plus four years
            equivalent work experience credit

                        and

            Five (5) years college level instruction

    b.  Career Education Subject Area

        Bachelor's degree and certification, where
        applicable, with five years equivalent work
        experience credit.

                        and

        Five (5) years college level instruction

2.  Public Service (Including Applied Research)

    Master's degree

                        and

    Five years college level service

IV. Professor

    A.   Evidence of good character, mature attitude, and stable personality.

    B.   Documented ability (as opposed to merely potential) in instruction, and/or public service.

    C.   Documented evidence of substantial professional productivity of quality.

    D.   High degree of academic maturity and responsibility.

    E.   Acknowledged record of teaching success.

    F.   Plus the specific qualifications as outlined following for the applicable function:

        1.   Instruction

           Both Academic and Career Education Subject Areas

           Earned doctorate from an accredited institution in the instructional discipline or related area.

                    and

           Ten years college level instruction

        2.   Public Service (Including Applied Research)

           Master's degree

                    and

           Ten years college level service

V. Exceptions to these minimum rank qualifications can be made by recommendation of the president as an exception and approval by the State Board of Regents.

## PROMOTION CRITERIA

All community colleges and technical institutes are to develop and use specific criteria for evaluating the faculty in teaching and public service using the following general criteria as minimum requirements.

### General Criteria

All teaching faculty are expected to possess adequate teaching skills. However, candidates from the teaching faculty recommended for promotion should also be judged on the basis of their contributions to the institution in the public service area (including professional activities and applied research where applicable.) It is the responsibility of each institution to establish specific criteria for evaluating the performance of the faculty in instruction and public service.

1. Instruction

    Evaluation of instruction shall be based on the following criteria with the institution assigning varying degrees of weight to each criterion. Deficiencies in some criteria ought to be counterbalanced by superiority in others.

    A.   Evaluation by department/division chairperson, and appropriate dean

    B.   Evaluation of curriculum and/or program development; development of instructional techniques, etc.

    C.   Evaluation of the individual's responsibilities in the advisement of students

    D.   Honors and recognition for contributions to teaching (if applicable)

    E.   A record of continued professional development within the individual's field of specialization

    F.   Evaluation by peers; especially those in the same academic area (as appropriate for the individual institution)

    G.   Student evaluation of the teaching performance

2. Public Service (Including Applied Research and Professional Activities)

    Evaluation of the public service component should be based on performance in three areas:  public service to the

community as defined by role and mission of the institution;
service to the institution; and service within the bounds of the
applicant's academic discipline and budgeted assignment.
Evaluation should be based on all three areas although it is
recognized that differences in emphases may exist. The
institution shall have the responsibility for determining the
emphasis as well as the responsibility for determining specific
criteria based on the individual's aspect of work. These criteria
should include: community service programs, applied research
activities, public service consultation, committee and
administrative responsibilities, and active contributions to
professional associations. In each case, documentation of the
evaluation process and criteria shall be as complete as possible.

If the faculty member recommended for promotion is assigned in the
institution budget to the public service area (continuing
education and extended service) rather than the instructional
area, the evaluation should be based on the job assignment of the
individual. Specific evaluative criteria might be developed using
the following as guidelines:

A.    A description of the nominee's position that permits
      evaluation of performance in relation to assigned and
      budgeted duties. This should include a statement of the
      mission or purpose of the position, and of the objective(s)
      of the nominee's service unit, as well as the specific
      assigned tasks and responsibilities of the nominee.

B.    An evaluation of the nominee's performance. In addition to an
      appraisal of the nominee's ability, resourcefulness and
      creativity, this evaluation should include an assessment of
      the results of his or her work, in terms of measures of
      benefits or savings to his or her clientele, and ratings of
      work output, success, and tasks completed. The origination
      of new public service programs that have been seen through to
      successful completion is an excellent indication of
      creativity.

C.    An evaluation of the nominee's effectiveness, as judged by
      his or her impact on individuals, groups, or organizations
      served. This should include indices of the success of his or
      her service, in terms of improvement of communities,
      programs, operating agencies, production processes, or
      management practices. It should also include indications of
      client satisfaction with the service provided by the

92

nominee, and of the magnitude and complexity of his or her
work (as opposed to perfunctory activity that does not lead
to useful results).

## GENERAL PROCESS GUIDELINES AT INSTITUTION LEVEL

So that the decision process can be as objective as possible, each
recommendation (forwarded from the department to a higher
administrative level in the institution) should be accompanied by
complete and careful documentation of the candidate's teaching
performance, and/or public service contributions, and/or research.
Although the areas of instruction, public service and research are all
considered important, certain exceptions may exist where evaluation may
occur in one or the other area exclusively. In these cases, as well as
in the general case, appropriate supervisory personnel shall clearly
and adequately document the facts which justify the individual's
promotion. The initiating unit may, if it deems it desirable, include
information relative to the candidate's research activities,
publication record, exceptional administrative performance or other
types of contributions. Additional procedures may be used by each
institution with approval of the State Board of Regents. For example,
the institution may wish to establish an institution level promotion
review committee that is interdisciplinary to review the individual
unit recommendations.

## GENERAL PROCESS GUIDELINES AT BOARD LEVEL

A letter of recommendation from the president of the institution with
the "Institutional Promotion Report" as an attachment will be forwarded
to the Chancellor for his or her review. The Chancellor's
recommendation will be forwarded to the Committee on Personnel and
their recommendation forwarded to the Board.

Source:   SBR Meetings, December 13, 1974; December 3, 1976;
          September 30, 1983

Note:     Upon adoption of this policy at the December 13, 1974
          meeting, implementation of the Board-approved institutional
          criteria began on September 1, 1975, and no faculty
          experienced demotion in rank due to the new policies. Upon
          extending the policy to the technical institutes at the
          September 30, 1983 meeting, no technical institute faculty
          shall be demoted in rank as a result of the new provisions.

ONLY REGULAR FULL-TIME FACULTY ARE ELIGIBLE FOR TENURE AND PROMOTION.

This checklist shall be completed by the department head in concert with the faculty member prior to the department head's acceptance of the faculty member's portfolio for tenure and/or promotion review.

Name  Wong-opasi, Uthaiwan              SS# 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
      Last      First      Middle

Present Rank and Date Awarded  Assistant Professor, August 1992

Date Given Tenure-track Appointment at TSU  August 1992

Has Appointment been Continuous?    X  Yes              No
If appointment has not been continuous, explain.

Check-off list to determine faculty member's eligibility for academic tenure and/or promotion consideration:

**Tenure and Promotion**

  X 1. Faculty member has been employed pursuant to a tenure-track appointment. Attach copy of appointment document.

**Tenure**

  X 2. By the end of the current academic year, the faculty member will have completed not less than the minimum five continuous years of probationary service at TSU (except in the case of an approved leave of absence which cannot count as any part of the probationary period).

____ 3. By the end of the current academic year, the faculty member will not have completed the minimum of five years of probationary service at TSU, but credit for prior service (not to exceed three years of previous full-time service) was granted by the President and confirmed in writing by the President at the time of the initial appointment. (Attach copy of document.)

**Promotion**

  X 4. Faculty member holds appropriate academic and professional credentials and has the minimum number of years of professional experience in current rank at TSU.

____ 5. Faculty member holds appropriate academic and professional credentials and satisfies the minimum of years of professional experience in current rank through credit for prior service at another institution which was granted by the President and confirmed by the President in writing at the time of the initial appointment. (Attach copy of document.)

Department Head's Signature/Date _____

Faculty Member's Signature/Date _____

94

Exhibit 17

# TENNESSEE STATE UNIVERSITY
# TIMELINES FOR TENURE AND PROMOTION REVIEW: 1996-97

## By First Friday in October *(October 4, 1996)*

1.   The Department Head will:

   a.   Receive from all candidates for tenure and/or promotion an application file containing items to be used to review at each committee level.
   b.   Add to the file a report on teaching effectiveness.
   c.   Convene the Departmental Tenure and Promotion Committee and explain the review process.
   d.   Forward (without comment) the application files to the Departmental Tenure and Promotion Committee.

## By Third Friday in October *(October 18, 1996)*

2.   The Departmental Tenure and Promotion Committee will:

   a.   Review the application files of candidates in their Department for tenure and/or promotion.
   b.   Obtain a minimum of two letters of evaluation.
   c.   Complete and submit to the Department Head the Committee's recommendation on each candidate's application.

## By Second Friday in November *(November 8, 1996)*

3.   The Department Head will:

   a.   Review the report of the Departmental Committee and all applicant files.
   b.   Prepare and submit to the Dean a written recommendation on each candidate.

## By Third Friday in November *(November 15, 1996)*

4.   The Dean will receive all recommendations for tenure and/or promotion from Department Heads and will forward these (without comment) to the School Tenure and Promotion Committee.

## By First Friday in December *(December 6, 1996)*

5.   The School Promotion and Tenure Committee will:
   a.   Review all applicant files, including recommendations of the Departmental Committee and the school Committee.
   b.   Prepare and submit to the Dean a written recommendation on each candidate.

By Second Friday in December *(December 13, 1996)*

6.    The Dean will:
    a.    Review all applicant files, including recommendations of the Departmental Committee and the School Committee.
    b.    Prepare and submit to the Vice President for Academic Affairs a written recommendation on each candidate.

By Second Friday in January *(January 10, 1997)*

7.    The Vice President for Academic Affairs will forward all recommendations (without comment) to the Faculty Personnel Committee.

By First Friday in February *(February 7, 1997)*

8.    The Faculty Personnel Committee will:
    a.    Review all applicant files for tenure and/or promotion, the reports of the committees, and the recommendations of the Department Head and Deans.
    b.    Forward a recommendation on each candidate to the Vice President for Academic Affairs.

By Third Friday in February *(February 21, 1997)*

9.    The Vice President for Academic Affairs will:
    a.    Review all applicant files, including the report of the committees and the committees and the recommendations of previous administrators.
    b.    Forward a recommendation regarding each candidate to the President and inform each candidate of the Vice President's recommendation. If the Vice President for Academic Affairs' recommendation is negative, the candidate may appeal. (See Faculty Handbook, Promotion Appeals Procedures, pp 76-77; Tenure Appeals Procedures, pp 68-69).

By Third Friday in March *(March 21, 1997)*

10.    The President will:
    a.    Review all applicant files for promotion including the findings of appeals, the reports of the committees, and the recommendations of all previous administrators.
    B.    Forward all recommendations regarding tenure to the Chancellor of the Tennessee Board of Regents, along with decisions regarding any cases that were appealed.

VPAA: Revised 8/96

96

Exhibit 8

Attachment 1

**Institute of Government**
Tennessee State University
330 10th Avenue North
Nashville, TN 37203-3401

P.O. Box 140
23 September, 1996

Telephone: (615) 963-7241
FAX: (615) 963-7245

TO: Dr. Gus Bankhead
     Vice-President, Academic Affairs
FROM: Ann-Marie Rizzo,
     Chair, Faculty Senate
SUBJECT: Promotion and Tenure Timetable

---

At the September 19th meeting the Faculty Senate discussed discrepancies in the application of promotion and tenure procedures. Apparently some schools and/or colleges instruct eligible faculty to apply in the fall of what will begin their fifth year at TSU. Faculty in other units are informed that if they apply at the beginning of the fifth year, their applications will not be forwarded. The Senate agreed that this important issue needed quick resolution so that eligible faculty may begin applying next month for promotion and/or tenure at the University. The Senate unanimously approved the following statement to be included in the Faculty Handbook.

> A faculty member is eligible to apply for promotion and/or tenure
> at the beginning of the academic year falling within their fifth year
> of employment.

It would be much appreciated if you would share this item with deans and directors of teaching units.

cc: Dr. Hefner

AN EQUAL OPPORTUNITY/AFFIRMATIVE ACTION EMPLOYER M/F

Exhibit 9

RECEIVED NOV 0 1 1996

**Office of
Vice President for Academic Affairs**
Tennessee State University
3500 John A. Merritt Blvd.
Nashville, TN 37209-1561

To:        DEANS AND DEPARTMENT HEADS
From:      Augustus Bankhead
Date:      October 31, 1996

SUBJECT:   APPROPRIATE YEAR TO APPLY FOR TENURE

Several persons have raised the question of interpretation on <u>the year in which application is made for tenure.</u> Some have apparently received forms which carry ambiguous wording. This memorandum is to clarify the practice and interpretation of the TBR tenure policy at Tennessee State University.

Application for tenure is made during the fall semester of the faculty member's sixth year of service. Documents are processed during the fall and spring semesters and forwarded to the President of the University who presents his recommendation to the Tennessee Board of Regents. The Board normally acts on tenure recommendations during its summer meeting and informs the President of its actions. Persons receiving tenure are informed at the beginning of their seventh year that tenure has been awarded. Persons not receiving tenure are informed at the beginning of the seventh year that this is their last year of employment at the University. The person's employment ends with the close of the succeeding spring semester.

Please inform all faculty in your area and all committee members of this interpretation. Please ensure that no documents are in circulation to your faculty and committee members which are contrary to this practice and interpretation.

c: Faculty Senate Chair and Members

AN EQUAL OPPORTUNITY/AFFIRMATIVE ACTION EMPLOYER M/F



Exhibit 10

**College of Arts and Sciences**
Tennessee State University
3500 John A. Merritt Blvd.
Nashville, TN 37209-1561

Department of Languages, Literature,
and Philosophy

November 6, 1996

Dr. Ho Helen Railsback
Professor
Department of Languages, Literature,
   and Philosophy

Dear Dr. Railsback:

I am writing to report the action of the Departmental Rank and
Tenure Committee on the application of Dr. Uthaiwan Wong-Opasi
for tenure and for promotion from assistant professor to associate
professor. The committee noted that Dr. Wong-opasi will complete
her fifth year of service at the end of the current academic year
and that she therefore does not have the requisite five years
required prior to application for promotion and tenure noted by
the administration. However, the committee also discussed the
ambiguity of this requirement, i.e. that some faculty had received
promotions after applying during the fifth year and that the issue
is under study by various units within the University. Therefore,
since Dr. Wong-opasi did support her application with evidence
of research, teaching, and public service that meets the requirements
for both tenure and for associate professor, by a vote of three
to two, the committee voted to support her application.

Sincerely,

James L. Head

James L. Head
Chair, Departmental Rank
   and Tenure Committee

AN EQUAL OPPORTUNITY/AFFIRMATIVE ACTION EMPLOYER M/F

# COLLEGE OF ARTS AND SCIENCES

Exhibit 11 a

## Office of the Dean

MEMORANDUM

TO:         Heads
            Dr. James Holloway
            Dr. Roderic N. Burton

FROM:       Bobby L. Lovett
            Dean

RE:         APPLICATIONS FOR TENURE/PROMOTION

DATE:       November 6, 1996

Per the Vice President for Academic Affairs' recent letter, we continue to accept only the applications for tenure/promotion wherein the person has <u>served</u> a <u>full</u> five (5) years of probationary status, request exception, or has years awarded (on the contract) toward tenure/promotion.

Therefore, <u>please</u> use the proper forms for the application. I an enclosing the two (2) forms for the front part of the application. <u>Destroy</u> all your old forms so that <u>no</u> confusion and contradictions exist in the documents' language.

Thank you.

BLL/jve

Enclosures

/00

Exhibit 11 b

## TENNESSEE STATE UNIVERSITY

College of Arts and Sciences

Tenure and/or Promotion Eligibility Checklist

ONLY REGULAR FULL-TIME FACULTY ARE ELIGIBLE FOR TENURE AND PROMOTION.

This checklist shall be completed by the department head in concert with the faculty member prior to the department head's acceptance of the faculty member's portfolio for tenure and/or promotion review.

Name _____ SS# _____
     Last        First       Middle

Present Rank and Date Awarded _____

Date Given Tenure-track Appointment at TSU _____

Has Appointment been Continuous? _____ Yes _____ No
If appointment has not been continuous, explain.

Check-off list to determine faculty member's eligibility for academic tenure and/or promotion consideration:

### Tenure and Promotion

__1.    Faculty member has been employed pursuant to a tenure-track appointment. (Attach copy of appointment document.)

### Tenure

__2.    At the end of the last academic year, the faculty member completed not less than the minimum five continuous years of probationary service at TSU (except in the case of an approved leave of absence which cannot count as any part of the probationary period).

__3.    At the end of the last academic year, the faculty member had not completed the minimum of five years of probationary service at TSU, but credit for prior service (not to exceed three years of previous full-time service) was granted by the President and confirmed in writing by the President at the time of the initial appointment. (Attach copy of document.)

### Promotion

__4.    Faculty member holds appropriate academic and professional credentials and has the minimum number of years of professional experience in current rank at TSU.

__5.    Faculty member holds appropriate academic and professional credentials and satisfies the minimum of years of professional experience in current rank through credit for prior service at another institution which was granted by the President and confirmed by the President in writing at the time of the initial appointment. (Attach copy of document.)

Department Head's Signature/Date _____

Faculty Member's Signature/Date _____

101

 TENNESSEE STATE UNIVERSITY  Exhibit 11 e

College of Arts and Sciences

Tenure and/or Promotion Recommendations

Name _____     Academic Year _____

Highest Degree _____     Year Awarded _____

Rank _____     Year Awarded _____

Date of Tenure-track Appointment _____

School/College (Academic Unit) _____

Department _____

Request for:     Tenure     _____

            Promotion     _____

            From     _____ to _____

**Recommendations:**     Write "yes", "no", or "NA" for not applicable.
If a "no" recommendation is given, provide an explanation.

|  | Tenure | Rank |
|---|---|---|
| **Department Committee**<br>Explanation | _____ | _____ |
| **Department Head**<br>Explanation | _____ | _____ |
| **School/College Committee**<br>Explanation | _____ | _____ |
| **Dean, Graduate Studies (if applicable)**<br>Explanation | _____ | _____ |
| **Academic Dean/Director**<br>Explanation | _____ | _____ |
| **Faculty Personnel Committee**<br>Explanation | _____ | _____ |
| **Vice President for Academic Affairs**<br>Explanation | _____ | _____ |
| **President**<br>Explanation | _____ | _____ |

TENNESSEE STATE UNIVERSITY

College of Arts and Sciences

*Exhibit 12*

Tenure and/or Promotion Eligibility Checklist

ONLY REGULAR FULL-TIME FACULTY ARE ELIGIBLE FOR TENURE AND PROMOTION.

This checklist shall be completed by the department head in concert with the faculty member prior to the department head's acceptance of the faculty member's portfolio for tenure and/or promotion review.

Name    Wong-opasi    Uthaiwan    SS#    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
    Last     First     Middle

Present Rank and Date Awarded    Assisstant Professor

Date Given Tenure-track Appointment at TSU    August 1992

Has Appointment been Continuous?    x    Yes    _____ No
If appointment has not been continuous, explain.

Check-off list to determine faculty member's eligibility for academic tenure and/or promotion consideration:

**Tenure and Promotion**

_X_ 1.    Faculty member has been employed pursuant to a tenure-track appointment.  (Attach copy of appointment document.)

**Tenure**

_no_ 2.    At the end of the last academic year, the faculty member completed not less than the minimum five continuous years of probationary service at TSU (except in the case of an approved leave of absence which cannot count as any part of the probationary period).

_____ 3.    At the end of the last academic year, the faculty member had not completed the minimum of five years of probationary service at TSU, but credit for prior service (not to exceed three years of previous full-time service) was granted by the President and confirmed in writing by the President at the time of the initial appointment.  (Attach copy of document.)

**Promotion**

_____ 4.    Faculty member holds appropriate academic and professional credentials and has the minimum number of years of professional experience in current rank at TSU.

_____ 5.    Faculty member holds appropriate academic and professional credentials and satisfies the minimum of years of professional experience in current rank through credit for prior service at another institution which was granted by the President and confirmed by the President in writing at the time of the initial appointment.  (Attach copy of document.)

*Acting*
Department Head's Signature/Date    Jo Helen Railsback    Nov. 11, 1996

Faculty Member's Signature/Date

Exhibit 13

## Report on Teaching Effectiveness

**Re: Dr. Uthaiwan Wong-Opasi**

Date: 7 November 1996

     Since Dr. Wong-Opasi is not eligible for tenure and promotion review until the academic year which begins in August 1997, I am deferring a report on teaching effectiveness until that time.

     This deferral actually is beneficial to the cause of Dr. Wong-Opasi, since the report will then be made by the Department Head, Dr. Gloria Johnson, who is recusing herself from the process this year, because she is a candidate for promotion herself and does not wish to perform her usual duties in order to avoid any appearance of a conflict of interest. Dr. Johnson, who has been her immediate supervisor during the probationary period, will be able to comment much more cogently than I on the matter of her teaching effectiveness. Furthermore, Dr. Wong-Opasi will have an additional year in which to enhance her teaching credentials.

Jo Helen Railsback
Professor of English,
   acting for the Head



Exhibit 14

**College of Arts and Sciences**
Tennessee State University
3500 John A. Merritt Blvd.
Nashville, TN 37209-1561

Department of Languages, Literature,
and Philosophy

7 November 1996

Dr. Bobby L. Lovett, Dean
College of Arts and Sciences
Tennessee State University

Dear Dean Lovett:

   The Advisory Committee of the Department of Languages, Literature and Philosphy met on November 4, 1996, and recommended in favor of granting both tenure and promotion to Associate Professor to Dr. UTHAIWAN WONG-OPASI by a vote of 3 to 2.

   In light of University policy, as articulated in letters from both you and the Vice President for Academic Affairs, I cannot concur with this recommendation since I am bound by those rules. I recommend that she reapply next year when she is eligible.

   Please note that I am acting in place of the Head of the Department, Dr. Gloria Johnson, who has recused herself since she is applying for promotion and does not wish to be involved in the process in her usual capacity, to avoid any appearance of a conflict of interest.

                              Sincerely yours,

                              Jo Helen Railsback

                              Jo Helen Railsback
                              Professor of English,
                               acting for the Head

AN EQUAL OPPORTUNITY/AFFIRMATIVE ACTION EMPLOYER M/F

Exhibit 15

Ex - Post Facto Checklist

TENNESSEE STATE UNIVERSITY

College of Arts and Sciences

Tenure and/or Promotion Eligibility Checklist

ONLY REGULAR FULL-TIME FACULTY ARE ELIGIBLE FOR TENURE AND PROMOTION

This checklist shall be completed by the department head in concert with the faculty member prior to the department head's acceptance of the faculty member's portfolio for tenure and/or promotion review.

Name   Wong-opasi,   Uthaivan                         SS#   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
       Last          First        Middle

Present Rank and Date Awarded   Assistant Professor

Date Given Tenure-track Appointment at TSU   August 1992

Has Appointment been Continuous?   X   Yes _____ No
If appointment has not been continuous, explain.

Check-off list is to determine faculty member's eligibility for academic tenure and/or promotion consideration:

**Tenure and Promotion**

X 1.   Faculty member has been employed pursuant to a tenure-track appointment. (Attach copy of appointment document.)

**Tenure**

X 2.   At the end of the last academic year, the faculty member completed no less than the minimum five continuous years of probationary service at TSU (except in the case of an approved leave of absence which cannot count as any part of the probationary period).

no 3.   At the end of the last academic year, the faculty member has not completed the minimum of five years of probationary service at TSU, but credit for prior service (not to exceed three years of previous time service) was granted by the President and confirmed in writing by the President at the time of the initial appointment. (Attach copy of document.)

**Promotion**

X 4.   Faculty member holds appropriate academic and professional credentials and has the minimum number of years of professional experience in current rank at TSU.

5.   Faculty member holds appropriate academic and professional credentials and satisfies the minimum of years of professional experience in current rank through credit for prior service at another institution, which was granted by the President and confirmed by the President in writing at the time of the initial appointment. (Attach copy of document.)

Action
Department Head's Signature/Date   So Wen Railbach   Nov. 11, 1996

Faculty Member's Signature/Date

---

Prevailing Checklist

ONLY REGULAR FULL-TIME FACULTY ARE ELIGIBLE FOR TENURE AND PROMOTION.

This checklist shall be completed by the department head in concert with the faculty member prior to the department head's acceptance of the faculty member's portfolio for tenure and/or promotion review.

Name   Wong-opasi, Uthaivan                      SS#   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
       Last      First      Middle

Present Rank and Date Awarded   Assistant Professor   August 1992

Date Given Tenure-track Appointment at TSU   August 1992

Has Appointment been Continuous?   X   Yes _____ No
If appointment has not been continuous, explain.

Check-off list to determine faculty member's eligibility for academic tenure and/or promotion consideration:

**Tenure and Promotion**

X 1.   Faculty member has been employed pursuant to a tenure-track appointment. Attach copy of appointment document.

**Tenure**

X 2.   By the end of the current academic year, the faculty member will have completed not less than the minimum five continuous years of probationary service at TSU (except in the case of an approved leave of absence which cannot count as any part of the promotionary period).

3.   By the end of the current academic year, the faculty member will not have completed the minimum of five years of probationary service at TSU, but credit for prior service (not to exceed three years of previous time service) was granted by the President and confirmed in writing by the President at the time of the initial appointment. (Attach copy of document.)

**Promotion**

X 4.   Faculty member holds appropriate academic and professional credentials and has the minimum number of years of professional experience in current rank at TSU.

5.   Faculty member holds appropriate academic and professional credentials and satisfies the minimum of years of professional experience in current rank through credit for prior service at another institution, which was granted by the President and confirmed by the President in writing at the time of the initial appointment. (Attach copy of document.)

Department Head's Signature/Date

Faculty Member's Signature/Date

89/90

106



Exhibit 16

**Office of**
**Vice President for Academic Affairs**
Tennessee State University
3500 John A. Merritt Blvd.
Nashville, TN 37209-1561

November 13, 1996

MEMORANDUM

To:      Dr. James Head, Languages, Literature & Philosophy
         Dr. Uthaiwan Wong-opasi, Languages, Literature & Philosophy

From:    Augustus Bankhead
         Vice President for Academic Affairs

Subject:    Tenure Guidelines

While the interpretation of TBR's intent of 5 years of service may be questioned, there has been no inconsistency in TBR interpretation for the past several years. I do not think you will find any record of a person being recommended for tenure until their sixth year.

I have circulated a memorandum to clarify this situation. I had asked earlier that all information contrary to the application in the sixth year be taken from circulation. While the Faculty Senate is making a recommendation, it is not in the authority of the Vice President to unilaterally change the practice on the spot. The faculty should respond to this matter at an official faculty meeting.

Based on the consistency of past practice, and finding no evidence to the contrary, faculty in their fifth year should anticipate applying in the fall of their sixth year.

AB:b

AN EQUAL OPPORTUNITY/AFFIRMATIVE ACTION EMPLOYER M/F



Exhibit 17

# COLLEGE OF ARTS AND SCIENCES

Office of the Dean

November 14, 1996

Dr. Uthaiwan Wong-opasi
Assistant Professor
Department of Languages, Literature
 and Philosophy
Tennessee State University
Main Campus

Re:    Application for Tenure and Promotion

Dear Dr. Wong-opasi:

I am returning your application for tenure-promotion, as delivered to my office (11-13-96) by Dr. Jo Helen Railsback. Your file will not be submitted to the Promotion and Tenure Committee of the College of Arts and Sciences, because . . .

- you did not follow guidelines;

- no copy of the appointment document is included in the application as required by the "Tenure and/or Promotion Eligibility Checklist";

- you have not "completed not less than the minimum five continuous years of probationary service" at the end of the 1995-96 academic year;

- your August 1992 contract (attached) does not grant "credit for prior service . . . granted by the President' and TBR; and 'your application illustrates no record of an extraordinary nature that warrants my recommendation for an application by exception.

108

Dr. Uthaiwan Wong-opasi
Page 2
November 14, 1996

I recommend that you apply for tenure-promotion at the proper time, Fall of 1997.

Sincerely,

Bobby L. Lovett
Dean

BLL: s

pc:     Dr. G. Johnson
        Dr. Jo H. Railsback
        Dr. J. Head
        Dr. A. Bankhead

Exhibit 18

To:   Dr. David Broad
      Faculty Senate

From: Dr. Uthaiwan Wong-opasi
      Languages, Literature, and Philosophy

Date: November 21, 1996

Re:   **Policy and Procedure on Tenure and Promotion**

Dr. Bankhead, in his November 13 memorandum, states that:

1.  "While the <u>interpretation</u> of TBR's intent of 5 years of service may be questioned, there has been **no inconsistency in TBR interpretation for the past several years.**"
2.  "I (=Dr. Bankhead) do not think you will find any record of a person being recommended for tenure until their sixth year."

While Dr. Bankhead's directives concern only tenure application, Dr. Lovett, Dean of Arts and Sciences, made the following extended interpretations:

3.  that the fifth-year rule apply to **promotion application as well;**
4.  that **no untenured faculty members can apply for promotion only;**
5.  that the required fifth-year service for **promotion** include **only years at TSU.**

6.  Hence, Dr. Lovett prohibited department heads and chairs of departmental and college-levels committees on Tenure and Promotion from accepting applications from faculty in their fifth year of service this year and pulled out one application which had already been approved at the departmental level.

However, we have evidence to the contrary that:

1&2.  The TBR Records on the TSU Promotion and Tenure Recommendations from 1991-1996 show persons being recommended for **tenure** in their **fifth and sixth years** and beyond; **with and without credit for prior services;**
3.  The same TBR records show persons being recommended for **promotion** in their **fifth years and earlier;**
4&5.  TSU Faculty Handbook does **not** require credit for prior service <u>in writing</u> or <u>at TSU</u> for promotion.

In light of evidence to the contrary, we, therefore, **question the legality of Dr. Bankhead's following recommendation:**

7.  "Based on the consistency of past practice, and finding **no evidence to the contrary, faculty** in their fifth year should anticipate applying in the fall of their sixth year."

Finally, we agree with Dr. Bankhead's statement in his memo that:

8.  "While the Faculty Senate is making a recommendation, it is **not in the authority of the Vice President to unilaterally change the practice on the spot.**"

In conclusion, since there has been no change in policy, we request that all faculty in their fifth year, if they so wish, be given an extended deadline to apply for tenure and/or promotion this year should they be able to satisfy the requirements <u>exactly</u> as described in *TSU Faculty Handbook* and/or *TBR Guidelines.*

*Exhibit 19*

**Office of**
**Vice President for Academic Affairs**
Tennessee State University
3500 John A. Merritt Blvd.
Nashville, TN 37209-1561

November 13, 1996

MEMORANDUM

To: Dr. James Head, Languages, Literature & Philosophy
Dr. Uthaiwan Wong-opasi, Languages, Literature & Philosophy

From: Augustus Bankhead
Vice President for Academic Affairs

Subject: Tenure Guidelines

While the interpretation of TBR's intent of 5 years of service may be questioned, there has been no inconsistency in TBR interpretation for the past several years. I do not think you will find any record of a person being recommended for tenure until their sixth year.

I have circulated a memorandum to clarify this situation. I had asked earlier that all information contrary to the application in the sixth year be taken from circulation. While the Faculty Senate is making a recommendation, if is not in the authority of the Vice President to unilaterally change the practice on the spot. The faculty should respond to this matter at an official faculty meeting.

Based on the consistency of past practice, and finding no evidence to the contrary, faculty in their fifth year should anticipate applying in the fall of their sixth year.

AB:b

*Misrepresentation*

---

To: Dr. David Bread
Faculty Senate

From: Dr. Uthaiwan Wong-opasi
Languages, Literature, and Philosophy

Date: November 21, 1996

Re: Policy and Procedure on Tenure and Promotion

Dr. Bankhead, in his November 13 memorandum, states that:

1. "While the interpretation of TBR's intent of 5 years of service may be questioned, there has been no inconsistency in TBR interpretation for the past several years."
2. "I (=Dr. Bankhead) do not think you will find any record of a person being recommended for tenure until their sixth year."

While Dr. Bankhead's directives concern only tenure application, Dr. Lovett, Dean of ... Sciences, made the following extended interpretations:

3. that the fifth-year rule apply to promotion application as well;
4. that no untenured faculty members can apply for promotion only;
5. that the required fifth-year service for promotion include only years at TSU.

6. Hence, Dr. Lovett prohibited department heads and chairs of departmental and college-levels committees on Tenure and Promotion from accepting applications from faculty in their fifth year of service this year and pulled out one application which had already been approved at the departmental level.

However, we have evidence to the contrary that:

1&2. The TBR Records on the TSU Promotion and Tenure Recommendations from 1991-1996 show persons being recommended for tenure in their fifth and sixth years and beyond; with and without credit for prior services;

3. The same TBR records show persons being recommended for promotion in their fifth years and earlier.

4&5. TSU Faculty Handbook does **not** require credit for prior service in writing or at TSU for promotion.

In light of evidence to the contrary, we, therefore, question the legality of Dr. Bankhead's following recommendation:

7. "Based on the consistency of past practice, and finding no evidence to the contrary, faculty in their fifth year should anticipate applying in the fall of their sixth year."

Finally, we agree with Dr. Bankhead's statement in his memo that:

8. "While the Faculty Senate is making a recommendation, it is not in the authority of the Vice President to unilaterally change the practice on the spot."

In conclusion, since there has been no change in policy, we request that all faculty in their fifth year, if they so wish, be given an extended deadline to apply for tenure and/or promotion this year should they be able to satisfy the requirements exactly as described in TSU Faculty Handbook and/or TBR Guidelines.

*Rebuttal*

AN EQUAL OPPORTUNITY/AFFIRMATIVE ACTION EMPLOYER M/F

Exhibit 20-1

February 5, 1997

Dr. James Hefner, President
Tennessee State University
Nashville, Tennessee

Dear Dr. Hefner,

Please find attached the original copies of a petition which was circulated
between January 21 and 31, 1997. (Please note that its initial date was before
the Faculty Senate Executive Committee last met with you about the issue). The
petition was circulated among a somewhat limited group of faculty members at TSU.
People who might benefit from the petition--those in their 5th years of tenure-
track service at TSU--and individuals who are not tenured were not encouraged to
sign it, although a few insisted that they do so. Some faculty members said they
did not sign the petition because they are members of one of the various
Personnel Committees active this year. Due to the lack of time, the relatively
small band of signature-gatherers could not reach all departments--indeed all
colleges--of the University.

Another problem in getting signatures for the petition was that many faculty
members were under the impression that your decision to allow 5th year requests
for tenure during the 1997-98 school year had solved the problem, forgetting that
several faculty members would be eligible for tenure this year if your ruling
were extended to cover the 1996-97 school year and that the petition was about
that very issue.

As I understand your "compromise" offered to the Faculty Senate Executive
Committee, you are willing to allow people to apply in their 5th years in the
1997-98 school year and to reapply in their 6th years if they fail to win tenure
with their first applications. My personal hope is that, in the spirit of your
"compromise," you will allow people in their 5th year this year (1996-97) to
either apply for tenure this year or that, at a minimum, you will grant them the
right to reapply in their 7th years if they are unable to win tenure in their 6th
years.

Lynn E. Dwyer
President, TSU Chapter, AAUP
Social Work and Sociology Department

.cc: Dr. Rizzo, President, TSU Faculty Senate

Exhibit 20-2

January, 1997

*Given that the statements in the 1989 Faculty Handbook (sections C and E on tenure) do not prohibit a person's applying for tenure during their fifth year of tenure-track employment at Tennessee State University (including any credit for prior service)#

*Given that the University application circulated first to prospective applicants this school year indicated that one could apply in one's fifth year of tenure-track employment at TSU (including any credit for prior service);

*Given that 5 people were allowed to apply for tenure in their fifth years of tenure-track employment between 1991 and 1994 and that they were awarded tenure;

*And, given that TSU's administration did not allow for proper faculty discussion, consent and notice before the policy was changed to an insistence on sixth-year tenure applications;

We the undersigned members of the faculty urge the administration of Tennessee State University to open the application-for-tenure process immediately to people in their fifth year of service for this year, with the understanding that by school year 1997-98 the Faculty Handbook policy and the application forms for tenure and promotion will have been made clear and consistent. We further urge the faculty personnel committees and administration of Tennessee State University to fully consider those people in their fifth years for tenure, without prejudice due to the fact of their fifth year applications, and that their applications be considered on the same basis as other applications for tenure.

SIGNATURE                              NAME (PLEASE PRINT)

*Jane Allen McKinney*                  JANEALLEN MCKINNY
                                       Nina Lucciacc
Olist T. Roberts                       Olist T. Roberts

#People in their fifth year of tenure-track employment at Tennessee State University (including any credit for prior service) will be termed "people in their fifth year" henceforth.

113

January, 1997                    Exhibit 20-3

*Given that the statements in the 1989 Faculty Handbook (sections C and E on tenure) do not prohibit a person's applying for tenure during their fifth year of tenure-track employment at Tennessee State University (including any credit for prior service)#

*Given that the University application circulated first to prospective applicants this school year indicated that one could apply in one's fifth year of tenure-track employment at TSU (including any credit for prior service);

*Given that 5 people were allowed to apply for tenure in their fifth years of tenure-track employment between 1991 and 1994 and that they were awarded tenure;

*And, given that TSU's administration did not allow for proper faculty discussion, consent and notice before the policy was changed to an insistence on sixth-year tenure applications;

We the undersigned members of the faculty urge the administration of Tennessee State University to open the application-for-tenure process immediately to people in their fifth year of service for this year, with the understanding that by school year 1997-98 the Faculty Handbook policy and the application forms for tenure and promotion will have been made clear and consistent. We further urge the faculty personnel committees and administration of Tennessee State University to fully consider those people in their fifth years for tenure, without prejudice due to the fact of their fifth year applications, and that their applications be considered on the same basis as other applications for tenure.

SIGNATURE                          NAME (PLEASE PRINT)

_[signature]_                      _Kathleen Bryant_

_[signature]_                      DoRis Daniels

#People in their fifth year of tenure-track employment at Tennessee State University (including any credit for prior service) will be termed "people in their fifth year" henceforth.

114

January, 1997

    *Given that the statements in the 1989 Faculty Handbook (sections C and E on tenure) do not prohibit a person's applying for tenure during their fifth year of tenure-track employment at Tennessee State University (including any credit for prior service)#

    *Given that the University application circulated first to prospective applicants this school year indicated that one could apply in one's fifth year of tenure-track employment at TSU (including any credit for prior service);

    *Given that 5 people were allowed to apply for tenure in their fifth years of tenure-track employment between 1991 and 1994 and that they were awarded tenure;

    *And, given that TSU's administration did not allow for proper faculty discussion, consent and notice before the policy was changed to an insistence on sixth-year tenure applications;

We the undersigned members of the faculty urge the administration of Tennessee State University to open the application-for-tenure process immediately to people in their fifth year of service for this year, with the understanding that by school year 1997-98 the Faculty Handbook policy and the application forms for tenure and promotion will have been made clear and consistent. We further urge the faculty personnel committees and administration of Tennessee State University to fully consider those people in their fifth years for tenure, without prejudice due to the fact of their fifth year applications, and that their applications be considered on the same basis as other applications for tenure.

SIGNATURE

*Nipha P. Kumar.*
*Edward I. Isibor*
*James Head*
*Wayne L. Billings*

NAME (PLEASE PRINT)

NIPHA P. KUMAR.

EDWARD I. ISIBOR
James Head

Wayne L. BILLINGS

#People in their fifth year of tenure-track employment at Tennessee State University (including any credit for prior service) will be termed "people in their fifth year" henceforth.

January, 1997

*Given that the statements in the 1989 Faculty Handbook (sections C and E on tenure) do not prohibit a person's applying for tenure during their fifth year of tenure-track employment at Tennessee State University (including any credit for prior service)#

*Given that the University application circulated first to prospective applicants this school year indicated that one could apply in one's fifth year of tenure-track employment at TSU (including any credit for prior service);

*Given that 5 people were allowed to apply for tenure in their fifth years of tenure-track employment between 1991 and 1994 and that they were awarded tenure;

*And, given that TSU's administration did not allow for proper faculty discussion, consent and notice before the policy was changed to an insistence on sixth-year tenure applications;

We the undersigned members of the faculty urge the administration of Tennessee State University to open the application-for-tenure process immediately to people in their fifth year of service for this year, with the understanding that by school year 1997-98 the Faculty Handbook policy and the application forms for tenure and promotion will have been made clear and consistent. We further urge the faculty personnel committees and administration of Tennessee State University to fully consider those people in their fifth years for tenure, without prejudice due to the fact of their fifth year applications, and that their applications be considered on the same basis as other applications for tenure.

SIGNATURE                              NAME (PLEASE PRINT)

_Ann Marie Rizzo_                      Ann. Marie Rizzo, (Inst. of Govt.,

To the above reasons, only. (Apart from the administration/competence, to one should be advised to apply until AFTEC completion success!!!)                              Asst.state prof

#People in their fifth year of tenure-track employment at Tennessee State University (including any credit for prior service) will be termed "people in their fifth year" henceforth.

January, 1997

*Given that the statements in the 1989 Faculty Handbook (sections C and E on tenure) do not prohibit a person's applying for tenure during their fifth year of tenure-track employment at Tennessee State University (including any credit for prior service)#

*Given that the University application circulated first to prospective applicants this school year indicated that one could apply in one's fifth year of tenure-track employment at TSU (including any credit for prior service);

*Given that 5 people were allowed to apply for tenure in their fifth years of tenure-track employment between 1991 and 1994 and that they were awarded tenure;

*And, given that TSU's administration did not allow for proper faculty discussion, consent and notice before the policy was changed to an insistence on sixth-year tenure applications;

We the undersigned members of the faculty urge the administration of Tennessee State University to open the application-for-tenure process immediately to people in their fifth year of service for this year, with the understanding that by school year 1997-98 the Faculty Handbook policy and the application forms for tenure and promotion will have been made clear and consistent. We further urge the faculty personnel committees and administration of Tennessee State University to fully consider those people in their fifth years for tenure, without prejudice due to the fact of their fifth year applications, and that their applications be considered on the same basis as other applications for tenure.

| SIGNATURE | NAME (PLEASE PRINT) |
|---|---|
| | WIN MYINT |
| | RONALD ATKINSON |
| | ARNOLD DEAN |
| | KOFI SEMENYA |
| | CHARLES A. WILLIAMS |
| | Jeanetta JACKSON |
| | ELIZABETH WAYT |

#People in their fifth year of tenure-track employment at Tennessee State University (including any credit for prior service) will be termed "people in their fifth year" henceforth.

*Given that the statements in the 1989 Faculty Handbook (sections C and E on tenure) do not prohibit a person's applying for tenure during their fifth year of tenure-track employment at Tennessee State University (including any credit for prior service)#

*Given that the University application circulated first to prospective applicants this school year indicated that one could apply in one's fifth year of tenure-track employment at TSU (including any credit for prior service);

*Given that 5 people were allowed to apply for tenure in their fifth years of tenure-track employment between 1991 and 1994 and that they were awarded tenure;

*And, given that TSU's administration did not allow for proper faculty discussion, consent and notice before the policy was changed to an insistence on sixth-year tenure applications;

We the undersigned members of the faculty urge the administration of Tennessee State University to open the application-for-tenure process immediately to people in their fifth year of service for this year, with the understanding that by school year 1997-98 the Faculty Handbook policy and the application forms for tenure and promotion will have been made clear and consistent. We further urge the faculty personnel committees and administration of Tennessee State University to fully consider those people in their fifth years for tenure, without prejudice due to the fact of their fifth year applications, and that their applications be considered on the same basis as other applications for tenure.

| SIGNATURE | NAME (PLEASE PRINT) |
|---|---|
| *Philip J. Ollapally* | PHILIP J. OLLAPALLY |
| *James F. Holloway* | James F. Holloway |
| *A. Gamshadzai* | AMIRI GAMSHADZAHi |
| *A. Saraylo* | Ayoub Saraylo |
| *Willard A. Smith* | Willard Smith |
| *[signature]* | ; INGFU JENQ |

#People in their fifth year of tenure-track employment at Tennessee State University (including any credit for prior service) will be termed "people in their fifth year" henceforth.

January, 1997                     Exhibit 20-9

\*Given that the statements in the 1989 Faculty Handbook (sections C and E on tenure) do not prohibit a person's applying for tenure during their fifth year of tenure-track employment at Tennessee State University (including any credit for prior service)#

\*Given that the University application circulated first to prospective applicants this school year indicated that one could apply in one's fifth year of tenure-track employment at TSU (including any credit for prior service);

\*Given that 5 people were allowed to apply for tenure in their fifth years of tenure-track employment between 1991 and 1994 and that they were awarded tenure;

\*And, given that TSU's administration did not allow for proper faculty discussion, consent and notice before the policy was changed to an insistence on sixth-year tenure applications;

We the undersigned members of the faculty urge the administration of Tennessee State University to open the application-for-tenure process immediately to people in their fifth year of service for this year, with the understanding that by school year 1997-98 the Faculty Handbook policy and the application forms for tenure and promotion will have been made clear and consistent. We further urge the faculty personnel committees and administration of Tennessee State University to fully consider those people in their fifth years for tenure, without prejudice due to the fact of their fifth year applications, and that their applications be considered on the same basis as other applications for tenure.

| SIGNATURE | NAME (PLEASE PRINT) |
|---|---|
| *[signature]* | Anthony J. Blasi |
| *[signature]* | LYNN E. DWYER |
| *[signature]* | ROBERT S. CASTOR |
| *[signature]* | HORTENSE C. Kilpatrick |
| *[signature]* | James Montmarquet |
| *[signature]* | David Broad |
| *[signature]* | Q. M. Tso |
| | S. Kyle D. Riggs |
| *[signature]* | Barbara O'Connor |

#People in their fifth year of tenure-track employment at Tennessee State University (including any credit for prior service) will be termed "people in their fifth year" henceforth.

Exhibit 21a

# CHARGE OF DISCRIMINATION

| | AGENCY | CHARGE NUMBER |
|---|---|---|
| This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form. | ☐ FEPA  ☒ EEOC | 253970603 |

TENNESSEE HUMAN RIGHTS COMMISSION _____ and EEOC
*State or local Agency, if any*

| NAME *(Indicate Mr., Ms., Mrs.)* | HOME TELEPHONE *(Include Area Code)* |
|---|---|
| Dr. Uthaiwan Wong-Opasi | (615) 646-6426 |

| STREET ADDRESS          CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|
| 7033 Somerset Farms Drive, Nashville, TN 37221 | 08/28/57 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME *(If more than one list below.)*

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE *(Include Area Code)* |
|---|---|---|
| Tennessee State University | Cat D (501 +) | (615) 963-7517 |

| STREET ADDRESS          CITY, STATE AND ZIP CODE | COUNTY |
|---|---|
| 3500 John A. Merritt Blvd. Nashville, TN 37203 | 037 |

| NAME | TELEPHONE NUMBER *(Include Area Code)* |
|---|---|
| | |

| STREET ADDRESS          CITY, STATE AND ZIP CODE | COUNTY |
|---|---|
| | |

| CAUSE OF DISCRIMINATION BASED ON *(Check appropriate box(es))* | DATE DISCRIMINATION TOOK PLACE |
|---|---|
| ☒ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☒ NATIONAL ORIGIN  ☐ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ OTHER *(Specify)* | EARLIEST  LATEST  08/01/92   01/13/97  ☐ CONTINUING ACTION |

THE PARTICULARS ARE *(If additional space is needed, attach extra sheet(s)):*

I. On October 4, 1996, I was discriminated against from receiving tenure and promotion.

II. On January 13, 1997, I was told by the Dean of Arts and Sciences (Dr. Bobby Lovett) that my employment was terminated and that a letter would follow, effective May 10.

III. Respondent is a public institution of higher education and employs over five hundred employees. I believe I have been discriminated against because of my race, sex/female and national origin/Thai in violation of Title VII of the Civil Rights Act of 1964, as amended.

*Asian*    *possibly*

*[Round stamp:]* EQUAL EMPLOYMENT OPPORTUNITY COMMISSION  NASHVILLE, TN  RECEIVED FEB 26 1997

| ☒ I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - *(When necessary for State and Local Requirements)* |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct. | SIGNATURE OF COMPLAINANT  SAME |
| Feb. 26, 1997    *[signature]* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(Day, month, and year)* |
| Date       Charging Party *(Signature)* | |

EEOC FORM 5 (Rev. 06/92)

[2]

# AMENDED CHARGE OF DISCRIMINATION (EEOC CHARGE NUMBER 253970603)

| Federal Agency: | EQUAL EMPLOYMENT OPPORTUNITY COMMISSION |
|---|---|
| State Agency: | TENNESSEE HUMAN RIGHTS COMMISSION |

| NAME | HOME TELEPHONE |
|---|---|
| **Dr. Uthaiwan Wong-opasi** | **(615) 646-6426** |

| STREET ADDRESS | DATE OF BIRTH |
|---|---|
| 7033 Somerset Farms Drive, Nashville, TN 37221 | 08/28/57 |

**NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME.**

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE |
|---|---|---|
| TENNESSEE STATE UNIVERSITY | Cat D (501 +) | (615) 963-7401 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 3500 John A. Merritt Blvd., | Nashville, TN 37209 | 037 |

**CAUSE OF DISCRIMINATION BASED ON**

| RACE SEX NATIONAL ORIGIN RATALIATION | DATE DISCRIMINATION TOOK PLACE |
|---|---|
| | EARLIEST 06/92 — LATEST 01/13/97 |
| | CONTINUING ACTION |

**THE PARTICULARS ARE**

Items I - III below are more consistent with the claims made on the original complaint questionnaire form filed with the EEOC in Nashville.

I. I was discriminated against from receiving **tenure** when I applied for tenure on October 4, 1996, by the President (Dr. James A. Hefner), the Vice President for Academic Affairs (Dr. Augustus Bankhead), and the Dean of Arts and Sciences (Dr. Bobby Lovett).

II. I was discriminated against also from receiving **promotion** when I also applied for promotion on the same day and by the same authority as in I above.

III. I was issued a **verbal termination of my employment** from the Dean of Arts and Sciences on January 13, 1997, to be followed by a letter, effective May 10.

IV. My immediate supervisor is the Head of Department of Languages, Literature, and Philosophy (Dr. Gloria Johnson).

V. Respondent is a public institution of higher education and employs over five hundred employees. I believe I have been discriminated against because of my race/Asian, sex/female, national origin/Thai, and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended.

| | |
|---|---|
| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the Agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY (When necessary for State and Local Requirements) |
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct. | SIGNATURE OF COMPLAINANT |
| April 11, 1997 | SUBSCRIBED AND SWORN TO BEFORE ME THIS |
| Date       Charging Party *(Signature)* | DATE (Day, month, and year) |

EXHIBIT 27 e

## SECOND AMENDED CHARGE OF DISCRIMINATION (EEOC CHARGE NUMBER 253970603)

Federal Agency:   EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
State Agency:   TENNESSEE HUMAN RIGHTS COMMISSION

| NAME | HOME TELEPHONE |
|---|---|
| Dr. Uthaiwan Wong-opasi | (615) 646-6426 |

| STREET ADDRESS | DATE OF BIRTH |
|---|---|
| 7033 Somerset Farms Drive, Nashville, TN 37221 | 08/28/57 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP
COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME.

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE |
|---|---|---|
| TENNESSEE STATE UNIVERSITY | Cat D (501 +) | (615) 963-7401 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 3500 John A. Merritt Blvd., | Nashville, TN 37209 | 037 |

| CAUSE OF DISCRIMINATION BASED ON | DATE DISCRIMINATION TOOK PLACE |
|---|---|
| RACE   SEX   NATIONAL ORIGIN RATALIATION | EARLIEST   LATEST 06/92   05/26/97 CONTINUING ACTION |

THE PARTICULARS ARE

Pursuant to my (First Amended Charge of Discrimination, dated April 11, 1997, Tennessee State University administrators continued to engage in unlawful acts of retaliation and discrimination.

I.   I was harassed with violations of administrative directives by Head of Department of Languages, Literature, and Philosophy (Dr. Gloria Johnson), the Dean of Arts and Sciences (Dr. Bobby Lovett), and the Vice President for Academic Affairs (Dr. Augustus Bankhead).

II.   I was denied an official recognition of "Coordinator of Spanish" despite the services rendered for the past five years since the start of my employment at Tennessee State University.

III.   I was given a very negative and damaging evaluation (60 pts.) by Dr. Johnson on my annual faculty evaluation on April 30, 1997. Each year, I received a 90+ score on a 100 basis.

IV.   I believe I was discriminated against because of my religion (Buddhism) in addition to my race (Asian), sex (female), and national origin (Thai) as originally filed.

V.   Respondent is a public institution of higher education and employs over five hundred employees. I believe I have been discriminated against because of my race/Asian, sex/female, national origin/Thai, and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended.

| | |
|---|---|
| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the Agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY (When necessary for State and Local Requirements) I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct. | SIGNATURE OF COMPLAINANT RECEIVED |
| July 28, 1997   _signature_ | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Day, month, and year)   JUL 3 0 1997 |
| Date   Charging Party (Signature) | |

NASHVILLE, TN

U.S. Department of Justice

Civil Rights Division

Exhibit 22

*Special Counsel for Immigration Related*
*Unfair Employment Practices*
*P.O. Box 27728*
*Washington, DC 20038-7728*

May 29, 1997

CERTIFIED MAIL

Uthaiwan Wong-opasi, Ph.D.
7033 Somerset Farms Drive
Nashville, TN 37209

        Re:  Charge Filed Against Tenesse State University
             Charge Number 71-6

Dear Ms. Wong-opasi:

     On May 19, 1997, the Office of Special Counsel accepted as
complete your discrimination charge against Tenesse State
University alleging a violation of 8 U.S.C. § 1324b.

     We will begin an investigation of your charge in order to
determine if there is reasonable cause to believe that there has
been a violation of the law.  By law, this Office initially has
120 days, until September 16, 1997, to conduct this investigation
and file an exclusive complaint.

     If it is established that the law has been violated, our
Office may try to negotiate a Settlement Agreement in order to
resolve the violation.  If a negotiated resolution is not
possible, a complaint could be filed before an Administrative Law
Judge designated by the Office of the Chief Administrative
Hearing Officer.

     At the conclusion of the 120-day period mentioned above, if
the investigation of this charge has not been completed or it is
determined that a complaint should not be filed, you will be
notified of the charge's dismissal or of the continuation of the
investigation.  You may then file your own complaint within 90
days following your receipt of that determination letter.  The
Special Counsel may seek to intervene in any proceedings that may
result.  Also, the Special Counsel may still file a complaint at
any time before the expiration of the 90-day period.

Please include your charge number (71-6) in any correspondence with this Office. In addition, it is your responsibility to notify us of any changes in your address or telephone number. You may direct any questions about your charge or this letter to me at 1-800-255-7688 (toll-free) or (202) 616-5543 (direct line).

Sincerely,

Juan Maldonado
Senior Attorney

- 2 -

125



Exhibit 23

**College of Arts and Sciences**
Tennessee State University
3500 John A. Merritt Blvd.
Nashville, TN 37209-1561

Department of Languages, Literature,
and Philosophy

RECEIVED May 8, 1997

Dr. Charles Smith, Chancellor
Tennessee Board of Regents
1415 Murfreesboro Road
Nashville, TN 37217

MAY 1 3 1997

Tennessee Board of Regents
Office of Chancellor

Dear Dr. Smith:

I am writing to request your protection from unlawful employment terminations and from further harassments as well as your intervention in rectifying mismanagement by Tennessee State University Administration.

I am currently an Assistant Professor of Spanish in the Dept. of Languages, Literature, and Philosophy. This year is my fifth year of service at TSU and I was eligible for tenure and/or promotion application.

On November 14, 1996, Dr. Bobby L. Lovett, Dean of Arts and Sciences, removed my application from the application process despite the fact that my application had already been approved for both tenure and promotion by the Departmental Ranks and Tenure Committee. Earlier, I asked Dr. Lovett to consider me for application by exception when he had insisted on a full five-year completion prior to my application. He then informed me that first of all, he would not be able to look at my tenure application. Second, he only considered faculty who had attracted $1.8 million in grants or those who had written one book and eight articles per year to qualify for exceptions to the requisite five years. Third, he threatened me that if I applied this year, I would not receive tenure and that I would not be able to apply again next year. On my request to apply for promotion alone, he told me that non-tenured faculty could not apply for promotion separately without simultaneously applying for both tenure and promotion.

On January 2, 1997, at the Faculty Institute, Dr. Augustus Bankhead, Vice President for Academic Affairs, announced that there had been no change in the tenure policy, i.e. the appropriate year for tenure application was in the sixth year, and that there had been no exceptions to the sixth year-rule during the two preceding years. Notwithstanding, Dr. Bankhead had claimed earlier that there had **not been a single exception to the sixth-year rule.** Contrary to his claim, however, at the Faculty Senate November meeting, I showed **a list of Recommendations for Tenure and Promotion from 1990-1995** obtained from the Tennessee Board of Regents which **showed faculty receiving tenure and/or promotion in their fifth year or prior to the fifth year with and/or without credits for prior service. The same list was sent to Dr. James A. Hefner, TSU President,** by the board as well. Moreover, Dr. Bankhead claimed that no faculty had ever been turned down from receiving tenure at TSU. Finally, he asked for compliance with the sixth-year rule. I then pleaded to Dr. Bankhead to allow faculty in the fifth year who were caught in between this year while the policy was being changed to the sixth-year rule to apply in order to protect the University from the legality issue being challenged in court or elsewhere. Dr. Bankhead declined my request in the presence of Dr. James A. Hefner at the Faculty Institute. Dr. Bankhead simply referred the faculty to appeals.

126

According to *TSU Faculty Handbook*, the appeal process is for faculty who received a negative recommendation for tenure and/or promotion. This is inapplicable to my case because I did receive a positive recommendation. Moreover, the dean's removal of my application and with approval of the vice president simply eradicated my faith in any internal appeals. The President, in addition, did not respond to my letter requesting an extension of the application deadline to all fifth-year faculty.

On January 13, 1997, I was issued a verbal termination by Dr. Bobby Lovett to be followed by a letter of termination, effective May 10. To the question, "On what ground?" Dr. Lovett replied, "I do not have to give you a reason." He added, "Even if I give a reason, you will not see it."

I reported the incident to the Faculty Senate meeting on January 17. The senate decided that, "There appeared to be a linkage between the verbal termination and Dr. Wong-opasi's speaking up at the Faculty Institute." The senate also advised me to seek my own legal counsel for protection.

Many more harassments ensued. On February 14, Dr. Lovett harassed me that my pay for the whole day would be cut for failure to report to my office during my office hour. I replied that my office hour was for only one hour on that day and that I was running around on campus. I further added that when I was not paid for substituting for other instructors' classes during their absences, I did not see how he could cut down my pay. Because of these harassments, I decided to file a complaint with the Equal Employment Opportunity Commission in an effort to gain legal protection from firing and further harassments.

However, the EEOC filing did not stop TSU administration from harassing me further. I was alleged "insubordinate" through a series of organized set-ups by TSU administration. My performance evaluations for the past four years of 90+ went down to 60 due to a "lack of interpersonal skills." I viewed all of these harassments as the price the administration wanted me to pay for having stood up for my rights and the rights of all faculty. Throughout my employment at TSU, I have maintained an impeccable record of performance:--being nominated for Teacher of the Year Award in 1995-96, winning three grants from the National Endowment for the Humanities three years in a row, two grants for the past two summers, including a Fulbright-Hays grant and another grant from the U.S. Dept. of Education. I was also recognized as "Outstanding University Professor or Researcher with an International Acclaim" by the U.S. Immigration and Naturalization Service plus awards from the International Biographical Centre in Cambridge, England and the American Biographical Institute, and many more. Regarding service, I served as Coordinator of the Spanish Program, Academic Advisor to Spanish majors and minors, Faculty Advisor to the Spanish Club. In short, I have been the sole person responsible for the Spanish Program. Each year, I served on two departmental committees and three college-level committees. I am also Chairperson for Global Awareness, a program which enjoyed the highest rating and visibility on campus and in the Nashville community. (Please refer to attached copies for details.)

I believe I have been unfairly treated because of my race, national origin, and sex. I have been discriminated against from receiving the rank which I was entitled to at the time of hiring and have been denied promotion since. The purpose of my writing to you is to seek justice for myself and my colleagues. Tennessee State University has had a long history of racial discrimination. This includes recent terminations through restructurings and this year's illegal handling of tenure and promotion applications. Please call me at (O) 963-5739 or (H) 646-6426 if I can answer any questions you may have. Thank you for your intervention.

Sincerely,

Dr. Uthaiwan Wong-opasi

attachment and cc:    Faculty Senate    AAUP-TSU Chapter    AAUP-Regional Chapter



**Office of**
**Vice President for Academic Affairs**
Tennessee State University
3500 John A. Merritt Blvd.
Nashville, TN 37209-1561

Exhibit 24

April 7, 1998

Dr. Uthaiwan Wong-Opasi
Department of Languages,
   Literature and Philosophy

Dear Dr. Wong-Opasi

I indicated I would share with you illustrations of the concerns gathered from your colleagues, your department head and your dean regarding their decisions to not recommend you for tenure. I said I would also express concerns that I have.

First, I urge you to review letters in your portfolio from your colleagues and administrators in the College of Arts and Sciences.

Your Department Head, Dr. Gloria Johnson and I have had extended discussion regarding your apparent unwillingness to work harmoniously with colleagues and within regulations which apply to all faculty in the department.

She indicates that it has been necessary to insist that you post office hours consistent with College of Arts and Sciences requirements.

You insisted, despite being alerted, that your application is for promotion to professor from assistant professor. This insistence, for me, reflects an unwillingness to be governed by the same regulations as your colleagues.

You have insisted on including information from the 1982-83 edition of the Faculty Handbook in your portfolio despite being informed that the 1989 issued of the Handbook is in effect. You charged that the Tennessee Board of Regents had not approved the 1989 Faculty Handbook. When you wrote TBR making this charge, the response you received from TBR is that it does not approve faculty handbooks. I had already stated this to you.

Dr. Johnson stated that it was necessary for a colleague to ask you to leave his classroom and not interfere with the instructional process.

You insisted on designating yourself as coordinator for foreign languages, despite being told

128



Dr. Uthaiwan Wong-Opasi
Page 2
April 7, 1998

repeatedly that no such title exists and that you had been assigned no duties for coordination. This statement was only removed from your credentials and a grant application after I refused to approve the application with that embellishment.

Without authority, you contacted an applicant for a position in the Department of Languages, Literature, and Philosophy.

You have asked if other persons were not recommended for tenure. I have not responded to this question as I do not know its relevancy to your application.

These are illustrations of concerns. Dr. Johnson, Dr. Lovett, and I have attempted, earnestly, to work with you through the steady stream of letters and certified letters and questioning of regulations. The most serious, factor, however, is that from your day to day relations with your colleagues over a period of several years, they chose to not give a positive recommendation that you continue as a faculty member in the Department.

While your contributions are genuinely appreciated, it continues to be our conclusion that we will not reverse our recommendation on your tenure application.

Sincerely

Augustus Bankhead, Vice President
for Academic Affairs

April 18, 1998                Exhibit 25

Dr. Augustus Bankhead
Vice-President for Academic Affairs
Tennessee State University
3500 John Merritt Blvd.
Nashville, TN  37209

Dr. Bankhead:

   I wish to write in support of Professor Uthaiwan Wong-Opasi's efforts to gain
tenure at the University.  I can speak as an individual who was directly supervised by her.
I was hired by Dr. Johnson, the department head, to teach introductory-level Spanish
classes during the fall semester of 1995.  At the time I was studying for my PhD Exams in
Spanish and Portuguese at Vanderbilt University.  Dr. Johnson informed me at the time of
my hire that I would work under Dr. Wong-Opasi, the director of the Spanish program.

   During the course of the semester I was given direction and advice for my course
by Dr. Wong-Opasi.  I consulted with her occasionally about various course-related items
and was observed and evaluated in the classroom by her.  She always gave me advance
notice of the classroom evaluations, although I had told her that such notice was not
necessary.  After each evaluation we reviewed her report in her office.  Her feedback and
criticisms were always helpful and constructive.

   I can say that in my experience working under Dr. Wong-Opasi, I found her
conduct, and treatment of her colleagues and students to exhibit a high degree of
professionalism at all times.  I can only speak in a positive manner about my time spent at
T.S.U. working with her, and would recommend her for the promotion under
consideration.  If I can answer any further questions about her I can be reached at 847 So.
9th, Salina, KS  67401.  My telephone number is  (785)827-9271.

                          With best regards,

                          *Alan Jilka*
                          Alan Jilka

130

Exhibit 26



**Office of
Vice President for Academic Affairs**
Tennessee State University
3500 John A. Merritt Blvd.
Nashville, TN 37209-1561

April 17, 1998

Dr. Uthaiwan Wong-opasi
Languages, Literature and Philosophy

Dear Dr. Wong-opasi

This letter is to inform you that the Tenure and Promotions Appeals Committee has submitted to me the results of its review of your application for tenure. The Committee's consideration of your appeal resulted in a finding of no change in recommendation. My review of your application did not result in a change of my initial recommendation.

This recommendation and all materials have been forwarded to Dr. James A. Hefner.

Sincerely

Augustus Bankhead, Vice President
    for Academic Affairs

c: Dr. James A. Hefner

131



RECEIVED

APR 2 1 1998

PRESIDENT'S OFFICE

**College of Arts and Sciences**
Tennessee State University
3500 John A. Merritt Blvd.
Nashville, TN 37209-1561

Exhibit 27

Department of Languages, Literature,
and Philosophy

April 21, 1998

Dr. James A. Hefner, President
Tennessee State University

Dear Dr. Hefner:

I am writing to inform you that I am compelled to appeal to you for a positive recommendation for both my tenure and promotion application.

Please be advised also that Dr. Bankhead was aware of my preparation to submit additional information to the Tenure and Promotion Appeals Committee. **However, he failed to provide me with requested information. Moreover, at no point in time did he give me a timeline for appeals or for the entire remaining process now that the original timeline had been off. He also surprised me by sending Ms. Gamble to hand-deliver his April 17, 1998 letter to me in my office today at around 3:10 p.m. He informed me in the said letter that the appeals committee found no change in recommendation. This was illogical because I was not given a time alert for me to submit additional material.**

**Submitted herewith is my Tenure and Promotion Appeal Packet for your reconsideration. A letter of support from Mr. Alan Jilka is being mailed directly to Dr. Bankhead. You may wish to arrange for him to transfer it to you. Thank you.**

Sincerely,

Uthaiwan Wong-opasi, Ph.D.

Attachments:     Dr. Bankhead's April 17 letter and
                 My tenure and promotion appeal packet

132



Exhibt 28

**Office of the President**
Tennessee State University
3500 John A. Merritt Blvd.
Nashville, TN 37209-1561

May 13, 1998

Dr. Uthaiwan Wong-opasi
7033 Somerset Farms Drive
Nashville, TN 37221

Dear Dr. Wong-opasi:

This is to notify you that your tenure-track appointment at this institution will not be renewed following your completion of service for the period ending May, 1999.

Sincerely,

James A. Hefner
President

133.

AN EQUAL OPPORTUNITY/AFFIRMATIVE ACTION EMPLOYER M/F



*Exhibit 29*

**College of Arts and Sciences**
Tennessee State University
3500 John A. Merritt Blvd.
Nashville, TN 37209-1561

# URGENT

Department of Languages, Literature,
and Philosophy

## CERTIFIED MAIL WITH RETURN RECEIPT REQUESTED

### Amendment to Dr. Wong-opasi's
### Tenure and Promotion Appeal
### to The Tennessee Board of Regents
### on May 7, 1998

May 15, 1998

Dr. Charles E. Smith, Chancellor
Tennessee Board of Regents
1415 Murfreesboro Rd., Ste. 350
Nashville, TN 37217-2833
(P) 366-4400; (**F**) **366-4464**

Dear Dr. Smith:

As an amendment to my tenure and promotion appeal to the Board, I am forwarding a copy of **TSU President's letter of termination of my employment, effective May 1999.**

**Please be advised that I was deprived of my rights, including my right of appeal at the University level. I was <u>never</u> <u>truly</u> <u>granted</u> a <u>right of appeal</u> because TSU Administration employed delay and obstruction tactics during my appeal process. More importantly, my employment was terminated because of unlawful employment discrimination and retaliation on my protected right of speech and academic freedom.**

**Please send me your response <u>via certified mail to my home address only</u> at 7033 Somerset Farms Drive, Nashville, TN 37221, <u>by May 18, 1998</u>.**

Thank you.

Sincerely,

Uthaiwan Wong-opasi, Ph.D.

Attachments:

Dr. Wong-opasi's employment termination letter from Dr. James A. Hefner, dated May 13, 1998

134

January, 1997

*Given that the statements in the 1989 Faculty Handbook (sections C and E on tenure) do not prohibit a person's applying for tenure during their fifth year of tenure-track employment at Tennessee State University (including any credit for prior service)#

*Given that the University application circulated first to prospective applicants this school year indicated that one could apply in one's fifth year of tenure-track employment at TSU (including any credit for prior service);

*Given that 5 people were allowed to apply for tenure in their fifth years of tenure-track employment between 1991 and 1994 and that they were awarded tenure;

*And, given that TSU's administration did not allow for proper faculty discussion, consent and notice before the policy was changed to an insistence on sixth-year tenure applications;

We the undersigned members of the faculty urge the administration of Tennessee State University to open the application-for-tenure process immediately to people in their fifth year of service for this year, with the understanding that by school year 1997-98 the Faculty Handbook policy and the application forms for tenure and promotion will have been made clear and consistent. We further urge the faculty personnel committees and administration of Tennessee State University to fully consider those people in their fifth years for tenure, without prejudice due to the fact of their fifth year applications, and that their applications be considered on the same basis as other applications for tenure.

| SIGNATURE | NAME (PLEASE PRINT) |
|---|---|
| *(signature)* | Raymond Richardson |
| Kenneth Daniels | Kenneth Daniels |
| Patricia G. Hull | Patricia G. Hull |

#People in their fifth year of tenure-track employment at Tennessee State University (including any credit for prior service) will be termed "people in their fifth year" henceforth.

119